# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

---

## CIVIL ACTION NO. 3:04-CV-917-J-32TJC-HTS

---

**JEREMIAH THOMAS, EUGENE ULRATH,
SYLVESTER BUTLER, CURT MASSIE,
KELVIN FRAZIER, REGINALD WILLIAMS,
PAUL ECHOLS, MICHAEL MCKINNEY,
CHARLES MORGAN, ANTONIO WARD,**

**Plaintiffs,**

**vs.**

**JAMES MCDONOUGH and RANDALL BRYANT,**
**each in his official capacity, and MICHAEL RATHMANN,**
**JAMES V. CROSBY, JR., BRADLEY CARTER, GEORGE SAPP,**
**ALLEN CLARK, STACEY GREEN, OSCAR SHIPLEY,**
**each in his individual capacity,**

**Defendants.**

---

## PLAINTIFFS' OMNIBUS RESPONSE IN OPPOSITION TO
## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

---

George E. Schulz, Jr.
Leon Fresco
Holland & Knight LLP
50 North Laura Street, Suite 3900
Jacksonville, Florida 32202
(904) 353-2000
(904) 358-1872 (Fax)

Cassandra Capobianco, Esq
Christopher M. Jones, Esq.
Kristen Cooley Lentz, Esq.
Florida Institutional Legal Services
1010-B NW 8th Avenue
Gainesville, Florida 32601
(352) 375-2494
(352) 271-4366 (Fax)

Randall C. Berg, Esq.
Florida Justice Institute
100 S.E. 2nd Street
Miami, FL 33131
(305) 358-2081
(305) 358-0910(Fax)

*Pro Bono Attorneys for Plaintiffs*

## TABLE OF CONTENTS

**Preliminary Statement**                                                    Page 1

**Statement of Material Facts in Support of Plaintiffs' Eighth Amendment Claims**  Page 5

I.  Jeremiah Thomas's Claims                                                  Page 5

    A.  Background (February 1991 until April 2000)                        Page 5

    B.  Thomas's Treatment at FSP (July 13, 2000 until Aug. 16, 2000)     Page 9

    C.  Thomas's Gassings for which Damages are Sought                    Page 10
       (September 2000)

    D.  Thomas Returns to FSP (June 18, 2003 until July 25, 2003)         Page 14

II.  Curt Massie's Claims                                                     Page 16

    A.  Introduction                                                       Page 16

    B.  Background Information on Curt Massie                              Page 16

    C.  Background Information on Stacey Green                             Page 16

    D.  The Events of October 8, 2000                                      Page 18

III.  Eugene Ulrath's Claims                                                  Page 21

    A.  Introduction                                                       Page 21

    B.  Background Information on Eugene Ulrath                            Page 21

    C.  Background Information on Defendants Oscar Shipley and             Page 21
       Bradley Carter

    D.  The Events of October 8, 2002                                      Page 24

## TABLE OF CONTENTS (CONT'D)

IV. Michael McKinney's Claims                                                      Page 27

    A. Background Information on Michael McKinney                Page 27
       (July 1989 until May 2004)

    B. Background Information on Defendant Michael Rathmann       Page 28

    C. Michael McKinney's Damages Claim (June 2004 until May 2005)  Page 29

V. Claims of Injunctive Relief Plaintiffs                                            Page 31

VI. Background Facts Pertaining to All Plaintiffs' Claims                            Page 32

    A. Introduction                                              Page 32

    B. History of Widespread Prisoner Abuse at FSP               Page 33
       (January 1996 until July 17, 1999)

    C. Aftermath of Frank Valdes's Death (July 18, 1999 until April 2000)  Page 37

    D. Defendant Allen Clark Arrives at FSP in April 2000         Page 42

    E. Concurrently Existing Concerns Regarding the Mental Health
       Status of Inmates at FSP (January 1996 until April 2000)  Page 44

    F. Eighth Amendment Considerations Precluding the Gassing
       of Mentally Ill Inmates                               Page 45

**Procedural History**                                                              Page 48

**Summary Judgment Standard**                                                       Page 48

**Argument**                                                                        Page 49

I. Introduction and Roadmap of Issues to be Discussed                               Page 49

II. Plaintiffs' Record Evidence Establishes that Defendants' Gassings
   were Malicious and Sadistic and Caused Plaintiffs to Sustain
   Physical Injuries                                                   Page 50

**<u>TABLE OF CONTENTS (CONT'D)</u>**

A.  Plaintiffs Have Undoubtedly Suffered Sufficient Physical
Injuries to Maintain their Lawsuit Against Defendants          Page 50

1.  Introduction and Governing Law                             Page 50

2.  Plaintiffs' Physical Injuries Plainly Satisfy the Requirements
of the Eighth Amendment and the PLRA                       Page 52

a.  General Considerations                                  Page 52

b.  Jeremiah Thomas Suffered Sufficient Physical Injury     Page 53

c.  Curt Massie, Eugene Ulrath, and Michael McKinney
Suffered Sufficient Physical Injuries                   Page 53

B.  Defendants Green and Shipley Acted Maliciously and
Sadistically in Gassing Plaintiffs Massie and Ulrath          Page 55

1.  Legal Standard for Eighth Amendment Excessive Force Claims  Page 56

2.  Defendant Green Acted Maliciously and Sadistically in
Gassing Plaintiff Curt Massie without Justification        Page 59

3.  Defendant Shipley Acted Maliciously and Sadistically in
Gassing Plaintiff Eugene Ulrath without Justification      Page 60

C.  Defendants Crosby, Carter, Rathmann, Clark, and Sapp
were Deliberately Indifferent to the Malicious and Sadistic
Use of Force against Plaintiffs Thomas, McKinney,
Massie, and Ulrath                                            Page 61

1.  Legal Standard for Deliberate Indifference Supervisory Liability  Page 61

2.  Defendant Crosby Violated Plaintiffs Thomas's, Ulrath's,
Massie's, and McKinney's Rights                            Page 63

a.  Plaintiffs Generally                                    Page 63

b.  Plaintiff Thomas                                        Page 65

c.  Plaintiff Massie                                        Page 67

d.  Plaintiffs Ulrath and McKinney                          Page 67

iii

## TABLE OF CONTENTS (CONT'D)

      3.  Defendant Clark Violated Plaintiffs Thomas's and Massie's Rights Page 69

          a.  Plaintiffs Generally      Page 69

          b.  Plaintiff Thomas      Page 70

          c.  Plaintiff Massie      Page 71

      4.  Defendant Carter Violated Plaintiff Ulrath's Rights      Page 72

      5.  Defendant Rathmann Violated Plaintiff McKinney's Rights      Page 73

      6.  Defendant Sapp Violated Plaintiffs Thomas's and Massie's Rights  Page 75

III.  None of the Defendants in this Case are Entitled to Qualified Immunity      Page 77

    A.  Introduction      Page 77

    B.  Legal Standard      Page 77

      1.  Constitutional Violation      Page 78

      2.  Clearly Established      Page 79

    C.  Application of Qualified Immunity Law to Plaintiffs' Record
       Evidence Plainly Establishes that None of the Defendants are
       Entitled to Qualified Immunity      Page 79

      1.  Defendants Green and Shipley are not Entitled
         to Qualified Immunity      Page 79

      2.  Defendants Crosby, Clark, Carter, Rathmann, and Sapp
        are not Entitled to Qualified Immunity      Page 80

IV.  Continuing Violations Create Triable Issues for Injunctive Relief      Page 81

    A.  Introduction      Page 81

    B.  Defendants' New Videotaping Procedure Fails to Significantly Reduce
       the Likelihood that Plaintiffs will be Unconstitutionally Gassed      Page 86

    C.  Contrary to Defendants' Assertions, Severely Mentally Ill Inmates at
       FSP Continue to be Gassed with no Safeguards in Place      Page 90

# TABLE OF CONTENTS (CONT'D)

D. Guards at FSP Continue to Lack the Training Required to Prevent the Gassing of Mentally Ill Inmates such as Plaintiffs — Page 93

E. Review of Uses of Chemical Agents at FSP is Ineffective in Preventing Severely Mentally Ill Prisoners from being Gassed — Page 94

F. Asthmatics Continue to be Gassed at FSP — Page 96

G. Defendants Continue to use CS Gas in Confined Spaces at FSP — Page 96

H. Defendants Knowingly Fail to Provide Proper Decontamination Procedures — Page 97

V. Plaintiffs Thomas's, Ulrath's, Butler's, Frazier's, Williams's, and Morgan's Claims are Not Moot — Page 98

A. Applicable Law on Mootness and/or Standing — Page 98

B. Defendants Continue to Frequently Transfer Plaintiffs in-and-out of FSP — Page 99

VI. Plaintiffs Have Exhausted Their Administrative Remedies — Page 102

A. Introduction — Page 102

B. Plaintiffs Have Exhausted their Claims for Injunctive Relief — Page 103

C. Plaintiff Curt Massie Properly Exhausted Administrative Remedies — Page 103

D. Plaintiff Eugene Ulrath Properly Exhausted Administrative Remedies — Page 104

E. Defendant James Crosby's Arguments with Regard to Massie, Ulrath, and McKinney are Meritless — Page 104

F. Plaintiff Jeremiah Thomas Properly Exhausted Administrative Remedies — Page 107

G. Plaintiff Michael McKinney Properly Exhausted Administrative Remedies — Page 118

Conclusion — Page 120

Certificate of Service — Page 120

**PRELIMINARY STATEMENT**

If the Eighth Amendment right to be free from excessive force means anything, it is that mentally ill prisoners should not be gassed with chemical agents when posing no threat to self or others.  At the Florida State Prison in Starke, Florida ("FSP"), severely mentally ill prisoners are routinely gassed as "discipline" for exhibiting manifestations of their mental illnesses.  But, when these same prisoners are transferred to the similarly configured prison across the street, gassing them is prohibited.[1] Every Defendant in this case has either personally gassed inmates maliciously or sadistically, or has created, implemented, or maintained policies permitting gassings of mentally ill inmates for disciplinary purposes rather than as a last resort to prevent injury to staff or inmates.

In their Motions for Summary Judgment, Defendants retreat to the procedural defenses of the Prison Litigation Reform Act and other defenses hoping that their arguments will bring about a dismissal of this case without requiring them to defend the legitimacy of their action, and thereby eliminate any likelihood of reforming this abhorrent practice.  Upon reviewing the record evidence and governing law, the Court should deny Defendants' summary judgment motions, and find that Plaintiffs are entitled to their day in Court to hold Defendants accountable for their actions and to end this unconstitutional practice at FSP.

The Plaintiffs in this case are severely mentally ill inmates in the custody of the Florida Department of Corrections ("FDOC") who have been subjected to unjustified and excessive uses of chemical agents by Defendants while housed at FSP.  At the time chemical agents were used against them, Plaintiffs were housed in FSP's Close Management ("CM")

---

[1] The pictures attached to this response establish that the physical layouts and inmate cells at FSP and Union Correctional Institution (UCI) are almost identical. Compare Ex. 1("FSP Photographs") to Ex. 2 ('UCI Photographs").

units and were classified as having an "S-3" psychiatric grade.  CM is an extremely restricted housing status in which inmates are confined alone in a completely enclosed nine-by-seven foot prison cell with a solid steel door that contains only a small window with a food-flap.[2]

S-3 is the psychiatric classification "assigned routinely to inmates who are determined to need psychotropic medication even if the inmate may be exercising the right to refuse same.[3]  FSP houses over 700 CM inmates who are classified as S-3.[4]  Many S-3 inmates are severely mentally ill and are repeatedly transferred in and out of inpatient care after being gassed with chemical agents at FSP.[5]  Defendants interestingly refer to these individuals as "frequent fliers."[6]

Plaintiffs' claims are expressly limited to "non-spontaneous," or planned uses of chemical agents against inmates in confinement.  A "non-spontaneous" use of chemical agents is force that is used on an inmate who poses no immediate threat either to self or others at the time force is used.  Plaintiffs seek civil damages, declaratory relief, and injunctive relief to remedy two main types of constitutional violations that have occurred in the past, and continue to occur, at FSP: (1) gassings of severely mentally ill inmates who are unable to conform their conduct to avoid being gassed; and (2) malicious and sadistic gassings of inmates in retaliation for angering prison guards.

Plaintiffs' opposition to Defendants' motions relies upon extensive documentary, and photographic evidence; depositions; and affidavits and reports of experts and other witnesses, including Plaintiffs' experts: Chase Riveland, Dr. Kathryn Burns, and Dr. Woodhall

---

[2] *See* Ex. 1.
[3] *See* Ex. 3 (FDOC Mental Health Personnel Orientation Guide) at p. 3, ¶ i.
[4] *See* Ex. 4 (McDonough Responses to Plaintiffs' Interrogatories) at p. 5.
[5] *See* Ex. 5 (Burns Reports and Decl. composite) at p. 5.
[6] *See* Ex. 6 (Crosby Deposition) at p. 200; Ex. 7 (Rathmann Deposition) at p. 68.

Stopford.  Mr. Riveland is a widely accepted expert regarding all aspects of correctional operations, including security, proper use of force, and correctional mental health care.[7]  He has served in leadership positions in correctional systems, including as the Secretary of the Washington Department of Corrections and the Executive Director of the Colorado Department of Corrections and formerly served as president of the American Correctional Association.  Dr. Kathryn Burns, Plaintiffs' correctional mental health expert, is also a leading authority in her field.[8]  She is a psychiatrist who has extensive experience in correctional mental health care, including as the Chief Psychiatrist for the Ohio Department of Rehabilitation and Correction (Ohio's prison system).  And, Dr. Woodhall Stopford is the preeminent clinician and research physician in the field of toxicology and chemical agents.[9]  He currently holds the position of Assistant Clinical Professor of Occupational and Environmental Medicine at the Duke University School of Medicine.[10]

Plaintiffs cite the reports and testimony of these experts to establish three main principles: (1) there is no penological justification for gassing any inmates, especially those who are severely mentally ill and taking psychotropic medications, for yelling or banging on the door of their cell; (2) FDOC's policy of allowing guards to gas mentally ill inmates when they yell or bang on their cell doors creates catastrophic mental health crises for these inmates, requiring their continual transfer in and out of inpatient care and creating a vicious cycle of abuse, violating accepted correctional standards; and (3) because mentally ill

---

[7] *See* Ex. 8 (Riveland Reports and Decl. composite) at pp. 41-60
[8] *See* Ex. 5 at pp. 30-38.
[9] *See* Ex. 9 (Stopford Reports) at pp.74-82.
[10] Both Riveland and Burns were recently accepted as experts by Judge Adams in *Osterback v. McDonough*, a class-action case alleging that conditions of confinement in FDOC's CM units including FSP are unconstitutional.  This Court is familiar with Riveland's qualifications because of his opinions in *Valdes v. Crosby*.

inmates are repeatedly gassed and not provided with proper decontamination methods, they are at a substantial risk of suffering burns, respiratory problems, and other medical ailments after being gassed with chemical agents in confinement.

To assist the Court in tracking Plaintiffs' responses to Defendants' arguments, Plaintiffs provide the following roadmap to their response. First, Plaintiffs will set forth all material facts in support of their Eighth Amendment claims, focusing on those facts that remain in dispute. Plaintiffs will then address why they have presented sufficient material facts to establish that Defendants Shipley and Green's actions should be deemed by this Court to be malicious and sadistic. As part of this analysis, Plaintiffs will additionally establish that they sustained physical injuries that were more than *de minimis*. Next, Plaintiffs will establish that Defendants Crosby, Clark, Carter, Rathmann, and Sapp are liable for the unconstitutional use of force against Plaintiffs because they were deliberately indifferent to the fact that Plaintiffs were being gassed with no penological justification.

Plaintiffs will then explain why no Defendant is entitled to qualified immunity. The law in the Eleventh Circuit was clear that both: (1) guards cannot use force against inmates maliciously and sadistically; and (2) correctional supervisors can bear liability for constitutional violations that their deliberate indifference caused.

Plaintiffs will then discuss why continuing violations at FSP require the Court to enter injunctive relief. Essentially, because severely mentally ill inmates such as Michael McKinney continue to be gassed at FSP, the Court should intervene to require FDOC to implement changes that will minimize the likelihood that Plaintiffs will be unconstitutionally gassed again. Plaintiffs will next explain why the injunctive claims brought by Plaintiffs

who are not currently housed at FSP should not be denied as moot.  Finally, Plaintiffs will establish that they properly exhausted their administrative remedies prior to filing suit.

<div align="center">

**STATEMENT OF MATERIAL FACTS IN SUPPORT OF
PLAINTIFFS' EIGHTH AMENDMENT CLAIMS**

</div>

**I.    Jeremiah Thomas's Claims**

**A. Background (February 1991 until April 2000)**

Jeremiah Thomas's case vividly exemplifies the nature of the problems that exist at FSP.[11]  Thomas is a 35-year-old man with a history of psychological problems.[12]  Since his incarceration in 1991, he has been civilly committed to the Correctional Mental Health Institution ("CMHI") several times,[13] frequently admitted for inpatient mental health treatment, and is currently housed in the inpatient transitional care unit at UCI.[14]  Since as early as 1993, FDOC has documented that Thomas suffers from: 1) Schizoaffective Disorder Bipolar – Manic; 2) Antisocial Personality Disorder with Severe Borderline features; and 3) Asthma.[15]

Rather than summarizing the boxes of FDOC documents detailing Thomas' severe mental illnesses, FDOC provides the following description of Thomas's mental health:

> There is no psychiatric treatment prior to his 1991 incarceration. Two admissions to Correctional Mental Health Institution which occurred for thirteen (13) months in 1991-92 and for seven (7) months in 1993.  Inmate has repeated treatments for mania, behavior control problems, impulse control and substance abuse.  Periodic non-compliance with medication lead to decompensations.  Charlotte Correctional Institution Mental Health 1994,

---

[11] Thomas brings damages claims against Defendants Crosby, Clark and Sapp. Defendant Sapp remains at FDOC, but Crosby and Clark resigned because of federal corruption charges to which they pleaded guilty.  *See* Ex. 10 (Crosby); Ex. 11 (Clark).
[12] *See* Ex. 12 (Composite of Thomas mental health records).
[13] *See* Ex. 13 (Thomas internal movement log).
[14] *See Id.*
[15] *See* Ex. 12; *see also* Ex. 9 at p. 106-116.

<div align="center">5</div>

> *noted auditory hallucinations and impaired thought process*.  Admitted to crisis stabilization unit at Charlotte Correctional Institution 5/17/95.  ***Acutely agitated, eating his feces, pouring urine on his hands, attempted to cut his penis***.  On 9/14/95, he was transferred to Zephyrhills Correctional Institution crisis stabilization unit.  Subject then moved to Union Correctional Institution in the crisis stabilization unit.  ***On 10/1/95, he was discharged to Florida State Prison, where there was a marked increase in agitation and bizarre behavior***.  On 12/8/95, subject was again moved to Union Correctional Institution, crisis stabilization unit from Florida State Prison with persistent agitation, and hearing voices.  On 1/12/96, he was moved to transitional care unit.  Several medications have been used: Lithium, Trilafon, Cogentin, Benadryl.  ***Subject tends to make progress when he's compliant with medication and residing in a sage* [sic] *housing unit.*** [16]

As of January 10, 2000, FDOC also knew that Thomas "ha[d] a long history of mental illness, . .  has been hospitalized several times (CMHI – 3 times, CSU – 3 times, and TCU – twice) . . . [and] ha[d] a history of suicide attempts, with the last one being in 1996."[17]  It is indisputable that Jeremiah Thomas was severely mentally ill in 2000 and Defendants knew it.

Significantly, on January 6, 2000, FSP medical staff declared Thomas *ineligible to be gassed* with chemical agents.  As described in a use of force summary, "Inmate Thomas was causing a disturbance by beating on his cell door and window.  He refused all orders to cease.  ***Chemical agents could not be used due to the inmate being a psych 3***."[18]  As of this date, Defendants knew that medical staff had advised it was improper to use gas on Thomas because he was too mentally ill.  *Defendant George Sapp*, an Assistant Warden at FSP, specifically knew he had improperly ordered Thomas's gassing prior to receiving medical clearance, and had to be told by medical staff to retract his order because Thomas was too sick to be gassed.  The use of force report states that "at approximately 1:12 a.m. Duty

---

[16] *See* Ex. 14 (Thomas mental health record excerpts 1996-2000) (emphasis added).
[17] *Id.*
[18] *See* Ex. 15. (January 6, 2000 use of force report) (emphasis added).

Warden Mr. Sapp was notified by Lieutenant Zook and gave approval for chemical agents."[19] But "[a]t 1:30 am, Mr. Sapp was advised chemical agents could not be used due to inmate Thomas being a psych III patient."[20]   Sapp admitted that it was appropriate to handle Thomas's alleged misbehavior through mental health intervention rather than gassing him.[21]

After this incident, Thomas was transferred to UCI for inpatient mental health care on January 10, 2000.[22]   He was transferred back to FSP on February 3, 2000.[23]   Upon returning to FSP, Thomas was gassed with chemical agents four times in one month, twice simply for yelling in his cell.[24]   Notably, on March 3, 2000, Captain L. O. Kelsay temporarily stopped the violence against Thomas by refusing to gas him for behavior that would typically have prompted a gassing.   As described by Captain Kelsay, "Sergeant G. Anders advised me that Inmate THOMAS, Jeremiah . . . was *creating a disturbance*.   Inmate THOMAS was holding a loud conversation with himself.   He was escorted to the Clinic for evaluation."[25]   In Kelsay's report, he specifically warned his commanding officers:

> *Inmate THOMAS has a real mental problem. <u>Chemical agents effective only during the application.</u> Disciplinary reports have absolutely no effect. Management meals also have proven ineffective.  Inmate THOMAS should be evaluated by the Mental Health.  One Inmate should not be permitted to disrupt an entire wing on a continuous basis*.[26]

---

[19] *See Id*.
[20] *Id*.
[21] *See* Ex. 16 (Sapp deposition July 3, 2007) at pp. 130.
[22] *See* Ex. 13.
[23] *Id*.
[24] *See* Ex. 17 (Composite exhibit of Thomas gassings in February and March 2000).
[25] *See* Ex. 18 (March 3, 2000 incident report) (emphasis added).
[26] *Id*.

Significantly, Captain Kelsay's warning was "noted" by *Defendant Sapp*.[27]   Accordingly, Sapp knew that chemical agents did not affect Thomas's behavior, and could only be used as punishment for behavior that Thomas lacked the capacity to control.

Due to Captain Kelsay's intervention, Thomas was immediately transferred back to UCI.[28]   During the period in which Thomas was at UCI, medical staff repeatedly declared him "not mentally competent" to receive disciplinary reports for yelling and banging on his cell door.[29]   Thomas was transferred back to FSP on April 11, 2000.[30]

On April 13, 2000, Thomas attempted to commit suicide by shredding his towel and trying to hang himself.[31]   According to Thomas's medical records, FSP security staff made an inquiry during this period regarding whether chemical agents could be used against Thomas.[32]   Medical staff wrote that Thomas was "***not cleared for pepper spray due to S grade 3***."[33]   In an example of Defendants' knowing disregard of Thomas's condition, he was disciplined for ripping his towel to hang himself, and was transferred back to UCI on April 17, 2000,[34] where he again attempted suicide, and stated "I feel like hurting myself, I can't take it any more."[35]   Thomas was housed at UCI from April 17, 2000 until July 13, 2000.[36]

---

[27] *Id*
[28] *Id.*
[29] *See* Ex. 19 (Composite FDOC determinations Thomas not competent).
[30] *See* Ex. 13.
[31] *See* Ex. 20 (Thomas April 11, 2000 Daily Record of Segregation).
[32] *See* Ex. 21 (Thomas April 13, 2000 medical records and disciplinary report related to suicide attempt).
[33] *Id.*
[34] *Id.*
[35] *See* Ex. 22 (Thomas May 13, 2000 suicide attempt).
[36] *See* Ex. 13.

**B.      Thomas's Treatment at FSP (July 13, 2000 until August 16, 2000)**

After staying at UCI for three months, Thomas was returned to FSP on July 13, 2000. *Immediately* upon arriving back at FSP, Thomas was gassed at 1:35 A.M.[37]  Guards reported gassing Thomas because he "was screaming profanity at staff refusing all orders to stop screaming and creating a disturbance."[38]  This gassing was not an isolated event; Thomas was gassed eight (8) times during the twenty-one (21) day period between July 20, 2000 and August 3, 2000, sometimes twice in one day, often simply for yelling in his cell.[39]

These uses of force are significant in several respects: (1) they establish that FSP has a known pattern and practice of gassing inmates for behavior that poses no danger -- e.g., being noisy in secure cells -- even if the inmate has just returned from inpatient care; (2) they establish that chemical agents served as no deterrent whatsoever to Thomas's actions (i.e., if he was mentally capable of understanding that he could be gassed for yelling or banging on his cell door, he would have already learned to stop this behavior); (3) they establish Defendants Allen Clark and George Sapp knew this because they ordered Thomas's gassings on these dates, and provided *post hoc* approval of these gassings upon subsequently reviewing the use of force reports;[40] and (4) they establish that, because Clark and Sapp were meeting with Crosby on a daily basis and discussing uses of force at FSP, Crosby also knew of the cycle of violence occurring against Thomas.[41]

---

[37] *See* Ex. 23 (Thomas composite July and August 2000 gassings).
[38] *Id.*
[39] *Id.*
[40] *See* Ex. 24 (Thomas composite detailed reports July and August 2000)
[41] *See* Ex. 25 at 85-87; Ex. 16 at pp. 102-105.

On August 16, 2000, while Thomas was *not in his cell,* he was *not gassed* after refusing to submit to handcuffs and spitting on a guard while in the shower.[42]   Rather than gassing Thomas, a "camera was used to videotape Inmate Thomas" and, thus, "[n]o force was used."[43]   Defendants Sapp and Clark each reviewed this incident report and, as a result, knew that patient techniques of crisis intervention are more effective in remedying Thomas's behavior than gassing him.[44]

### C.      Thomas's Gassings for which Damages are Sought (September 2000)

In light of what has been described above, by September 2000, Crosby, Sapp, and Clark knew that: (1) Thomas was severely mentally ill; (2) medical personnel had refused to permit Thomas's gassing on two separate occasions in 2000 on account of his severe mental illnesses; (3) Captain Kelsay had warned FSP management that gassing Thomas had no effect whatsoever on his behavior; (4) guards nonetheless continued to gas Thomas repeatedly for yelling and banging on his cell door; and (5) non-violent alternatives such as videotaping and referring Thomas to mental health for counseling had worked to remedy Thomas's "disruptive" behavior.   In addition, Crosby had personally received a letter from Jeremiah Thomas's father that expressed concerns about Thomas's mental health and treatment at FSP.[45]   Crosby, however, took no action upon receiving this letter and simply told Thomas's father to voice his concerns somewhere else. [46]

Despite knowing all of this, Crosby, Sapp, and Clark subsequently authorized and approved the gassing of Thomas six times in seven days beginning on September 20, 2000

---

[42] *See* Ex. 26 (August 16, 2000 incident report).
[43] *Id.*
[44] *Id.*
[45] *See* Ex. 27 (October 1, 1998 letter).
[46] *See id*; Ex. 6 at pp. 162-66.

and concluding on September 26, 2000.[47] On September 18, 2000, Sapp appointed Clark as

Duty Warden for the period between September 18, 2000 and September 25, 2000.[48] As

Clark explained, "if I was the duty warden that week, they would have to come to me prior to

-- if they wanted to use force or unless it was a spontaneous use of force."[49] In addition,

during that week, Sapp was responsible for reviewing all uses of chemical agents after the

fact to determine whether any inappropriate actions were taken.[50] According to Sapp, his

review of the reports focused on the following issue:

> [W]hen the shift supervisor gives a final counseling order to that inmate that,
> you know, if you do not stop your behavior I will administer chemical agents
> **he is to wait five minutes between that and the actual application of force.**
> **That is the main one that I would look at**.[51]

Additionally, Sapp testified that, prior to approving Thomas's gassings in September 2000,

he "may have known it at the time" that "Thomas had already been sprayed during the year

2000 13 times while at Florida State Prison."[52]

Nevertheless, on September 20, 2000 at 5:50 PM, Thomas was gassed again for

"yelling out his cell door and beating and banging on his cell door."[53] This gassing was

authorized by Clark and received *post-hoc* approval by Sapp on September 20, 2000.[54] Eight

hours later, at 2:00 AM on September 21, 2000, Thomas was gassed again.[55] This gassing

was again authorized by Clark and received *post-hoc* approval by Sapp on September 25,

---

[47] *See* Ex. 28 (Composite of September 2000 gassings).
[48] *See* Ex. 29 (September 18, 2000 memo).
[49] *See* Ex. 25 at p. 66.
[50] *See* Ex. 16 at pp. 115-130.
[51] *Id.* at pp. 96-99 (emphasis added).
[52] *Id.* at 118-119.
[53] *See* Ex. 30 (Thomas September 20, 2000 use of force report).
[54] *Id.*
[55] *See* Ex. 31 (Thomas September 21, 2000 use of force report).

2000.[56]  On September 23, 2000, Thomas was gassed again, this time with both OC pepper

spray and CN gas.[57]  The use of CN gas on prisoners in confined cells was subsequently

prohibited by FDOC due to reports that it had caused the death of inmates in other prisons.[58]

Nevertheless, as before, this gassing was again authorized by Clark and received *post-hoc*

approval by Sapp on September 25, 2000.[59]

       After guards gassed Thomas three times in four days -- once with CN gas -- it was

obvious that Thomas's behavior was deteriorating.  On September 24, 2000, Thomas was

gassed for "flood[ing] his cell and . . . beating on his cell door yelling at staff."[60]  Again, this

gassing was authorized by Clark and approved *post-hoc* by Sapp on September 25, 2000.[61]

Two irregularities existed in the use of force report that should have alerted Clark and Sapp

to take action to prevent Thomas's further abuse.  First, the use of force report stated that

guards "dispensed (3) Three (1) One Second bursts of MK-46 OC into cell D1109s striking

Inmate Thomas in the back."[62]  But medical staff had reported that "Thomas had chemical

burn [sic] to his right elbow and abdomen."[63]  Second, contrary to Sapp's stated routine, he

approved this use of force despite the fact that the "final warning" was given to Thomas at

1:56 PM and the gas was used merely four minutes later.[64] While perhaps neither of these

facts is significant when considered alone, Clark and Sapp deliberately ignored the fact that

---

[56] *Id.*
[57] *See* Ex. 32 (September 23, 2000 use of force report).
[58] *See* Ex. 33 (FDOC memos regarding discontinuing CN gas).
[59] *See* Ex. 32.
[60] *See* Ex. 34 (Thomas September 24, 2000 use of force report).
[61] *Id.*
[62] *Id.*
[63] *See* Ex. 28 at p. 4; *see also* Ex. 9 at pp. 106, 112-13.
[64] *See* Ex. 34.

Thomas had been gassed four times in five days while use of force reports were indicating that guards were improperly using chemical agents against him.

After Thomas was gassed four times in five days, guards gassed him again on September 25, 2000 with the entire arsenal of chemical agents--OC, CN, and CS.[65]  He was gassed with these agents solely because he was reportedly "loud and disorderly by banging on his cell door and kicking."[66]  Again, Thomas was not given a five minute final warning as required under the rules, and yet, this use of force was again approved by Sapp,[67] which indicates his deliberate indifference to the improper use of force against Thomas.  Thomas was treated for second-degree burns on his arms and abdomen.[68]

Despite having second-degree burns all over his body from having been gassed five times in six days, on September 26, 2000, Thomas was gassed again for "kicking his cell door."[69]  Sapp again approved this use of force, finding that "[n]o inappropriate actions were noted," even though the final warning was given less than five minutes before the gassing occurred.[70]  After this gassing, Thomas was finally taken to the infirmary, where he was again treated for widespread chemical burns.[71]  Thomas was diagnosed as having major second-degree burns, delusions, and disorientation.[72]  Pictures of Thomas's burns are attached to this response.[73]

---

[65] *See* Ex. 35 (Thomas September 25, 2000 use of force report).
[66] *Id.*
[67] *Id.*
[68] *See* Ex. 28 at p. 4; *see also* Ex. 9 at pp. 106, 112-13.
[69] *See* Ex. 36 (Thomas September 26, 2000 use of force report).
[70] *Id.*
[71] *See* Ex. 9 at pp. 106, 112-13.
[72] *Id.*
[73] *See* Ex. 37 (Thomas color photographs).

On September 29, 2000, Thomas was transferred to UCI's inpatient care unit where he remained for almost three years until June 18, 2003.[74]  Thomas has testified that he has never banged on his cell door excessively unless he was attempting to declare a medical or psychiatric emergency.[75]  Yet, he was gassed repeatedly in a manner than would "eat me up on the inside . . . it burn me real bad and it harmed me."[76]

### D.     Thomas Returns to FSP (June 18, 2003 until July 25, 2003)

Even though FDOC knew of the horrific events that Thomas endured at FSP in 2000, Thomas was transferred back to FSP on June 18, 2003.[77]  On July 20, 2003, Thomas was gassed for "creating a minor disturbance on the wing by kicking his cell door, cursing at staff and refusing all orders . . . to cease."[78]  On July 22, 2003, Thomas was gassed with 9 bursts of OC and CS for again reportedly "creating a minor disturbance on the wing by kicking his cell door, cursing staff and refusing all orders . . . to cease."[79]  After being gassed twice in three days, Thomas's mental health significantly deteriorated and prompted a transfer back to UCI on July 25, 2003.[80]  Thomas has remained in an inpatient mental health unit ever since.[81]

In addition to the undisputed second-degree burns Thomas sustained, the psychological harm inflicted by these gassings was catastrophic.  Dr. Olga Infante, a psychologist at UCI who treated Thomas after he was transferred from FSP, testified:

> I just don't know yet where would be a good place for Jeremiah other than the TCU.  This is an inmate that it took me six -- close to six months to stabilize,

---

[74] *See* Ex. 13.
[75] *See* Ex. 38 (Thomas deposition) at p. 43.
[76] *See id.* at p. 80.
[77] *See* Ex. 13.
[78] *See* Ex. 39 (Thomas July 20, 2003 use of force report).
[79] *See* Ex. 40 (Thomas July 22, 2003 use of force report).
[80] *See* Ex. 13.
[81] *Id.*

if not six months, close to it.  I mean he's a rapid cycler.  It seemed forever.
Like he would do well two weeks and then he would decompensate and then
do two weeks okay.  So I hate -- we're being so careful with him as to where
would he go from where we're at.  I hate to see him decompensate, because it
would take forever to bring him back to where he's at today.[82]

Finally, FDOC has known since 1993 that Jeremiah Thomas has asthma.[83]  Despite

this knowledge, guards gassed him 20 times in nine months.[84]   These gassings caused

Thomas to suffer from asthma attacks, which caused him to "gasp for breath and begin

wheezing . . . [and] become dizzy and almost lose consciousness."[85]

 Since arriving at UCI in 2003, Thomas has not been gassed even though he has

yelled in his cell or banged on his door on numerous occasions.[86]  For instance, on November

28, 2003, Thomas was cited for "kicking on his cell door and yelling."[87]  But during this

incident, "restraints were placed on Inmate THOMAS with *no force necessary or used.*"[88]

The same non-violent approaches that UCI uses to resolve Thomas's behavior were and are

available at FSP, but guards and supervisors deliberately chose to gas him instead.

---

[82] *See* Ex. 41 (Infante deposition) at pp. 41-43.
[83] *See* Ex. 14.
[84] *See* Ex. 42 (FDOC September 10, 2007 Supplemental response to Plaintiffs' 8th Request to Produce).
[85] *See* Ex. 9 at p. 109.
[86] *See* Ex. 42.
[87] *See* Ex. 43 (November 28, 2003 incident report).  According to the use of force chart for Thomas provided by
FDOC (Ex. 42), Thomas's behavior has never required resolution through the use of chemical agents at UCI.
[88] *See* Ex. 43.

II.   **Curt Massie's Claims**

A.    **Introduction**

Plaintiff Massie brings a straightforward use of force claim.  Defendant Stacey Green maliciously and sadistically gassed him with OC and CN gas on October 8, 2000 for making a funny face at a nurse who failed to give him his anxiety medication.  Massie also claims that Clark, Sapp, and Crosby were deliberately indifferent to his unconstitutional gassing.

B.    **Background Information on Curt Massie**

Massie is a 48-year-old man who was originally incarcerated in 1996 and was subsequently released in 2006 after filing a meritorious *pro se* petition.[89]  FDOC physicians have classified him as an S-3 inmate diagnosed with: (1) Obsessive Compulsive Disorder; (2) Anxiety Disorder; (3) Paranoid Personality Features (including delusional thought content); and (4) Antisocial Personality Disorder.[90]

C.    **Background Information on Stacey Green**

Defendant Stacey Green began working as a corrections officer at FSP in 1993 and was promoted to sergeant in 1998 by Defendant Crosby.[91]  Because of the *Skrtich* case and warnings given to Crosby by former FSP warden Ron McAndrew, it was well established and documented by October 8, 2000 that Green had a history of inmate abuse.[92]  In *Skrtich,* a case that ultimately settled out of Court, Green was accused of repeatedly punching an

---

[89] *See* Ex. 44 (Massie FDOC inmate profile).  Massie brings damages claims against Defendants Crosby, Clark, Sapp, and Green as well as injunctive claims against Defendants McDonough and Bryant.
[90] *See* Ex. 45 (Massie FDOC psychological profile).
[91] *See* Ex. 46 (Green Interrogatory responses).
[92] *See Skrtich v. Thornton*, 280 F.3d 1295 (11th Cir. 2002); Ex. 47 (McAndrew Decl.) at ¶ 11.

inmate during an unauthorized cell extraction.[93]  Furthermore, Green had been reprimanded in 1995 for conduct unbecoming an employee after challenging an inmate to a fight.[94]

A use of force log provided by FDOC shows that Stacey Green never used chemical agents on inmates during the 18-month period between April 9, 1998 and October 26, 1999 -- the date videotaping of chemical agent use was discontinued by Crosby.[95]  During this same time period -- immediately after being sued by *Skrtich* -- Green only used force of any kind on inmates twice.[96]  But during the next 18-month period after videotaping of chemical agents was discontinued by Crosby and Sapp (i.e., November 1999-April 2001), Green gassed inmates on twenty-nine (29) separate occasions.[97]  Prior to Massie's gassing on October 8, 2000, Green had already gassed twenty-one (21) other inmates during the 5-month period between April 27, 2000 and October 8, 2000.[98]  Eighteen (18) of the gassings were approved by Sapp; the remaining three (3) gassings were personally approved by Crosby.[99]  Because of the morning meetings between Crosby, Clark, and Sapp where all uses of force were discussed, all three individuals knew that Green had not begun gassing inmates until after videotaping had been eliminated.  Green was ultimately required to resign under pressure from FDOC after pleading guilty to possession of anabolic steroids.[100]

---

[93] *Skrtich*, 280 F.3d at 1288-1300.
[94] *See* Ex. 48 (March 22, 1995 reprimand letter).
[95] *See* Ex. 49 (Green use of force log).
[96] *Id.*
[97] *Id.*
[98] *Id.*
[99] *Id.*
[100] *See* Ex. 50 (Green plea agreement); *see also* Ex. 51 at pp. 22-26.  Scientific research also shows that steroids cause aggression, mood swings, and other psychiatric side effects.
*See also* www.deadiversion.usdoj/pubs/brochure/steroids/hidden/index.html. Last visited Sept. 25, 2007.

D.        The Events of October 8, 2000

The events occurring on October 8, 2000 are addressed in detail in the grievances filed by Curt Massie after being gassed.[101]  Stacey Green gassed Massie in retaliation for complaining to a nurse about her failure to provide him with his daily medication of Vistaril.[102]  As stated by the manufacturer, Vistaril is prescribed to "provide symptomatic relief of anxiety and tension associated with psychoneurosis."[103]  In other words, Green gassed Massie in retaliation for displaying anxiety over not receiving his anxiety medication. Green has no independent recollection of this event and is reliant upon his report.[104]  Green's unlawful gassing of Massie was authorized by Clark and approved by Sapp.[105]

After Massie "mimicked" a nurse who failed to give him the medications prescribed to treat his anxiety, Green threatened Massie and then left the wing.[106]  Approximately 30 minutes passed between the time Green left Massie's wing and the time he returned with chemical agents.[107]  Massie was sitting quietly on his bunk dressed only in boxer shorts when Green used chemical agents on him even though he was neither yelling nor banging on his cell.[108]  While Massie was being gassed, he went to the sink and splashed water on his face and body to try to "limit the pain."[109]  Green then left, but returned to again gas Massie, who tried to protect himself by placing items of clothing over the food flap.[110]  After emptying the

---

[101] *See* Ex. 52 (Massie grievances composite).
[102] *Id.*
[103] *See* Ex. 53 (Pfizer information packet on Vistaril).
[104] *See* Ex. 51 at pp. 76-77.
[105] *See* Ex. 54 (Massie use of force report October 8, 2000).
[106] *See* Ex. 55 (Massie deposition excerpts) at p. 8.
[107] *Id.* at p. 10-11.
[108] *Id.* at p. 11-12.
[109] *Id.* at p. 14.
[110] *Id.* at pp. 15-16.

can of chemical agents into Massie's cell, Green again left and returned with a black can of CN gas.[111]  Massie begged Green not to gas him, but Green gassed him again anyway.[112]

Green admits his report was improperly altered by an unspecified officer-in-charge.[113] His typed report states that Massie was "screaming (cursing) at me and kicking his cell door."[114]  But his handwritten report shows that *someone else* added the words "and kicking his cell door," in order to justify the use of OC and CN gas on Massie.[115]  As Green admitted, "***[t]here's an addendum here on the bottom of it that states 'and kicking his cell door,' that's in someone else's writing***."[116]  According to Green, "I'm assuming that it was probably an officer in charge that done it, that changed the -- changed -- added this statement in there."[117]  According to Crosby, it is a felony for an officer to alter a use of force report without filing a separate report indicating that this was done,[118] but no action was ever taken to investigate the "addendum" to the report, which Defendant Sapp approved.

Moreover, Green's use of force report conflicts with his testimony to the Inspector General in two material respects.  First, Green's report stated that the disturbance began after he observed Massie cursing *at staff*.[119]  But his testimony to the IG indicates that after being passed over for medication, Massie simply went to the back of his cell and started cursing and screaming.[120]  Finally, as in Thomas's case, Sapp approved this use of force and stated

---

[111] *Id.* at pp. 18-20.
[112] *Id.* at p. 19.
[113] *See* Ex. 51 at pp. 78-79.
[114] *See* Ex. 54 at p. 2.
[115] *See id.* at p. 4.
[116] *See* Ex. 51 at pp.78-80.
[117] *See id.*
[118] *See* Ex. 6 at pp. 116-117.
[119] *See* Ex. 54.
[120] *See* Ex. 56 (FDOC IG report regarding use of force against Massie) at p. 12.

that "[n]o inappropriate actions were noted."[121]   In addition to approving a use of force report

that was admittedly altered, Sapp also approved a use of force where the "final warning" was

given at 12:02 PM and the gassing reportedly occurred at 12:05 PM.[122]

Massie suffered second-degree burns all over his body and remains very sensitive to

sun exposure even to this present day because of this gassing.[123]   Pictures of Massie's injuries

are attached to this response.[124]   His injuries were so extreme, he required an emergency

room visit three days after Green gassed him.[125]

After arriving in the emergency room on October 11, 2000, medical staff prescribed

Silvadene cream to treat the burns in the photographs taken after Green gassed him.[126]   Dr.

Dushoff confirmed that Massie was given Silvadene to treat the second-degree burns caused

by Green's gassings.[127]   Because Silvadene is widely prescribed to treat severe burns, any

common allergic reaction that Massie may have developed to the medication prescribed by

FDOC to treat his second-degree burns was a foreseeable result of Green gassing Massie

with whole canisters of OC and CN gas.[128]

---

[121] *See* Ex. 54.
[122] *Id.*
[123] *See* Ex. 9 at pp. 100, 102.
[124] *See* Ex. 57 (Massie color photographs).
[125] *See* Ex. 55 at p. 28 ("Seems like it was about 36 hours when it was really starting to medically be bad for me, where it was really showing up that the gas had caused some serious burns.").
[126] *Id.*
[127] *See* Ex. 58 (Dushoff deposition excerpt) at pp. 80-81.
[128] *Id.*

### III.   Eugene Ulrath's Claims

#### A.   Introduction

Plaintiff Eugene Ulrath will establish that, on the same day he was transferred to FSP (October 8, 2002), after trying to declare a mental health emergency for much of the day, Defendant Oscar Shipley excessively gassed him with chemical agents for no reason.[129]

#### B.   Background Information on Eugene Ulrath

Eugene Ulrath is a 44-year-old man with an extensive history of psychiatric problems dating from childhood.[130]   On May 14, 2002, Ulrath was diagnosed by FDOC doctors as suffering from Anxiety Disorder and Depressive Disorder and was given the mental health classification of "S-3."[131]   From the date of Ulrath's current incarceration (February 21, 2002) until the date he was transferred to FSP (October 8, 2002), Ulrath had not received any disciplinary reports for improper actions.[132]   Moreover, prior to being transferred to FSP, Ulrath had already been referred to inpatient care twice in an eight-month span.[133]

#### C.   Background Information on Defendants Oscar Shipley and Bradley Carter

Prior to gassing Ulrath on October 8, 2002, Defendant Oscar Shipley had an extensive history of using force abusively against inmates at FSP.   Crosby admits that Ron McAndrew told him to closely monitor Shipley upon Crosby succeeding McAndrew as Warden.[134]   According to Crosby, in response to McAndrew's warnings and his own

---

[129] *See* Ex. 59 (Ulrath grievances composite) at pp. 1-12.   Ulrath brings damages claims against Defendants Carter and Shipley and injunctive claims against Defendants McDonough and Bryant.
[130] *See* Ex. 60 (Ulrath FDOC inmate profile).
[131] *See* Ex. 61 (Ulrath FDOC psychological profile).
[132] *See* Ex. 62 (Ulrath discipline log).
[133] *See* Ex. 63 (Ulrath movement log).
[134] *See* Ex. 6 at pp. 100-105.

observations, he believed that Shipley was so dangerous, it was necessary to institute a policy to prevent Shipley from entering the FSP main building.[135] When asked if he knew of Shipley's gassing of Ulrath, Crosby responded, " . . . I can assure you I wasn't the warden on that day, without even looking on the charts, because Oscar Shipley wasn't supposed to be in the building."[136]

Shipley's history placed his supervisors on notice that he posed a danger to inmates at FSP. On December 7, 1995, Shipley was suspended for two days for conduct unbecoming an officer for "repeatedly us[ing] profane language and ma[king] threatening remarks" about what he would do to a superior officer.[137] On January 29, 1996, a letter was placed in Shipley's personnel file indicating "Shipley was demoted from Sergeant to C.O. due to his questionable use of force history."[138] Furthermore, on April 24, 2000, Shipley was suspended for 15 days for threatening former FSP Warden McAndrew and his wife by declaring "[i]f you have a set of balls, come over here and let me kick your ass."[139]

Despite Shipley's violent history toward inmates and commanding officers, and Crosby's purported standing order not to let Shipley in the building, Shipley was indeed working in the building on October 8, 2002.[140] When asked how this could be possible, Shipley responded that Defendant Clark changed his duties and shift times in retaliation for

[135] *Id.* at pp. 100-105, 216-217
[136] *Id.* at pp. 216-217
[137] *See* Ex. 64 (Shipley suspension letter December 7, 1995).
[138] *See* Ex. 65 (Shipley demotion letter January 29, 1996).
[139] *See* Ex. 66.
[140] *See* Ex. 67 (Ulrath use of force report).

Shipley' failure to attend a political function.[141]   Crosby testified that Defendant Bradley

Carter, the warden at FSP at the time, knew that Shipley presented a danger to inmates:[142]

> Any time [Shipley] tried to get reassigned back to the main unit, he would
> come to me and ask me could he come back.  I said "No, you ain't going
> back."  And when I left FSP, I told them they better not let him back in.  And
> they chose to one day, and they chose to put him back out shortly thereafter.
> He does not have the ability or temperament to work inside that building.

Despite this knowledge, Defendant Carter did nothing to prevent Shipley from being placed

back into direct contact with inmates such as Ulrath.  Carter knew that Shipley was back in

the building because Clark met with him every day to discuss the prior night's uses of force,

and Shipley had used force against other inmates prior to gassing Ulrath.[143]   Moreover,

Carter specifically knew that Shipley was dangerous because he signed a letter in December

2001 suspending Shipley for conduct unbecoming an officer.[144]   Ultimately, Shipley was

terminated for pleading guilty to conspiracy to distribute steroids to other corrections officers

at FSP.[145]   By his own admission, Shipley was using steroids and distributing steroids to

other guards on the date he gassed Ulrath.[146]

    Carter was Crosby's handpicked successor to become FSP Warden upon Crosby's

departure in July 2001.[147]   During his tenure as Warden, the rate of gassings dramatically

increased, from 240 uses of chemical agents per year in 2000 to 455 uses of chemical agents

per year by the end of his tenure.[148]   Despite knowing of this dramatic increase, Carter did

---

[141] *See* Ex. 68 (Shipley deposition) at pp. 110-115.
[142] *See* Ex. 69 (Crosby deposition, *Mathews v. Crosby,* October 15, 2003) at pp. 178-79.
[143] *See* Ex. 70 (Shipley use of force log); *see also* Ex. 25 at pp. 85-86.  Carter personally approved a use of force by Shipley on August 5, 2002.
[144] *See* Ex. 71 (Shipley suspension letter December 13, 2001).
[145] *See* Ex. 72 (Shipley plea agreement).
[146] *See* Ex. 68 at pp. 133-135; *see also* www.deadiversion.usdoj/pubs/brochure/steroids/hidden/index.html.
[147] *See* Ex. 73 (Carter deposition) at pp. 15-19.
[148] *See* Ex. 74 (FDOC Supplemental Responses to Plaintiffs' Eighth Request to Produce composite).

nothing to either investigate or address the increase.[149]   Moreover, the Correctional Medical Authority  -- an independent agency created by the Florida Legislature to monitor health care in Florida's prisons – performed a monitoring visit at FSP and found that seven healthcare staff "reported the use of chemical agents as a method of disciplinary action" during Carter's tenure as Warden. [150]

### D.     The Events of October 8, 2002

On October 8, 2002, Ulrath was transferred to FSP.[151]   Ulrath was immediately and constantly harassed by prison guards, which prompted him to attempt to declare a psychological emergency numerous times during the day.[152]   After realizing that his attempts at obtaining psychological help were being ignored, Ulrath was lying in his cell when Shipley gassed him repeatedly with pepper spray and tear gas without warning.[153] As Ulrath describes, "I was laying in my bunk.  The food port opened.  An officer told me to come to the door.  As I stood up and I started walking towards the door, without warning I was sprayed."[154]   As in Thomas and Massie's case, Shipley violated policy by allegedly giving a "final warning" at 6:53 P.M. and gassing Ulrath at 6:57 P.M.[155]   In addition, even under Shipley's version of the facts, Shipley failed to warn Ulrath that tear gas would be used if Ulrath did not cease any allegedly disruptive behavior.[156]   In spite of these violations, Shipley's use of force report was nonetheless approved.[157]

---

[149] *See* Ex. 73 at p. 29-30.
[150] *See* Ex. 75 at p. 6.
[151] *See* Ex. 63.
[152] *See* Ex. 59 at pp. 1-12.
[153] *See* id.; *see also* Ex. 76 (Ulrath deposition excerpts) at p. 14.
[154] *See* Ex. 76 at p. 14.
[155] *See* Ex. 67.
[156] *Id.*
[157] *Id.*

As a result of Shipley's gassings, Ulrath suffered extensive second-degree burns.[158] Pictures of Ulrath's burns are enclosed with this response.[159] Ulrath was gassed again with pepper-spray and tear gas on October 9, 2002.[160] On October 10, 2002 at 8:00AM, Ulrath attempted to commit suicide because of the depression caused by his unjustified gassings.[161] In response to his suicide attempt, the officer who gassed Ulrath on October 9th gave Ulrath a disciplinary report for destroying his state-issued bed sheet in order to hang himself.[162]

On October 15, 2002, Shipley entered Ulrath's cell alone in violation of FDOC policy causing Ulrath to "jump[] to his feet trying to shield himself with his SOS blanket."[163] As stated by Officer Paul Tillis, "Sergeant Shipley began to speak to the inmate at his [sic] time this inmate began shaking and crying and appeared to be very scared."[164] After Sergeant Shipley left the cell, "ULRATH laid down and pulled the SOS blanket over his head where he remained for the remainder of the night."[165] As concluded by Shipley's peers, "[h]e was dead wrong for that."[166] Months later, Warden Joseph Thompson officially reprimanded Shipley for his actions.[167] Even Shipley's self-serving description of his encounter with Ulrath shows that, rather than "counseling" Ulrath, Shipley gave Ulrath a thinly-veiled threat:

> I said, if we have to come in here and use force on you, because you're acting silly or doing whatever you're doing, and you accidentally fall, hit your head on that steel toilet or the corner of that bunk and kill yourself, I said -- I said, it don't do your family no good.[168]

---

[158] *See* Ex. 9 at pp. 117, 120-21.
[159] *See* Ex. 77 (Ulrath color photographs).
[160] *See* Ex. 78 (Ulrath October 9, 2002 use of force report).
[161] *See* Ex. 79 (Ulrath October 10, 2002 incident report).
[162] *See* Ex. 80 (Ulrath disciplinary report).
[163] *See* Ex. 81 (Shipley October 15, 2002 incident report).
[164] *Id.*
[165] *Id.*
[166] *Id.*
[167] *See* Ex. 82 (Thompson letter reprimanding Shipley).
[168] *See* Ex. 68 at pp. 121-123.

Ulrath was transferred out of FSP on October 18, 2002 into the inpatient mental health facility at UCI.[169]   Nevertheless, Ulrath continued to fear being transferred back to FSP.  On July 3, 2003, he sent a letter to Dr. Roderick Hall, FDOC's Director of Mental Health Services at the time, begging Hall not to transfer him to FSP because he had been abused there.[170]  Dr. Hall responded, stating there were no plans to transfer him.[171]

Doyle Kemp, the FDOC Bureau Chief of Sentence Structure and Population Management, submitted a similar affidavit to this Court on May 3, 2007, which stated that "[t]he Department has no present intention to move [Ulrath] to FSP."[172]  Nevertheless, Ulrath was transferred back to FSP from inpatient care two weeks later on May 18, 2007.[173]  Ulrath was against transferred out of FSP on August 30, 2007.[174]

In addition to the severe second-degree burns he suffered, Ulrath also experienced intense psychological pain.  Ulrath testified, "I don't think I'll ever recover from what happened, no ma'am. There's permanent psychological effects."[175]  As described by Dr. Burns, "Ulrath continues to display signs of Major Depression . . . [and] remains highly anxious and re-experiences intense feelings of fear whenever any prisoner housed near him is sprayed with chemical agents."[176]

---

[169] *See* Ex. 63.
[170] *See* Ex. 83 (Hall letter July 21, 2003).
[171] *Id.*
[172] *See* Ex. 84.
[173] *See* Ex. 63.
[174] *Id.*
[175] *See* Ex. 76 at p. 34.
[176] *See* Ex. 5 at p. 24.

IV.     **Michael McKinney's Claims**

    A.     **Background Information on Michael McKinney
       (July 1989 until May 2004)**

Like Plaintiff Thomas, Plaintiff Michael McKinney is a "frequent flier."[177]  He is a 37-year-old man who has been incarcerated since 1989.[178]  Since his incarceration, McKinney has been diagnosed with numerous severe mental illnesses such as: 1) adjustment disorder with disturbance conduct; 2) Obsessive-Compulsive Personality Disorder; 3) Dysthymic Disorder; 4) Dependent Personality Disorder; 5) Antisocial Personality Disorder; and 6) Major Depression with Recurrent Psychotic Ideations.[179]  Between 1993, when he was first incarcerated at FSP, and today, McKinney has been transferred in and out of inpatient care 22 times.[180]  These transfers are often prompted by specific events in McKinney's "long history of self injurious behavior."[181]

Between 2001 and March 2004, McKinney was gassed 24 times, including three separate occasions in which he was gassed twice on the same day.[182]  After enduring each series of gassings, McKinney would be transferred back to inpatient mental health care at UCI, only to be transferred back and subsequently gassed again.[183]  Despite his well-documented mental health problems, McKinney had repeatedly been gassed prior to 2004 solely for yelling in his cell.[184]

---

[177] *See* Ex. 6 at pp. 199-200; Ex. 73 at p. 30; Ex. 7 at p. 68.
[178] *See* Ex. 85 (McKinney FDOC movement log). McKinney brings a damages claim against Defendant Rathmann and injunctive claims against Defendants McDonough and Bryant.
[179] *See* Ex. 86 (McKinney psychological evaluations).
[180] *See* Ex. 85.
[181] *See* Ex. 86.
[182] *See* Ex. 87 (McKinney uses of chemical agents prior to 2004 composite).
[183] *Compare* Ex. 85 with Ex. 87.
[184] *See* Ex. 87.

In 2002, a professor who was corresponding with McKinney, wrote Crosby, expressing concern that McKinney's "confinement seems itself to be a factor contributing to violent conduct" and asking that McKinney "be given the opportunity to meet with a psychological counselor on a regular basis."[185]   Rather than giving McKinney the intensive therapy he needs, guards repeatedly gassed him simply for yelling in his cell or banging on his cell door.[186]   Between January and May 2004, McKinney was gassed on four separate occasions; CS tear gas was used on McKinney each time.[187]

**B.      Background Information on Defendant Michael Rathmann**

Defendant Michael Rathmann became the warden at FSP in May 2004 and remained until March 2006 when he was terminated by Defendant James McDonough and was replaced at FSP by Defendant Randall Bryant. [188]   Rathmann knew that he had "frequent fliers" at FSP during his tenure, but stated that he did not take any precautions to ensure that force was not improperly used against them.[189]   Moreover, according to Rathmann, he did not consider whether an inmate had been repeatedly gassed in the past, or had just been transferred from inpatient care in deciding whether to approve the inmate's gassing.[190]

Dr. David Gibbs, a psychiatrist at FSP during Rathmann's tenure as warden, repeatedly warned prison management that mentally ill inmates at FSP were being gassed unnecessarily, but Rathmann failed to establish policies requiring clearance from mental

---

[185] *See* Ex. 88 (Rosemann letter to Crosby).
[186] *See* Ex. 87.
[187] *See id.*
[188] *See* Ex. 7 at p. 48-49.
[189] *Id.* at pp. 69, 84-85.
[190] *Id.*  at p. 80-85

28

health prior to gassing mentally ill inmates.[191]  Gibbs states that during Rathmann's tenure as warden, he observed guards abuse inmates with chemical agents and inmates suffer burns to their faces, eyes, and bodies because of unnecessary gassings.[192]

### C.    Michael McKinney's Damages Claim (June 2004 until May 2005)

On June 15, 2004, Rathmann personally approved the use of nine reported bursts of pepper spray and tear gas on McKinney simply for "kicking on his cell door and yelling obscenities at staff on the wing."[193]  In addition, despite conceding that he was required to rely upon "the investigator's review" prior to approving a use of force,[194] Rathmann approved the use of force on McKinney before the institutional inspector's review had even been completed.[195]  The next day, McKinney executed a form consenting to inpatient mental health care and begging to be transferred to UCI because "I can't help myself."[196]  McKinney was placed in a suicide observation cell from June 16, 2004 until he was released back into the FSP wing at 2:10 PM on June 21, 2004.[197]

Less than four hours later, at 6:00 PM on June 21, 2004, McKinney was gassed with nine reported bursts of pepper spray and tear-gas simply for "kicking and banging on his cell door and yelling obscenities at staff members."[198]  Rathmann again approved this use of force.  Rathmann testified he may have known that McKinney had just been released from

---

[191] *See* Ex. 89 (Gibbs Decl.).
[192] *Id.*
[193] *See* Ex. 90 (McKinney uses of force June 2004 – November 2005 composite).
[194] *See* Ex. 7 at p. 82.
[195] *See* Ex. 90.
[196] *See* Ex. 91 (Consent to inpatient care June 16, 2004).
[197] *See* Ex. 92 (McKinney infirmary progress record June 21, 2004).
[198] *See* Ex. 90.

suicide watch prior to being gassed, but this fact would not impact his decision to approve McKinney's gassing.[199]

Less than eight-hours later, at 1:45 A.M. on June 22, 2004, McKinney was gassed again with six bursts of CS tear gas for "banging on his cell door and cursing staff."[200] Rathmann again approved this gassing even though McKinney had been gassed less than eight hours earlier and had not even been out of suicide watch for 12 hours upon being repeatedly gassed. Rathmann admits McKinney's release from suicide watch had no mitigating effect on his decision as to whether McKinney should be gassed.[201] Finally, on June 23, 2004, McKinney was transferred into inpatient care at UCI.[202]

McKinney was gassed again at FSP on January 5, 2005 (6 bursts of tear gas); February 3, 2005 (6 bursts of tear gas), and February 28, 2005 (6 bursts of tear gas).[203] On May 13, 2005, McKinney was gassed with pepper spray and tear gas solely for trying to get the attention of guards who would not give him a food tray.[204] Rathmann approved of the use of nine bursts of pepper spray and tear gas on May 19, 2005, four days prior to receiving the institutional inspector's review.[205] On May 18, 2005, McKinney was transferred back to UCI for inpatient care.[206] Rathmann testified that McKinney's mental health status was not part of his criteria for reviewing any uses of force on McKinney on these occasions.[207] When asked if he had any reaction to being shown what had happened to McKinney at FSP,

---

[199] See Ex. 7 at p. 88.
[200] See Ex. 90.
[201] See Ex. 7 at pp. 90-91.
[202] See Ex. 85.
[203] See Ex. 90.
[204] See Ex. 93 (McKinney deposition excerpts) at p. 54-57; Ex. 90.
[205] See Ex. 90.
[206] See Ex. 85.
[207] See Ex. 7 at p. 103.

Rathmann stated, "I don't know if I think anything of it. It's just a series of reports -- I mean, a series of applications of chemical agents."[208]

As a result of his gassings, "McKinney experienced intense physical pain and burning, chest pain and trouble breathing."[209]  He said his chest would hurt "like someone is stabbing you." [210]  In addition, the cycle of repeatedly being gassed with chemical agents has severely exacerbated his mental health illnesses, causing him to "hear[] voices in the last year telling him to hurt himself." [211]  Finally, McKinney has testified that after being gassed on these occasions, he suffered a burn on his right shoulder.[212]

## V.     Claims of Injunctive Relief Plaintiffs

Each Plaintiff -- except Massie, who has been released from FDOC custody -- seeks injunctive relief to preclude the unjustified and cruel use of chemical agents on them at FSP. Plaintiffs contend that it is unconstitutional to gas them simply for yelling and banging on their cell door and, as evidence of this fact, present that UCI -- the similarly configured prison across the street -- does not gas them for engaging in the same conduct.[213]  Each Plaintiff has been gassed repeatedly at FSP (McKinney, 36 times) simply for yelling and banging on their cell door.[214]  Plaintiffs have attached a chart of the number of times each Plaintiff has been subjected to chemical agents at FSP. [215]

---

[208] *See id.* at p. 104.
[209] *See* Ex. 9 at p. 64.
[210] *See id.*
[211] *See id.*
[212] *See* Ex. 93 at p. 49.
[213] *See* Ex. 94 (Deposition of Dr. Roderick Hall) at p. 61.
[214] *See* Ex. 42.
[215] See Ex. 95 (Plaintiffs' demonstrative chart of numbers of gassings at FSP per Plaintiff).

FDOC continues to allow guards to use chemical agents, including OC pepper spray and CS tear gas, against severely mentally ill inmates and asthmatic inmates isolated in CM cells at FSP.   FDOC has not provided institutional safeguards, such as: an adequate videotaping policy, a requirement that guards perform a "show of force" prior to using chemical agents against inmates, adequate oversight of the use of chemical agents by mental health staff, and the provision of training for guards who work with severely mentally ill inmates, like Plaintiffs, in confinement.   These issues are discussed more fully below.

## VI.   Background Facts Pertaining to All Plaintiffs' Claims

### A.   Introduction

By September 29, 2000, the date Jeremiah Thomas was finally transferred to UCI, Thomas had personally endured 20 gassings in nine months.[216]   Yet between 1996 and February 1998, there were never more than 25 total incidents per year at FSP where guards used chemical agents against inmates.[217]   By 2003, however, this number had skyrocketed to 610 uses of gas on FSP inmates per year.[218]   During the period in which FSP's annual gassing totals were exponentially increasing, FSP's inmate population was substantially decreasing.[219]   By 2003, _the rate of gassings per inmate at FSP had increased 28-fold in comparison to 1997._[220]

---

[216] _See_ Ex. 42.
[217] _See_ Ex. 47 at ¶ 16.
[218] _See_ Ex. 74 at p. 7.
[219] _See id._ at p. 22.
[220] This figure was obtained by comparing the ratio of gassings per inmate in 1997 [25 gassings/1000 inmates] to the ratio in 2003 [610 gassings/855 inmates]. _See_ Exs. 47 and 74.

32

B.      History of Widespread Prisoner Abuse at FSP
        (January 1996 until July 17, 1999)

This exponential increase is directly traceable to the brutal murder of inmate Frank Valdes at the hands of FSP guards during an unlawful cell-extraction on July 17, 1999.[221] Prior to Valdes's death, any behavior at FSP subjectively deemed by guards to constitute an "inmate disturbance" that could not be resolved non-violently was addressed through the use of a "cell extraction."[222]  During a typical cell extraction, "four or five officers us[ed] the physical force necessary to restrain and remove an inmate from his cell."[223]  In Valdes's case, his cell extraction resulted in death from "having suffered extensive beating wounds all over his body."[224]  Moreover, "the officers involved in [Valdes's] cell extraction sought to justify their actions by completing their use of force forms based on medical reports and false information."[225]  Medical personnel explained that "officers sometimes subjected an inmate to minor injuries during a use of force and later, after a medical exam confirmed the minor injuries, the officers would take the inmate back to his cell 'and beat him half to death.'"[226]

The murder of Frank Valdes was the culminating event of a series of prison abuse incidents beginning near the time of Defendant James Crosby's installation as FSP Warden.[227]  Crosby's philosophy of prison management can be summarized by his answer to the question of whether "the buck stops" with the Warden at FSP:

[221] See Valdes v. Crosby, 450 F.3d 1231, 1235 (11th Cir. 2006); see also Ex. 96 (Valdes use of force summary) .
[222] See Ex. 16 at pp. 66-67 (conceding that after Valdes's death, "[w]e very much limited cell extractions.").
[223] Mathews v. Crosby, 480 F.3d 1265, 1273 (11th Cir. 2007).
[224] Valdes, 450 F.3d at 1235.  Page 1239 of the Valdes Decision details the gruesome injuries suffered by Valdes.
[225] Id. at 1238.
[226] Id.
[227] See Ex. 6 at p. 89; see also Skrtich v. Thornton, 280 F.3d 1295 (11th Cir. 2002); Mathews v. Crosby, 480 F.3d 1265, 1273 (11th Cir. 2007).

*"I've never adhered to that . . . I don't think I was responsible for the action -- or inappropriate actions of persons who worked under my chain of command necessarily."*[228]

Prior to Crosby's installation as Warden, the previous warden, Ron McAndrew, asked Crosby to sit with him for a "desk audit" to review all issues and problems at FSP of which Crosby should be aware.[229]  Rather than meeting with McAndrew, Crosby indicated that he was not interested in such a meeting.[230]  Even after being snubbed by Crosby, McAndrew nonetheless "taped a list of [problem] guards to the center drawer of the warden's desk" in the hopes of preventing future incidents of prisoner abuse.[231]

McAndrew's list of problem guards included Defendant Shipley, who subsequently threatened McAndrew in front of his family during a softball game.[232]  The list also included Timothy Thornton, a defendant in three federal lawsuits in which FSP inmates were either seriously injured or killed.[233]  In addition to the list on his desk, McAndrew also referred Crosby to an FSP inspector, who knew of 13-15 other guards (including Defendant Green) suspected of abusing inmates and falsifying use of force reports.[234] Rather than heeding McAndrew's warnings, Crosby's first order of business was to "discontinue[] the practice of videotaping cell extractions."[235]  Next, Crosby demonstrated his reckless promotion practices by elevating Thornton to Captain, permitting him to work on X-wing, and personally

---

[228] *See* Ex. 6 at pp. 76-77.

[229] *See* Ex. 47 at ¶ 8; *Valdes*, 450 F.3d at 1240.

[230] *See* Ex. 47 at ¶ 9; *Valdes*, 450 F.3d at 1240.

[231] *See* Ex. 47 at ¶¶ 7, 10; *Valdes*, 450 F.3d at 1239.

[232] *See* Ex. 66 at p. 6; s*ee also* Ex. 69 at p. 174 (Crosby testifying that McAndrew was "emphatic two or three times about Oscar Shipley, to the point of reminding me every time he saw me.").

[233] *See Skrtich v. Thornton*, 280 F.3d 1295 (11th Cir. 2002); *Valdes v. Crosby*, 450 F.3d 1231, 1235 (11th Cir. 2006); and *Mathews v. Crosby,* 480 F.3d 1265, 1273 (11th Cir. 2007).

[234] *See* Ex. 47 at ¶ 11.

[235] *See* Ex. 47 at ¶ 12; *Valdes*, 450 F.3d at 1241.

selecting him to receive preferential staff housing.[236]   Crosby was also instrumental in

bringing Montrez Lucas, a corrections sergeant, to FSP from another correctional institution

where he had worked with Crosby.[237]   Among other well-documented disciplinary problems

known to Crosby,[238] Lucas bragged about abusing inmates with chemical agents and

falsifying use of force reports:

> Witness statements from [nineteen (19)] Correctional Officer Trainees . . .
> indicated that while Sergeant Lucas was acting in the capacity of an instructor
> in a Correctional Officer Basic Recruit Class, he instructed correctional
> officer trainees on how to falsely prepare Use of Force Reports, ***improperly
> use and/or administer chemical agents*** and electronic restraining devices as ***a
> means of punishing inmates***.
>
>          *   *   *
>
> Lucas told the class that inmates were supposed to be warned before chemical
> agents were applied.  He used the chemical agent while warning the inmate.
> He also stated that if he had to obtain chemical agents, he would use it even if
> the inmate had decided to comply with orders.  Lucas stated policy specified
> one second bursts of chemical agent; however, he emptied the can.[239]

Even though Crosby knew that FSP employed guards who abused prisoners with

chemical agents and falsified use of force reports, he nonetheless buried his head in the sand

by "delegat[ing] the responsibility of handling the complaints to his secretary, who had no

law enforcement background," instead of personally reviewing grievances and use of force

reports submitted to him.[240]   Reverend Andrew McRae, a prison chaplain at FSP from 1994

until August 1999, describes the harsh change in atmosphere at FSP under Warden Crosby:

---

[236] *Valdes*, 450 F.3d at 1240; *Mathews*, 480 F.3d at 1272.

[237] *Id. See* Ex. 97 at pp. 32 (Deposition of A.D. Thornton, *Valdes v. Crosby*).  Plaintiffs emphasize it is well-settled that "[s]worn deposition testimony may be used by or against a party on summary judgment regardless of whether the testimony was taken in a separate proceeding." *Gulf USA Corp. v. Federal Ins. Co.*, 259 F.3d 1049, 1056 (9th Cir. 2001) (citing *Curnow v. Ridgecrest Police*, 952 F.2d 321, 324 (9th Cir. 1991) (explaining that such testimony is treated as an affidavit pursuant to Rule 56(c)).

[238] *See* Ex. 6 at pp. 107-112; *See* Ex. 97 at pp. 32; *Valdes*, 450 F.3d at 1240; *Mathews*, 480 F.3d at 1272.

[239] Ex. 98 at pp. 4-5 (IG Report on Montrez Lucas); *Valdes*, 450 F.3d at 1240; *Mathews*, 480 F.3d at 1272.

[240] *See* Ex. 6 at p. 233, 243; *Valdes*, 450 F.3d at 1242; *Mathews*, 480 F.3d at 1274.

> no matter how an officer felt about an inmate, they were, basically FSP, they were restrained, because they had to deal with the warden.  Mr. Perrin, Mr. McAndrew, all of them, they were the bottom line so far as dealing with that. So they were basically held down.  Once Mr. Crosby got there, that vanished.[241]

As Ron McAndrew describes, during the period of his impending transfer out of FSP, there was a "culture of abuse that . . . [if] left unchecked [would result in] violent beatings and death of inmates."[242]

This culture was exemplified by the beating of inmate David Skrtich, in which Green beat Skrtich with his fists and brutally injured him.[243]  Despite the gravity of the *Skrtich* incident, Crosby reversed Warden McAndrew's main policy designed to minimize future prisoner abuse—he eliminated the previously existing policy of videotaping cell extractions.[244]  Specifically, on January 15, 1999, a memorandum was sent from Colonel Alton Christie to all shift captains and confinement lieutenants stating that "[v]ideo taping of the use of chemical agents or cell extractions will not be done."[245]  Crosby removed the videotaping requirement even though he knew that "inmates [were] abused by correctional officers,"[246] and that "the officers didn't like taping, and . . . whenever it was time to do one, they would act like the machine was tore up or that the battery went dead, or that they would make up something, because they didn't want to do them."[247]  In addition to Skrtich's

---

[241] *See* Ex. 99 at pp. 30-31 (Deposition of Reverend Andrew McRae); *Valdes*, 450 F.3d at 1241; *Mathews*, 480 F.3d at 1273.
[242] *See* Ex. 47 at ¶ 7.
[243] *Skrtich v. Thornton*, 280 F.3d 1295 (11th Cir. 2002)
[244] *See* Ex. 47 at ¶ 12; *Valdes*, 450 F.3d at 1241; *Mathews*, 480 F.3d at 1273.
[245] *See* Ex. 100 (January 15, 1999 memo from Christie).
[246] *See* Ex. 6 at p. 10.
[247] *See* Ex. 69 at pp. 169-170.

beating, there was also widespread suspicion among FSP medical staff that other FSP inmates had also recently been abused.[248]

Shortly before Valdes's death, another FSP inmate, Willie Mathews, was subjected to "a series of attacks in which excessive and unjustified force was used, resulting in serious injury, including a broken jaw."[249]  Despite the implausibility of Mathews having broken his own jaw, "[n]o use of force form was ever filed which might have explained Mathews' injury."[250]  Mathews was transferred to a hospital outside FSP for surgery only after Valdes was killed.[251]  Consequently, the Eleventh Circuit has held that, prior to Valdes's murder, "inmate abuse at the hands of guards was not an isolated occurrence, but rather occurred with sufficient regularity as to demonstrate a history of widespread abuse at FSP."[252]

### C.      Aftermath of Frank Valdes's Death (July 18, 1999 until April 2000)

Upon being informed of Valdes's death, Crosby downplayed the incident by attempting to resume the vacation he had commenced earlier.[253]  But Crosby was "told not to go again, that I needed to be at the institution because it looked like we had a bad situation."[254]  On July 20, 1999, Crosby received a memo from FDOC's Central Office stating that all cell extractions at FSP were to be videotaped as of July 21, 1999.[255]  Later that day, Alton Christie sent a memo -- copying Crosby -- informing all supervisors that "[v]ideo taping will also include any chemical agents used as well as cell extraction's [sic]."[256]

---

[248] *Valdes*, 450 F.3d at 1238.
[249] *Mathews*, 480 F.3d at 1268.  *See* Ex. 101 at pp. 243-247 (Mathews deposition, *Mathews v. Crosby*).
[250] *Valdes*, 450 F.3d at 1244.
[251] *Mathews*, 480 F.3d at 1271. *See* Ex. 101 at pp. 406-408.
[252] *Valdes*, 450 F.3d at 1244.
[253] *See* Ex. 102 at pp. 78-79 (May 10, 2004 deposition of Crosby, *Valdes v. Crosby*).
[254] *Id.*
[255] *See* Ex. 103 (June 20, 1999 Czerniak memo re videotape).
[256] *See* Ex. 104 (July 20, 1999 Christie Memo).

Shortly thereafter, on August 2, 1999, Defendant Sapp was transferred to FSP to serve as Assistant Warden.[257]   According to Sapp, "right after the Valdez [sic] incident . . . the Department's administration decided to make some changes in the top administration of that facility."[258]   Major changes were also made with regard to use of force policies.  As explained by Keith Musselman -- a current Sergeant at FSP who has served in that capacity since 1996 -- after Valdes's death, "they started using chemical agents more to try to get the situation handled."[259]   When asked how security staff became apprised of this new policy, Musselman explained, "there were memos sent from Tallahassee and word of mouth."[260]

At the time of Valdes's death, FSP used three types of chemical agents on inmates -- OC; CS; and CN.[261]   Gassing inmates in confined spaces causes significant injury and adverse health effects.[262]   According to Dr. Woodhall Stopford, the following harmful effects are associated with OC, CS, and CN:[263]

| Name of Chemical Agent | Documented Harmful Effects |
| --- | --- |
| OC (Oleoresin-capsicum) | Immediate symptoms of swelling, burning, pain, tearing, redness, chest pain, coughing, choking, intense burning, blistering of the skin. Also causes panic, fear, nausea, and disorientation. Repeated applications can cause severe burns, bronchospasms and cardiac arrhythmias. |
| CS (Orthochlorbenzalmalononitrile or O-Chlorobenzylidene Malonoitrile) | Eye damage, high blood pressure, exacerbation of asthma, second degree burns. |
| CN (Chloracetophenone) | Eye damage, lung damage, second degree burns, and death. |

---

[257] *See* Ex. 105 (FDOC Sapp transfer document).
[258] Ex. 16 at p. 48.
[259] Ex. 106 at p. 24 (Musselman deposition).
[260] *Id.*
[261] *See* Ex. 33.
[262] *See* Ex. 107 (Butler color photographs).
[263] *See* Ex. 9 at pp. 6, 11, 13-15, 17-18.

As a matter of sound medical practice, and according to the manufacturer's labels for the gasses used at FSP -- proper decontamination of inmates requires a shower with soap and cold water.[264]   Without proper decontamination, inmates can suffer significant injuries.[265] But FDOC policy prohibits inmates from using soap to decontaminate after being gassed with chemical agents because the types of soap available at FDOC prisons may exacerbate the injuries caused by chemical agent contact to the skin.[266]   As explained by Dr. Stopford, FDOC's failure to provide proper decontamination procedures "cause[s] prolonged pain and put[s] prisoners at risk of skin burns."[267]

Using gas against inmates in confinement also causes severe adverse mental health consequences.   According to Dr. Kathryn Burns, administration of chemical agents causes "intense physical and psychological pain" and leads inmates to have "a fear of dying . . . and intense helplessness."[268]   Because of the intense psychological pain caused by chemical agents, Dr. Olga Infante -- a former psychologist at UCI, the inpatient mental health correctional facility located across the street from FSP -- has recommended that, "a psychotic inmate who's in the midst of a crisis should not be sprayed."[269]

---

[264] *Id.* at 6.
[265] *Id.* at 24.
[266] *See* Ex. 108 (FDOC memo prohibiting soap).
[267] *See* Ex. 9 at p. 24.
[268] *See* Ex. 5 at p. 49.
[269] *See* Ex. 41 at pp. 56-57 (Deposition of Dr. Olga Infante) (emphasis added). For the Court's reference, the American Psychiatric Association defines "psychotic" as a person who suffers from any of the following disorders: "Schizophreniform Disorder (295.40), Schizoaffective Disorder (295.70), Delusional Disorder (297.1), Brief Psychotic Disorder (298.8), Shared Psychotic Disorder (297.3), Psychotic Disorder Due to a General Medical Condition (with delusions 293.81) (with hallucinations 293.82), Substance Induced Psychotic Disorder, and Psychotic Disorder Not Otherwise Specified (298.9)." *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision* (2000). Plaintiffs suffered from at least one of these illnesses during the period when they were gassed.

Contrary to Dr. Infante's professional recommendation, FSP security staff routinely used chemical agents on psychotic inmates. Crosby believed that inmates could be gassed as "discipline."[270] In addition to explaining the changes in use of force policies occurring immediately after Valdes's death, Sergeant Musselman detailed the broad range of inmate behavior that will prompt the use of chemical agents on inmates. According to Musselman, the most typical scenario where chemical agents are used is "where [inmates] kick on their cell door and beat on their cell door."[271] In addition to gassing inmates who beat on their door, Musselman affirmed that chemical agents are used in situations where inmates are simply "screaming and yelling" and the inmate does not comply with the guard's request to "stop yelling."[272] As Defendant Green confirmed during his deposition, there is no established criteria for determining the type of conduct at FSP that warrants the use of chemical agents; each officer is allowed to decide if an inmate should be gassed.[273]

While it might not appear unreasonable at first glance to provide guards with broad discretion to make *ad hoc* determinations regarding the kinds of inmate conduct that constitutes a "disturbance" requiring intervention with chemical agents, Dr. Burns explains why this broad discretion creates the potential for abuse:

> CM Prisoners at FSP eat all meals alone in their cells. There is virtually no normal human contact and extremely limited opportunity to social[ize] normally with others. Prisoners report that they risk receiving a DR [disciplinary report] or being sprayed with chemical agents at FSP if they attempt to speak to other inmates when they are in their cells. ***Such communication is by necessity, essentially shouting due to the physical plant and environmental noise which is viewed as being "disruptive" or "creating a disturbance" by correctional staff.***

---

[270] Ex. 6 at pp. 196 and 219.
[271] Ex. 106 at p. 20.
[272] *Id.* at pp. 20-22.
[273] Ex. 51 at pp. 40-41 (Deposition of Stacey Green).

Prisoners in CM at FSP are totally dependent on correctional staff to serve their meals; provide clean laundry and bedding; release them for scheduled medical appointments (which the prisoner has no knowledge of unless correctional staff tell them of the appointment); release them for recreation and/or showers; summon medical or mental health assistance on their behalf *(this, of course, also requires shouting or banging on the cell door, which is again interpreted by correctional staff as disruption or "creating a disturbance.")*[274]

Given the purely subjective nature of the determinations that are constantly made by guards with respect to whether a particular inmate's conduct rises to the level of a "disturbance" requiring the use of chemical agents -- and the absolute discretion given to guards to make these determinations -- the failure of prison management to monitor FSP guards to ensure that abuse is not occurring creates an unacceptable level of risk of abuse. Any FSP Warden should have enforced the July 20, 1999 policy mandating the use of video-cameras during non-spontaneous uses of chemical agents in order to protect inmates.

But on October 26, 1999, Warden Crosby convinced the FDOC Secretary to give FSP "an exception to the aforementioned FDC Procedure . . . regarding videotaping the use of chemical agents."[275]  As of that date, "[v]ideotaping the administration of chemical agents [was] not required for use on inmates who are creating a disturbance in their cells . . . ."[276] Defendant Sapp confirmed that he was "sure" that the rule was changed because of a "conversation that Mr. Crosby would have had with administration."[277]

In sum**,** Crosby and Sapp knew the following information prior to discontinuing the use of video cameras for non-spontaneous uses of chemical agents:

---

[274] Ex. 5 at pp. 5-6 (emphasis added).
[275] *See* Ex. 109 (October 26, 1999 Memo granting FSP videotape exception).
[276] *Id.*
[277] Ex. 16 at 72-74.

- In July 1999, one FSP inmate, Willie Mathews, was repeatedly beaten by guards and sustained a broken jaw; another inmate, Frank Valdes, was brutally beaten to death by prison guards.  Both of these beatings involved falsified and/or non-existent use of force reports;

- An FSP Sergeant, Montrez Lucas, had just been fired in September 1999 for teaching corrections officers how to abuse inmates, falsify use of force reports, and improperly gas inmates with chemical agents;

- There was already a rule in place at FSP, between July 1999 and October 1999, requiring officers to videotape non-spontaneous gassings -- a rule which Sapp has subsequently admitted makes FSP no less safe and provides accountability for everyone's actions;[278]

- Security personnel often attempted to blame camera malfunctions for their failure to videotape uses of force; and

- Security staff had broad discretion to decide when to gas inmates, including believing that gassing inmates is a proper course of action to get them to stop screaming and beating on their door—even though these are essential ways to communicate at FSP.

Despite this wealth of knowledge forewarning Defendants that inmates would be abused with chemical agents, Crosby and Sapp nonetheless obtained an exception that excluded FSP from FDOC rules requiring the videotaping of chemical agent uses.  This critical decision provided the catalyst for a pattern and practice of abusing inmates with chemical agents.

### D.    Defendant Allen Clark Arrives at FSP in April 2000

On April 20, 2000, Defendant Crosby, as FSP warden, signed a personnel action request as the "originator" of a transfer that would bring his close friend, Allen Clark, to FSP with a promotion to Major.[279]  Prior to being transferred and promoted by Crosby, Defendant Clark had been suspended for sixty (60) days for "inappropriate use of force during [his]

---

[278] *See* Ex. 110 (July 25, 2007 Rule 30(b)(6) deposition of Sapp) at pp. 78-80.
[279] *See* Ex. 111 (Clark transfer request); *see also* Ex. 11.

participation in quelling an inmate disturbance."[280]   In addition, on October 4, 1999, disciplinary charges were brought against Clark for a number of violations, including "conduct unbecoming a public employee" and "refusing to truthfully answer questions specifically relating to the performance of [his] duties."[281]   In Clark's own words, upon arriving at FSP, he became responsible for "everything from like -- like use of force, you know, if I was the duty warden that week, they would have to come to me prior to -- if they wanted to use force or unless it was a spontaneous use of force."[282]

Soon after arriving at FSP, Clark began keeping a log detailing every use of force that occurred at FSP.[283]   This log contained information as to the type of force used, the name of the inmate force was used upon, the names of the guards involved, and the name of the approving officer.[284]   Because Clark "kept a log of all use of forces . . . [he] knew the same names -- there was several names that kept popping up all the time. . . ."[285]   In addition to keeping the log, Clark met every morning with Crosby and Sapp to go over each and every use of force from the prior day.[286]   By keeping this log, Allen Clark came to know that "Sylvester Butler, Jeremiah Thomas, right off the hand, that's the only two names I can remember right off the hand, but that was two regulars."[287]   Clark continued this practice when Defendant Bradley Carter was warden at FSP.[288]   As a result, Clark, Crosby, and Carter

---

[280] *See* Ex. 112 (Clark suspension letter).
[281] *See* Ex. 113 (Clark ethics complaint).
[282]  *See* Ex. 25 at p. 66.
[283] *See id.* at pp. 79-85.
[284] *Id.*
[285]  *Id.*
[286] *Id.* at 85-87; Ex. 16 at pp. 102-105.
[287] Ex. 25 at pp. 78-80.
[288] *See* Ex. 25 at pp. 79-85.

knew Plaintiffs were "regular" targets of the use of force and that Green and Shipley used force regularly against them and other mentally ill inmates.

> **E.     Concurrently Existing Concerns Regarding the Mental Health Status of Inmates at FSP (January 1996 until April 2000).**

In addition to knowing that guards at FSP, including Green and Shipley, had a history of abusing inmates, Crosby, Sapp, and Clark also knew that FSP housed hundreds of severely mentally ill inmates who were taking psychotropic medications and were likely to manifest symptoms of their illnesses that could be confused by guards to constitute a "disturbance."[289] As explained by McAndrew, he knew as early as 1996 that "there were severely mentally ill inmates at FSP due to a lack of bed space in FDOC inpatient care facilities."[290] McAndrew advises that when faced with this situation, "[w]ardens have a special duty to protect these types of inmates from being hurt by security personnel simply for exhibiting behavior associated with their mental illness."[291] When asked whether severely mentally ill prisoners were housed at FSP due to a lack of inpatient bed space, Crosby replied ". . . I believe that to be true. I absolutely believe that to be true."[292]

In addition, Crosby knew that his guards were unable to distinguish between severely mentally ill inmates declaring a psychological emergency and inmates who were intentionally seeking to cause a disturbance. Crosby admitted, "I don't think they could differentiate between whether it was mental illness or whether they were just problematic and continued to act out."[293] Finally, it was common knowledge that mentally incompetent

---

[289] Ex. 16 at pp. 64-67.
[290] Ex. 47 at ¶ 18.
[291] *Id.*
[292] Ex. 6 at pp. 68-69.
[293] *Id.* at 70-71.

inmates were being gassed with chemical agents, as the following memo sent by FDOC, and

received by Crosby, indicates while discussing the importance of decontaminating inmates:

> Hopefully the inmate will comply. If not and he/she has a documented significant psychiatric history, a careful evaluation to determine whether the inmate is competent to refuse decontamination may be necessary. Involuntary decontamination may ultimately be required.[294]

Thus, the policy at FSP (as encouraged by FDOC) was to gas inmates first and ask questions

later regarding whether inmates were able to conform their behavior to FSP rules in the first

place.  Dr. Tuong T. Nguyen, the medical director at FSP, personally voiced her concerns to

Crosby and Clark regarding the high-rate at which mentally ill inmates were being gassed at

FSP, yet received no response from Crosby, Clark or any other security personnel.[295]

Even as early as 1998, the FDOC Office of Health Services warned prison officials

including those at FSP that "Pepper spray is <u>not</u> to be used on any inmate whose mental

grade is S-3 or above or who is in any inpatient mental health setting in order to provide

medical or mental health care."[296]  Accordingly, because it was prohibited to gas S-3 inmates

in order to *make them* take their medication or to *make them* see a psychologist, Defendants

knew that gassing S-3 inmates presented a substantial risk of harm, but allowed it anyway.

**F.     Eighth Amendment Considerations Precluding the Gassing of Mentally Ill Inmates**

It is cruel and unusual punishment to gas mentally ill inmates, including those who

are taking psychotropic medications, simply for screaming or banging on their cell door.  In

addition to the well-documented respiratory problems, medical ailments, and severe skin

burns these gases cause, the psychological harm these gasses inflict is tantamount to

---

[294] Ex. 108.

[295] *See* Ex. 114.

[296] *See* Ex. 115 (Office of Health Services Bulletin warning) at p.2.

psychological torture.  Four current and former FDOC mental health professionals: Dr. David Gibbs, Dr. Olga Infante, Dr. Peggy Watkins-Ferrell, and Dr. Tuong Nguyen, have described the psychological effects of gassing S-3 inmates.  According to Dr. Gibbs, gassing S-3 inmates "makes them more paranoid, frightened and fearful, and it makes them less trusting and more angry which is detrimental to the mental health services attempting to be provided to them."[297]  Dr. Infante states that mentally ill inmates are more likely to refuse decontamination after being gassed, because they become extremely agitated and are unable to process what has happened to them. [298]

Furthermore, Dr. Watkins-Ferrell, a psychologist currently posted at FSP, testified during her Rule 30(b)(6) deposition on behalf of McDonough that gassing mentally ill inmates can exacerbate the inmate's mental health condition and that ". . . other things can be used to contain the behavior, keep the inmates safe."[299]  Finally, Dr. Nguyen, the former medical director at FSP, unequivocally states "it is neither necessary nor acceptable to gas S-3 inmates with chemical agents in order to stop them from yelling or banging on their cell door.  These actions can be stopped through mental health intervention which is preferable to using force in these situations."[300]

In sum, gassing severely mentally ill inmates on psychotropic medications constitutes cruel and unusual punishment because of the following and Defendants know it:

- Gassing these inmates poses a substantial risk of harm to them because it can exacerbate the very mental health symptoms that the psychological staff are trying to treat--leading to a vicious cycle of behavior that requires further intervention with chemical agents to address the inmate's rapidly destabilizing behavior;

---

[297] *See* Ex. 89.
[298] *See* Ex. 41 at pp. 41-42, 64-65
[299] *See* Ex. 116 (Rule 30(b)(6) Watkins-Ferrell Deposition) at pp. 52-53.
[300] *See* Ex. 114.

- There is a substantial risk that these inmates' illnesses are affecting their behavior. Hence, these mentally ill inmates are effectively being punished for behavior they can neither control nor sometimes even articulate to psychologists;

- Mentally ill inmates who are gassed will necessarily distrust the security personnel who just gassed them, making it unlikely that they will subsequently comply with these same officers' commands to take a decontaminating shower (meaning that mentally ill inmates are at a substantial risk that they will suffer second degree burns as a result of being gassed)[301]; and

- Most importantly, as Dr. Watkins-Ferrell admitted and Dr. Nguyen confirmed, "rather than trying to rectify that behavior through the use of chemical agents, the mental health staff are there and psychiatric restraints can be used, other things can be used to contain the behavior, keep the inmates safe."[302]

Chemical agents constitute a level of force that is *manifestly unnecessary* under the circumstances. It is never necessary to gas a mentally ill inmate taking psychotropic medications simply to get him to stop screaming or banging on his cell door. According to Chase Riveland, "there is no penological justification for gassing inmates with chemical agents simply for yelling in their cells."[303] Moreover, Riveland explains that numerous jurisdictions, including the Federal Bureau of Prisons, prohibit this exact practice.[304]

As to this final point, Plaintiffs were repeatedly transferred from FSP to the inpatient mental health units at UCI after being gassed.[305] When Plaintiffs were transferred back to FSP, they would be gassed again, then returned to UCI. As Crosby indicates, UCI is located "down the sidewalk" from FSP.[306] But if a Plaintiff yells in his cell or bangs on his door at

---

[301] *See* Ex. 9 at p. 24.
[302] Ex. 116 at pp. 52-53.
[303] *See* Ex. 8 at 62.
[304] *See* Ex. 8 at pp. 24-27.
[305] *See* Exs. 13, 42, 63, and 85. Plaintiffs were also transferred to other inpatient mental health facilities where gassings were also prohibited.
[306] Ex. 6 at p. 199.

FSP, he is gassed with chemical agents;[307] if, after being transferred the next day to UCI, he engages in the same behavior, UCI officials manage him non-violently because "the Department policy precludes the routine use of chemical agents with inmates in inpatient settings."[308]  Given that the unit layouts of FSP and UCI are strikingly similar, and the fact that "other things can be used to contain the behavior, keep the inmates safe"[309] at UCI, it is unconstitutional to gas mentally ill inmates at FSP in response to the same behavior.

## PROCEDURAL HISTORY

Plaintiffs' Second Amended Complaint seeks declaratory and injunctive relief against Defendants McDonough and Bryant, and damages against twenty-eight (28) guards and supervisors.[310]  All Defendants filed Motions to Dismiss, which this Court denied.[311] The Eleventh Circuit subsequently affirmed this Court's denial of Defendant Wilson's Motion to Dismiss based on qualified immunity.[312]  Nineteen Defendants were voluntarily dismissed and the remaining Defendants have filed nine motions for summary judgment.[313]  Plaintiffs sought leave to file an omnibus Response to Defendants' Motions, which this Court granted.[314]  Plaintiffs address all of Defendants' arguments herein.

## SUMMARY JUDGMENT STANDARD

The Court may only grant summary judgment if "the evidence before the court demonstrates that 'there [are] no genuine issue[s] of material fact and that the moving party

---

[307] *See* Ex. 21 at pp. 19-22.
[308] *See* Ex. 94 at p. 61.
[309] Ex. 116 at pp. 52-53.
[310] *See* (Doc. 142).
[311] *See* (Docs. 145, 153, 215); (Docs. 193, 228).
[312] *See* Ex. 117 (*Butler v. McDonough*, No. 06-13662 (11th Cir. Nov. 30, 2006)
[313] *See* (Docs. 253, 289, 292, 295, 297, 303, 304, 305, 306).
[314] *See* (Docs 307, 312).

is entitled to judgment as a matter of law.'"[315]   In deciding whether a genuine issue of material fact exists, the Court must consider "the pleadings, depositions, affidavits, answers to interrogatories and admissions" in the record,[316] and "must draw all reasonable inferences in Plaintiffs' favor."[317]   Additionally, "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . ."[318]  In responding to Defendants' motions, Plaintiffs' have submitted over 130 exhibits establishing that Defendants have violated, and will continue to violate, Plaintiffs' Eighth Amendment right to be free from excessive force.

<u>**ARGUMENT**</u>

## I.      <u>Introduction and Roadmap of Issues to be Discussed</u>

Defendants have filed nine separate motions for summary judgment.  Defendants' motions raise the following arguments:

| Name of Defendant | Arguments Raised in Defendants' Motions for Summary Judgment and Page Numbers in this Response that Refute Defendants' Arguments |
|---|---|
| James Crosby | • Insufficient Exhaustion of Administrative Remedies by Plaintiffs Thomas, Massie, Ulrath and McKinney; (102-119)<br>• Lack of Supervisory Liability; (5-48, 55-68)<br>• Qualified Immunity; (5-48, 55-68, 77-81)<br>• Lack of Physical Injury Suffered by McKinney; (29-31, 52-55) |
| George Sapp | • Mootness as to Eugene Ulrath; (75)<br>• Insufficient Exhaustion by Thomas; (102-103, 107-118)<br>• Qualified Immunity; (5-20, 32-48, 55-63, 75-81)<br>• Lack of Supervisory Liability; (5-20, 32-48, 55-63, 75-81)<br>• Failure of Massie to State a Claim; (5-20, 32-48, 55-63, 75-81) |
| Allen Clark | • Qualified Immunity; (5-20, 32-48, 55-63, 69-72, 77-81)<br>• Lack of Supervisory Liability; (5-20, 32-48, 55-63, 69-72)<br>• Insufficient Exhaustion by Thomas; (102-103, 107-118) |

[315] *Mathews v. Crosby*, 480 F.3d 1265, 1268-69 (11th Cir. 2007) (citing Fed. R. Civ. P. 56(c)).
[316] *Skrtich v. Thornton*, 280 F.3d 1295, 1299 (11th Cir. 2002).
[317] *Cottrell v. Caldwell*, 85 F.3d 1480,1486 n.3 (11th Cir. 1996).
[318] *Anderson v. Liberty Lobby. Inc.*, 477 U.S. 242, 254 (1986).

| Bradley Carter | • Failure of Ulrath to State a Claim; (21-26, 32-48, 54-63, 72-73)<br>• Qualified Immunity; (21-26, 32-48, 54-63, 72-73, 77-81)<br>• Lack of Supervisory Liability; (21-26, 32-48, 54-63, 72-73)<br>• Lack of Physical Injury Suffered by Ulrath; (21-26, 50-55) |
|---|---|
| Michael Rathmann | • Insufficient Exhaustion by McKinney; (102-106, 118-119)<br>• Lack of Physical Injury Suffered by McKinney; (27-31, 50-55)<br>• Qualified Immunity; (27-48, 61-63, 73-75, 77-81)<br>• Lack of Supervisory Liability; (27-48, 61-63, 73-75)<br>• Failure of McKinney to State a Claim; (27-48, 50-55, 61-63, 73-81) |
| Oscar Shipley | • Failure to Present Disputed Material Facts Warranting a trial; (21-26, 34-35, 45-48, 55-61, 77-80)<br>• Qualified Immunity; (pp. 21-26, 34-35, 45-48, 55-61, 77-80)<br>• Lack of Physical Injury Suffered by Ulrath; (21-26, 50-55) |
| Stacey Green | • Lack of Physical Injury Suffered by Massie; (16-20, 50-55)<br>• Qualified Immunity; (16-20, 34-37, 45-48, 50-60, 77-80) |
| James McDonough<br><br>Randall Bryant | • Mootness/Standing Regarding Plaintiffs not Currently Housed at FSP; (5, 14-15, 26-27, 98-102)<br>• Lack of past Constitutional violation warranting injunctive relief; (5-48, 51-81)<br>• Lack of present Constitutional violation warranting injunctive relief; (5-120, emphasis on 81-102) |

The remainder of this response thoroughly refutes each of Defendants' arguments.[319]

Plaintiffs have attempted to avoid repeating facts and legal principles that are applicable to more than one Defendant, and ask the Court to refer to the chart above for clarification as to the sections herein that are responsive to specific arguments set forth by Defendants.

**II.    Plaintiffs' Record Evidence Establishes that Defendants' Gassings were Malicious and Sadistic and Caused Plaintiffs to Sustain Physical Injuries**

**A.    Plaintiffs Have Undoubtedly Suffered Sufficient Physical Injuries to Maintain their Lawsuit Against Defendants**

**1.    Introduction and Governing Law**

The Supreme Court has held that "[t]he Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis*

---

[319] *See* (Docs. 253, 289, 292, 295, 297, 303, 304, 305, 306).

uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'"[320]  Similarly under 42 U.S.C. § 1997e(e), "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  The Eleventh Circuit has fused the physical injury analysis under the PLRA with the *Hudson* analysis of claims brought under the Eighth Amendment for cruel and unusual punishment.[321]  To satisfy the physical injury requirements of both the Eighth Amendment and the PLRA, the injury must be more than *de minimis*, but need not be significant.[322]  The Supreme Court has held that malicious and sadistic use of force is actionable "whether or not significant injury is evident."[323]  And the Eleventh Circuit has implied that uses of force that are "repugnant to the conscience of mankind" might be actionable in a damages suit.[324]

Prior to discussing Defendants' malicious and sadistic intent in gassing Plaintiffs, it is necessary to dispense with various Defendants' contentions that any or all Plaintiffs failed to suffer sufficient physical injury to maintain this lawsuit.  First, however, Plaintiffs note that Crosby, Sapp, and Clark have conceded this issue with respect to Thomas and Massie; Crosby has additionally conceded this issue with respect to Ulrath.  As to the Defendants that have conceded physical injury, they have now waived any right to raise the affirmative defense of Plaintiffs' failure to sustain physical injuries as required by the PLRA.[325]

---

[320] *See Hudson*, 503 U.S. at 10 (quoting *Estelle*, 429 U.S. at 106).
[321] *See Harris v. Garner*, 190 F.3d 1279, 1287 (11th Cir.1999), *vacated*, 197 F.3d 1059, *reinstated in relevant part*, 216 F.3d 970 (11th Cir.2000) ( *en banc*).
[322] *See Harris*, 190 F.3d at 1286.
[323] *See Hudson*, 503 U.S. at 9.
[324] *See Harris*, 190 F.3d at 1287, n.7.
[325] *See Anderson-Bey v. District of Columbia*, 466 F.Supp.2d 51, 60 (D. D.C. 2006) (holding that the physical injury requirement is an affirmative defense that can be waived) *accord Caldwell v. District of Columbia*, 201 F.Supp.2d 27, 34 (D.D.C. 2001).

Attempts by Defendants to raise such arguments in a permissive reply would be improper, as litigants are prohibited from raising new arguments for summary judgment in a reply.[326]

Next, Plaintiffs note the Defendants who have raised a lack of physical injury claim:

| Name of Defendant | Plaintiff who Allegedly did not Suffer Sufficient Physical Injury |
|---|---|
| James Crosby (Doc. 297) | • Michael McKinney |
| Bradley Carter (Doc. 303) | • Eugene Ulrath |
| Michael Rathmann (Doc.294) | • Michael McKinney |
| Oscar Shipley (Doc. 295) | • Eugene Ulrath |
| Stacey Green (Doc. 305) | • Curt Massie |

### 2.   Plaintiffs' Physical Injuries Plainly Satisfy the Requirements of the Eighth Amendment and the PLRA

#### a.   General Considerations

Courts have recognized that the types of injuries caused by the malicious and sadistic application of chemical agents are sufficient to satisfy the physical injury requirements of the PLRA and the Eighth Amendment.  For instance, the Eighth Circuit has held that the "intense burning on [the] skin" that is caused by the exact "MK-46" canister used on Plaintiffs in this case constitutes sufficient physical injury to avoid dismissal.[327]   Similarly, the Middle District of Florida has permitted an inmate's claim to proceed when the inmate alleged only "shortness of breath" caused by chemical agents.[328]

---

[326] *See Fromm-Vane v. Lawnwood Medical Center, Inc.*, 995 F.Supp. 1471, 1475 (S.D. Fla. 1997).

[327] *Lawrence v. Bowersox*, 297 F.3d. 727, 730, 733 (8th Cir. 2002).  Defendants overstate the ruling in *Jones v. Shields,* a case preceding Lawrence in which the Eighth Circuit found that administration of a small amount of pepper spray against an inmate who was outside of his cell caused only *de minimis* injuries.[327] Plaintiffs' gassings are far more analogous to the gassing in *Lawrence* than the gassing in *Jones*.

[328] *Gunn v. Sullivan*, No. 2:04-cv-229, 2007 WL 80859 (M.D. Fla. Jan 8, 2007).

Similarly, many other Courts have held that injuries far less serious than the undisputed second-degree burns suffered by Plaintiffs are not barred by the PLRA. For instance, Courts have held that "bruising, scarring and swelling" are sufficient injuries.[329] Moreover, injuries such as: (1) aggravation of asthma[330]; (2) weight loss, abdominal pain, and nausea[331]; (3) denial of exercise[332]; (4) rashes[333]; (5) headaches and back pain[334]; and (7) tenderness and soreness[335] have all been held to be sufficiently serious to survive dismissal. Finally, one Circuit has held that an injury need not be observable, diagnosable, or requiring treatment by a medical professional to meet the PLRA standard.[336]

### b.      Jeremiah Thomas Suffered Sufficient Physical Injury

As an initial matter, Plaintiffs call the Court's attention to the fact that *no Defendant* has argued that Jeremiah Thomas's injuries were insufficient to support a lawsuit under the Eighth Amendment or the PLRA.[337]

### c.      Curt Massie, Eugene Ulrath, and Michael McKinney Suffered Sufficient Physical Injuries

Pursuant to the cases cited above, the injuries suffered by Massie, Ulrath, and McKinney also satisfy the PLRA's physical injury requirement. Even Defendants' expert Dr. Dushoff agrees that Plaintiffs suffered second degree burns.[338] As evidenced by the

---

[329] *See Watford v. Bruce*, 126 F. Supp.2d 425, 425 (E.D. Va. 2001); *accord Root v. Smith*, No. 1:03-cv-030, 2005 WL 1177914 (M.D. Fla. 2005); *cf. Gibbs v. Cross,* 160 F.3d 962 (3d Cir.1998)(severe headaches, mucus, watery eyes from "dust, lint, and shower odor" constitute "serious physical injury" under 28 U.S.C. § 1915(g)).
[330] *Robichaux v. Cain*, 99 Fed. Appx. 561, 562 (5th Cir. 2004).
[331] *Williams v. Humphreys*, No. CIV A CV504-053, 2005 WL 4905109 at *7 (S.D.Ga. Sept. 13, 2005).
[332] *Williams v. Goord*, No. 99Civ.1680, 2000 WL 1051874 at *8 n.4 (S.D.N.Y. July 28, 2000)
[333] *Caldwell v. District of Columbia*, 201 F.Supp.2d 27, 34 (D.D.C. 2001)
[334] *Rinehart v. Alford*, No. 3-02-CV-1565AH, 2003 WL 23473098 at *2 (N.D. Tex., Mar. 3, 2003)
[335] *Mansoori v. Shaw*, No. 99 C6155, 2002 WL 1400300 at *3 (N.D.Ill., June 28, 2002)
[336] *Oliver v. Kelly* 289 F.3d 623, 628 (9th Cir. 2002).
[337] *See* (Docs. 253, 289, 292, 295, 297, 303, 304, 305, 306).
[338] Ex. 58 at pp. 60.

attached photographs, Massie suffered massive second-degree burns all over his body which ultimately required him to be hospitalized.[339]   Green's contention that Massie's injuries were exacerbated by an allergic reaction to the medication given to him by FDOC is both a disputed fact and immaterial to this analysis.[340]  Dr. Stopford has testified that Massie's burns were caused by his allergy to the CN gas with which he was sprayed.[341]   Furthermore, Defendants are nonetheless liable for any damage, such as a reaction resulting from the cream FDOC prescribed to treat Massie's chemical burns, that was a reasonably foreseeable consequence of their improper gassing of Massie.[342]

Similarly, Ulrath sustained severe second-degree chemical burns and developed large blisters on his back, buttocks and legs.[343]   The burns Ulrath suffered far exceed the lesser injuries that have been determined to be sufficient to preclude dismissal under the PLRA's physical injury requirement.

Finally, McKinney suffered intense pain, burning-eyes and skin, a burn on his right shoulder, and sharp chest pains.[344]   Defendants single out McKinney because there is no photographic evidence of McKinney's physical injuries.  Nevertheless, McKinney's testimony provides sufficient evidence of injury, and 1997e(e) does not require photographic proof of physical injury.  The burn on his shoulder is sufficient, in and of itself, to satisfy the physical injury requirement.   In addition, the cumulative effect of the intense pain and burning McKinney experienced after being repeatedly gassed with the entire arsenal of

---

[339] *See* Ex. 57.
[340] *See* Doc. 305 at p. 15.
[341] *See* Ex. 9 at p. 100.
[342] *See Grandstaff v. City of Borger, Tex.*, 767 F.2d 161, 168 (5th Cir. 1985).
[343] *See* Ex. 9 at p. 117; Ex. 77.
[344] *See* Ex. 9 at p. 64; Ex. 93 at pp. 36-38, 49-50.

chemical agents also warrants a finding that the suffering inflicted onto McKinney was not *de minimis*.  More than 50 years ago, Justice Frankfurter wrote that, when it comes to the treatment of detained persons, "there comes a point where this Court should not be ignorant as judges of what we know as men."[345]  Plaintiffs submit that Defendants' 36 total uses of chemical agents against McKinney, a severely mentally ill inmate, for no legitimate penological purpose, is "repugnant to the conscience of mankind."[346]  As such, even if the Court finds McKinney's injuries to be *de minimis*, it should still allow McKinney to proceed with his claim because of the cumulative harm he has suffered from the 36 unnecessary gassings he has had to endure.  Finally, the Eleventh Circuit has also recognized that the PLRA does not preclude a prisoner's recovery of nominal damages, even in the absence of physical injury, where the prisoner establishes a violation of a fundamental constitutional right.[347]  Accordingly, McKinney's damages claim must be allowed to proceed to trial so long as the Court finds that officers used force against him maliciously and sadistically.  The same principle applies to Plaintiffs Thomas, Massie, and Ulrath.

### B.   Defendants Green and Shipley Acted Maliciously and Sadistically in Gassing Plaintiffs Massie and Ulrath

After establishing that they sustained more than *de minimis* physical injuries, Plaintiffs next show that material facts are in dispute regarding whether they were maliciously and sadistically gassed with chemical agents.  As an initial matter, Defendant Green has conceded that "the disputed facts concerning the spray incident, would, standing

---

[345] *Watts v. Indiana*, 338 U.S. 49, 52 (1949).

[346] *See Harris,* 190 F.3d at 1287, n.7.

[347] *See Hughes v. Lott*, 350 F. 3d 1157, 1162 (11th Cir. 2003).

alone, create a jury issue." While not all Defendants have so conceded, the facts in dispute

regarding the uses of chemical agents against Plaintiffs should be determined at trial.

### 1.      Legal Standard for Eighth Amendment Excessive Force Claims

The Eighth Amendment to the United States Constitution, which prohibits cruel and

unusual punishment, protects prisoners against "unnecessary and wanton infliction of

pain."[348] When guards use force against prison inmates, the determination of whether there

was an unnecessary and wanton infliction of pain depends on "whether force was applied in a

good faith effort to maintain or restore discipline or maliciously and sadistically for the very

purpose of causing harm."[349] According to the Supreme Court, what is necessary to show

sufficient harm for Eighth Amendment purposes depends upon the claim at issue, given that

Eighth Amendment claims are responsive to contemporary standards of decency.[350] In

evaluating whether Plaintiffs were maliciously and sadistically gassed, the Court must

consider the following factors: (1) the extent of the injuries suffered by Plaintiffs; (2) the

need for the use of gas; (3) the relationship between that need and the amount of force used;

(4) the threat reasonably perceived by Defendants; and (5) any efforts made by Defendants to

temper the severity of the force used.[351]

The determination of whether an officer has used excessive force does not hinge on

the type of force that an officer uses.[352] The Seventh Circuit recognized, "[i]t is a violation

---

[348] *See Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

[349] *Hudson v. McMillan*, 503 U.S. 1, 6-7 (1992)

[350] *See Hudson*, 503 U.S. at 8-9.

[351] *See Hudson*, 503 U.S. at 7; *see also Harris v. Chapman*, 97 F.3d 499, 505 (11th Cir. 1996).

[352] *See e.g., Landman v. Royster*, 333 F. Supp. 621, 649 (E.D. Va. 1971) ("If chaining a man to his bars, punishing him with a strap, and other corporal punishment should be enjoined, this Court cannot make a principled distinction which would permit the use of tear gas to punish or control the non-threatening inmate.") (internal citations omitted).

of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain."[353] Critically, the Eleventh Circuit and the Middle District of Florida have also held that the use of chemical agents against inmates in confinement can violate the Eighth Amendment.[354]   In the Middle District case, the plaintiff was similarly subjected to the non-spontaneous use of chemical agents while he was confined alone in his cell.[355]   Courts closely scrutinize the use of chemical agents in prisons and jails because such weapons "possess inherently dangerous characteristics capable of causing serious and perhaps irreparable injury to the victim."[356] Moreover, other Courts have held that "it is a violation of the Eighth Amendment for prison officials to use mace or other chemical agents . . . for the sole purpose of punishment or the infliction of pain."[357]

Accordingly, it is necessary for this Court to examine the "totality of the circumstances, including the provocation, the amount of gas used, and the purposes for which

---

[353] *Soto v. Dickey,* 744 F.2d 1260, 1270 (7th Cir.1984), *cert. denied,* 470 U.S. 1085 (1985).

[354] *Butler v. McDonough*, 208 Fed. Appx. 741, 742 (11th Cir. 2006); *Gunn v. Sullivan*, No. 2:04-cv-229, 2007 WL 80859 (M.D. Fla. Jan 8, 2007).

[355] *Gunn v. Sullivan*, at *2.

[356] *Id. quoting  Slakan v. Porter,* 737 F.2d 368, 372 (4th Cir.1984), *cert. denied,* 470 U.S. 1035 (1985).

[357] *Soto v. Dickey,* 744 F.2d 1260, 1270 (7th Cir. 1984); see also *Lawrence v. Bowersox*, 297 F.3d 727, 730-32 (8th Cir. 2002) (holding that the use of chemical agents against two inmates who were compliant and locked in a cell constituted excessive use of force because the inmates were confined to their cell and did not disobey any orders, they were doused with a huge can of pepper spray, and they both complained of skin and eye problems following the incident.); *Foulk v. Charrier*, 262 F.3d 687, 701-02 (8th Cir. 2001) (holding that a correctional officer had acted maliciously and sadistically when, after the plaintiff demanded to speak to a correctional supervisor, the officer later enticed the plaintiff to come to the front of his cell and then sprayed him in the face with chemical agents.); *Wilson v. DeTella*, No. 97-cv-7833, 1999 U.S. Dist. LEXIS 17181 (N.D. Ill. 1999) (holding that the use of chemical agents against a sleeping inmate who was later denied medical attention violated the Eighth Amendment and constituted "a degree of brutality offensive to human dignity."); *DeSpain v. Uphoff*, 264 F.3d 965, 978 (10th Cir. 2001) (applying the Whitley standard including the need for force and the amount of force used, and finding that an officer acted maliciously and sadistically when he sprayed pepper spray into plaintiff's housing tier not a good faith effort to maintain or restore order); *Williams v. Landen*, No. 90-6505, 1990 U.S. App. LEXIS 22059, *2-3 (4th Cir. 1990) (stating that although the use of tear gas against a confined prisoner is not unlawful per se, the use of chemical agents against a locked-down inmate violates the Eighth Amendment when no force is needed under the circumstances and the amount of tear gas used is unreasonable).

the gas is used [to] determine[e] the validity of the use of tear gas in the prison environment."[358]  The imposition of pain upon inmates without penological justification is proscribed by the Eighth Amendment.[359]  Moreover, instances of "physical abuse directed at [a] prisoner *after* he terminate[s] his resistance to authority would constitute an actionable eighth amendment violation."[360]  Significantly, the Eleventh Circuit has found that the use of force in retaliation for a provocative act occurring some time earlier is "more likely to be not an effort to restore order but instead either a motive for 'maliciously' striking the inmate 'for the purpose of causing harm' or else summary, informal, unofficial and unsanctioned corporal punishment."[361]

Prison officials additionally violate the Eighth Amendment when they use force "without penological justification,"[362] or "summarily and maliciously [to] inflict harm in retaliation for past conduct."[363]  It is well-established in the Eleventh Circuit that force is not justified against a non-resisting prisoner who does not pose a threat to security.[364]  Additionally, threatening language from officers can be relevant to the determination

---

[358] *See id.* (quoting *Bailey*, 736 F.2d at 969); *see also Justice v. Dennis,* 834 F.2d 380, 383 (4th Cir.1987) (en banc), *vacated on other grounds,* 490 U.S. 1087 (1989).

[359] *See id.* (citing *Evans v. Dugger,* 908 F.2d 801, 803 (11th Cir.1990) (citations omitted)). *See also Ort v. White,* 813 F.2d 318; *Rhodes v. Chapman,* 452 U.S. 337, 346 (1981).

[360] *See id.* (citing *Hope v. Pelzer,* 536 U.S. 730, 731 (2002)) (quoting *Ort v. White,* 813 F.2d 318, 324).

[361] *See id.* (citing *Ort v. White,* 813 F.2d 318, 324 (quoting *Smith v. Dooley,* 591 F.Supp. 1157 (W.D.La.1984), *aff'd,* 778 F.2d 788 (5th Cir.1985) (quoting *Dailey v. Byrnes,* 605 F.2d 858, 861 (5th Cir.1979). In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc) the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[362] *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)

[363] *Ort v. White*, 813 F.2d 318, 325 (11th Cir. 1987)

[364] *See, e.g., Skrtich*, 280 F.3d at 1303-04 (holding in a case naming Defendant Green that beating an inmate who had been incapacitated by a stun shield clearly constituted excessive use of force even if the initial decision to stun him was justified by his refusal to come out of his cell); *Breeden*, 280 F.3d at 1321-23; *Hope v. Pelzer*, 536 U.S. 730 (2002) (holding use of hitching post unconstitutional once inmate had ceased presenting any type of threat); *Davis v. Locke*, 936 F.2d 1208, 1212 (11th Cir. 1991) (holding, with respect to an inmate who was captured by officers after trying to escape, that dropping him on his head while he was in handcuffs constituted excessive force because he no longer posed a threat).

regarding the correctional officer's subjective intent to harm the inmate.[365]   Finally, the

Eighth Amendment not only prohibits the unjustified use of force, but also the excessive use

of force.   In the Eleventh Circuit, "[p]rison officials step over the line of constitutionally

permissible conduct if they use more force than is reasonably necessary in an existing

situation."[366]   Even if the original use of force is justified, chemical agents are nonetheless

unconstitutional if used in excessive quantities.[367]

> ## 2.   Defendant Green Acted Maliciously and Sadistically in Gassing Plaintiff Curt Massie without Justification

Green's use of chemical agents against Massie violated the Eighth Amendment, as

application of the *Hudson* factors plainly establish.   Green's use of chemical agents against

Massie caused him intense pain and second degree burns all over his body that required

Massie's hospitalization.[368]   Additionally, there was no need to use *any amount* of force

against Massie.   Even assuming Massie was yelling in his cell or kicking on his cell door as

Green reported -- and the "unspecified superior officer" added --  there is no legitimate

penological purpose to use force against a mentally ill inmate who is noisy in his cell simply

because he did not receive his anxiety medication.   Any reasonable officer in Green's

position would not have perceived a threat from Massie, who was alone safely confined in

the back of his cell behind a well-secured steel door.[369]

---

[365] *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005) (citing Evans v. Stephens, 407 F.3d 1272, 1281-82 (11th Cir. 2005)).

[366] *Ort*, 813 F.2d at 325

[367] *See Soto*, 744 F.2d at 1260 (holding that it violates the Eighth Amendment to use chemical agents in quantities greater than necessary); *see also Spain v. Procunier*, 600 F.2d 189, 196 (9th Cir. 1979) (permitting the use of chemical agents solely in narrowly defined circumstances such as when there are "safeguards to ensure that gas is not used in dangerous quantities.").

[368] *See* Ex. 55 at p. 28.

[369] *See* Ex. 56.

Critically, Massie was not yelling or kicking his door, he was sitting quietly on his bunk when Defendant Green gassed him.  Green made no attempt to avoid using force, but rather, used chemical agents against Massie to punish him for complaining about not receiving his anxiety medication.  Even though Green already had an extensive history of abusing inmates, the number of Green's uses of force suddenly increased after Crosby discontinued videotaping uses of chemical agents.[370]  Moreover, Green submitted an altered use of force report regarding his use of chemical agents against Massie.  These facts support Massie's allegations that Green used force against him maliciously and sadistically in violation of the Eighth Amendment.  Massie has established that material facts remain in dispute regarding whether Green's use of force against him violated the constitution.

### 3.   Defendant Shipley Acted Maliciously and Sadistically in Gassing Plaintiff Eugene Ulrath without Justification

Shipley's use of chemical agents against Ulrath also violated Ulrath's Eighth Amendment rights, as the application of the *Hudson* factors plainly establish.  Shipley's gassing of Ulrath caused him intense pain, second degree burns, and psychological trauma which led Ulrath to attempt to commit suicide.[371]  Shipley gassed Ulrath without warning even though Ulrath was lying quietly on his bunk and there was no need to use force at all.

Even if Ulrath was yelling in his cell or banging on his cell door as Shipley reported, there is no legitimate penological purpose to use force against a mentally ill inmate who is simply being noisy in his fully-secured cell.[372]  Moreover, under the facts as Ulrath alleges, a reasonable officer in Shipley's position would not have perceived any threat from Ulrath,

---

[370] *See* Ex. 49.
[371] *See* Ex. 9 at pp. 117-122; Ex. 77; Ex. 79.
[372] *See* Ex. 8 at p. 62.

who was alone in his cell and lying on his bunk.  Shipley also made no attempt to avoid using force against Ulrath.  His malice is further demonstrated by the fact that he entered Ulrath's cell in violation of FDOC policy and intimidated him only hours after Ulrath returned from suicide watch.  A reasonable factfinder can infer malicious and sadistic intent from these facts and the fact that Shipley was using steroids, which increase aggression, and engaging in felony distribution of steroids the day he gassed Ulrath.  In sum, Ulrath has sufficiently established that material facts remain in dispute regarding whether Shipley used force against him maliciously and sadistically in violation of the Eighth Amendment.

> **C.    Defendants Crosby, Carter, Rathmann, Clark, and Sapp were Deliberately Indifferent to the Malicious and Sadistic Use of Force against Plaintiffs Thomas, McKinney, Massie, and Ulrath**

> **1.    Legal Standard for Deliberate Indifference Supervisory Liability**

It is well-settled that prison officials have a duty to protect inmates from inhumane conditions of confinement that threaten inmates' health and safety.[373]   In the Eleventh Circuit, deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence.[374]   Under the deliberate indifference standard, an Eighth Amendment claimant does not have to show that a prison official intended harm to the inmate, but only that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.[375]

As the Supreme Court has explained, "[w]hether a prison official had the requisite knowledge of a substantial risk of harm is a question of fact subject to demonstration in the

---

[373] *Hope v. Pelzer*, 536 U.S. 730, 737-38 (2002); *Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *Helling v. McKinney*, 509 U.S. 25, 33 (1993); *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984).
[374] *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999).
[375] *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."[376]   On summary judgment, a genuine issue of material fact exists if the record contains evidence, even if only circumstantial, of subjective awareness of the risk of harm.[377] For instance, the Eleventh Circuit has held that the risk of harm to an inmate who had exhibited visible physical deterioration and weight loss was obvious and would permit a jury to infer knowledge of a substantial risk of serious harm.[378]

Prison supervisory officials are liable under Section 1983 either when the supervisor personally participates in the alleged constitutional violation, or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation.[379]   The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.[380]   In addition, supervisory liability attaches upon Plaintiff's creation of an inference that the supervisor's "failure to take appropriate measures to improve prisoner safety created a climate that preordained the ensuing violence."[381]   Finally, the Eleventh Circuit has explained that supervisory liability may also be shown when custom or policy results in deliberate indifference or an inference that the supervisor "knew that the subordinates

[376] *Id.*
[377] *Campbell v. Sikes*, 182 F.3d 1248, 1364 (11th Cir. 1999).
[378] *McElligott v. Foley*, 182 F.3d at 1256.
[379] *Hartley v. Parnell*, 193 F.3d 1263, 1268 (11th Cir. 1999); *La Marca v. Turner*, 995 F.2d 1526 (11th Cir. 1993).
[380] *Id.* (holding "[t]he deprivations that constitute wide-spread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." (citing *Brown v. Crawford*, 906 F.2d 667 (11th Cir. 1990)). *See also Gonzalez v. Reno.* 325 F.3d 1228 (11th Cir. 2003)
[381] *Mathews*, 480 F.3d at 1275 (citing *LaMarca*, 995 F.2d at 1539).

would act unlawfully and failed to stop them from doing so."[382]   Plaintiffs have established that material facts remain in dispute regarding whether Crosby was deliberately indifferent to the substantial risk that they would be unconstitutionally gassed.

### 2. Defendant Crosby Violated Plaintiffs Thomas's, Ulrath's, Massie's, and McKinney's rights

#### a. Plaintiffs Generally

Crosby violated Plaintiffs' constitutional rights because he was deliberately indifferent to the substantial risk that they would be harmed with chemical agents.  Prior to the first use of chemical agents at issue in this case on September 20, 2000 (against Thomas), Crosby knew that FSP had a notorious reputation for inmate abuse.  Crosby personally knew that guards abused inmates.  He was the Warden at FSP when guards killed inmate Frank Valdes and beat inmate Willie Mathews.  Before Valdes' death between 1996 and 1998, there were never more than 25 uses of chemical agents per year; but after Valdes' death, inmates at FSP were gassed 238 times in 2000, 385 times in 2001, and 447 times in 2002 under Crosby's leadership.  Crosby knew about this rapid increase in the use of chemical agents because he met with Clark and Sapp every morning to discuss the uses of force that had occurred the previous day.

Crosby's predecessor, Ron McAndrew, warned him about abusive guards including Shipley and Green.   Crosby knew that Shipley and Green had histories of inmate abuse and other dangerous behavior.  He also knew that Clark had a disciplinary record that included suspensions and citations for inappropriate use of force and lying to investigators.   He therefore knew that these officers posed a substantial risk to inmates.

---

[382] *Cottone*, 326 F.3d at 1360.

Even more critically, Crosby knew that guards falsified use of force reports.  He knew that guards would manipulate video cameras in order to "cover up" their abuse of inmates.  And he knew that the FDOC use of force rules gave this same population of guards broad discretion to decide what inmate conduct constituted a "disturbance" and to determine how they would respond to "disturbances."

Crosby knew that guards were not trained or able to discern when an inmate's behavior was the result of a mental illness, and that there were hundreds of severely mentally ill inmates at FSP because of a lack of inpatient bed space at UCI and the explicit decision to house S-3 CM inmates at FSP.  He specifically knew that a group of inmates including Thomas were known as "frequent fliers" because of their predictable decompensation at FSP and subsequent need to be transferred to UCI for inpatient care.  Significantly, he knew that gassing severely mentally ill inmates classified as S-3 posed a serious risk of harm to those inmates' safety because the FDOC Office of Heath Services and Dr. Nguyen told him so.

Despite knowing the foregoing prior to September 20, 2000, Crosby personally took several steps that were not only deliberately indifferent, but virtually guaranteed Plaintiffs would be abused.  He discontinued videotaping of non-spontaneous use of chemical agents at FSP.  The Eleventh Circuit has twice found that Crosby's decision to discontinue the use of cameras may have "sent a message to corrections officers that the administration at FSP was going to permit further abuse of inmates."[383]  Crosby refused to read inmates' abuse of force complaints.  He knew that officers wrote false reports, because of Montrez Lucas's actions and lasting influence, but he did not even look into reports that appeared irregular.  He

---

[383] *Matthews*, 480 F.3d at 1273; *Valdes v. Crosby*, 450 F.3d 1231, 1241 (11th Cir.  2006).

promoted Clark to a position that gave him control of all uses of force at FSP.  He promoted Green and Shipley and allowed them to work on wings with severely mentally ill inmates. He allowed guards to use chemical agents against asthmatic and severely mentally ill inmates even though he had the authority to establish a "no chemical agents" wing, to exempt specific inmates from the use of chemical agents based on their physical and mental health conditions, or to exempt all S-3 inmates at FSP from the use of chemical agents.[384]  Finally, he allowed the use of chemical agents against asthmatic inmates, including those who were severely mentally ill, who were yelling in their cell or banging on their cell doors when there was no legitimate penological purpose to do so.[385]   These general knowing actions and inactions, in conjunction with Crosby's specific actions and inactions with regard to each Plaintiff, were directly responsible for causing Plaintiffs' unconstitutional gassings..

### b.      Plaintiff Thomas

Crosby was deliberately indifferent to the risk of harm to Thomas.  Crosby knowingly allowed guards to gas Thomas on September 20, 21, 23, 24, 25, and 26, 2000.  The *Hudson* factors show that the uses of force against Thomas violated the Eighth Amendment.  As a result of these gassings, Thomas completely decompensated, developed second degree burns, and suffered asthma attacks.[386]

There was no need to use any force at all against Thomas, who was alone and securely confined behind the steel door of his cell; and was simply manifesting the unavoidable symptoms of his severe mental illnesses.  Reasonable officers would not have perceived any threat from Thomas, who was alone in his cell and in need of mental health

---

[384] *See* Ex. 47.
[385] *See* Ex. 8.
[386] *See* Ex. 9 at pp. 106-116.

care when guards gassed him.   There was no legitimate penological purpose to using chemical agents against Thomas even if he was being noisy in his cell.   The officers sought no alternatives to using force.   Significantly, not once did any of the Defendants or guards ask one of the mental health staff to talk with Thomas in order to attempt to resolve the situation prior to using force.

Crosby allowed Thomas to be abused even though he admits he knew Thomas was severely mentally ill.   He knew Thomas had been gassed eight times in a twenty-one day period in July 2000 immediately upon his return from inpatient care at UCI.   He also knew that the use of chemical agents had no effect on Thomas's behavior and that addressing Thomas's behavior through medication, counseling, or videotaping had previously been successful in reducing Thomas's "disruptive" behavior.   And, most importantly, he knew that medical staff had twice stated that Thomas' severe mental illness was a contraindication to the use of chemical agents.   Crosby also knew that guards nonetheless continued to use chemical agents against Thomas.

Despite this knowledge, Crosby took no action to protect or to provide treatment for Thomas when he was in acute mental health crisis on September 20, 21, 23, 24, 25, or 26, 2000.   Crosby allowed Clark to continue to authorize uses of chemical agents against Thomas, and allowed Sapp to continually approve them after the fact until Thomas was finally transferred to an inpatient unit on September 29, 2000.   Crosby's knowing actions and inactions caused the violation of Thomas's constitutional rights by allowing Thomas to suffer needless gassings six times in seven days.

### c.       Plaintiff Massie

Crosby was additionally deliberately indifferent to the risk of harm to Massie. Defendant Green gassed Massie, an S-3 inmate, merely nine days after Thomas was transferred.  Crosby promoted Green despite his knowledge of Green's history of inmate abuse.  Crosby also knew that Green's use of chemical agents had skyrocketed after Crosby discontinued videotaping of chemical agent usages.   Crosby even personally approved several of Green's gassings between April 27, 2000 and October 8, 2000.  Despite this knowledge, Crosby allowed Green to work on a wing with mentally ill inmates, including Massie.  Crosby's actions enabled Green to unnecessarily gas Massie on October 8, 2000. Crosby's knowing actions and inactions caused Massie's unconstitutional gassing.

### d.       Plaintiffs Ulrath and McKinney

Defendant Ulrath's claims against Crosby are based on uses of chemical agents against him on October 8 and 9, 2002.   McKinney's claims against Crosby are based on uses of chemical agents against him on June 15, 2004; June 21, 2004; June 22, 2004; and May 13, 2005.  McKinney was gassed at FSP at least 29 times at FSP prior to June 15, 2004.  Both Plaintiffs are severely mentally ill.

Both Plaintiffs maintain that Crosby created, permitted, and encouraged a brutal environment at FSP that has persisted far past Crosby's tenure at FSP which caused them to suffer harm even after Crosby left FSP.[387]  Plaintiffs specifically allege that they were abused with chemical agents as a direct result of Crosby's policies and practices, including his policy to allow non-spontaneous uses of chemical agents against inmates diagnosed with, or

---

[387]After leaving FSP, Crosby was Region II Director at FDOC and then became FDOC Secretary.   These positions gave him supervisory responsibility for FSP.

objectively manifesting symptoms consistent with mental illness, and his policy not to require videotaping of the non-spontaneous gassings at FSP.[388]   This Court denied Crosby's Motion to Dismiss Plaintiffs' claims[389] based on uses of force that occurred after Crosby's tenure stating that Plaintiffs had pled sufficient facts to support their claims.[390]   Ulrath and McKinney have developed a sufficient record to support their allegations and proceed to trial against Crosby.   The Seventh Circuit has held that a former warden could be liable for excessive force occurring after his tenure where, as here, a plaintiff alleges the current warden continued to implement the former warden's policies.[391]   Wardens Carter and Rathmann were handpicked disciples of Crosby and shared his deliberate indifference to the substantial risk that inmates at FSP would be harmed.[392]   Their alliance with Crosby's policies is best evidenced by the fact that they were each terminated after Crosby's resignation as Secretary.[393]

Plaintiffs Thomas, Massie, Ulrath, and McKinney's allegations that Crosby was deliberately indifferent to the risk that they would be harmed in violation of the Eighth Amendment, when it was clearly established that to do so was unlawful, are supported by the record and, thus, are sufficient to overcome summary judgment.   Plaintiffs have established that material facts remain in dispute regarding whether Crosby was deliberately indifferent to violations of their constitutional rights.

---

[388] (Doc. 142) at ¶¶ 146 (Ulrath) and 298 (McKinney).
[389] (Doc. 215).
[390] (Doc. 228).
[391] *See Sizemore v. Miller*, 1994 U.S. App. LEXIS 6999, No. 92-2098 (7th Cir.).
[392] *See* Ex. 173 pp. 15-19; Ex. 7 at pp. 48-49.
[393] *Id.*

### 3.    Defendant Clark Violated Plaintiffs Thomas's and Massie's Rights

#### a.    Plaintiffs Generally

Thomas and Massie have alleged that Clark was deliberately indifferent to the substantial and known risk that Plaintiffs would be subjected to the use of chemical agents in violation of their Eighth Amendment rights.  Clark authorized the use of chemical agents against Thomas on September 20, 21, 23, and 24, 2000 and against Massie on October 8, 2000.

Clark violated Thomas's and Massie's constitutional rights because he was deliberately indifferent to the substantial risk that they would be harmed with chemical agents.  Clark was transferred to FSP by Crosby on April 21, 2000.  He knew there was a long history of abuse of inmates at FSP, and that there was a dramatic increase in the use of chemical agents after guards killed Frank Valdes.  He also knew that guards at FSP wrote false use of force reports and manipulated videotapes in order to hide abuse of inmates. And he knew that FSP housed severely mentally ill inmates who Dr. Nguyen told him should not be gassed.  Despite this knowledge, Clark never required videotaping of uses of chemical agents.  He allowed guards to use chemical agents against Plaintiffs when they were merely being noisy in their cells, which is without penological justification.

Despite the fact that he knew FSP housed severely mentally ill inmates, he took no action to prevent these inmates from being gassed with chemical agents.  Instead, he authorized the use of chemical agents against Plaintiffs.[394]  Prior to authorizing the use of chemical agents against Plaintiff Thomas on September 20, 21, 23, and 24, 2000, Clark knew that Thomas had already been gassed eight times in a twenty-one day period in July

---

[394] *See* Ex. 8.

2000 immediately upon returning from inpatient care at UCI.   Clark had authorized or approved several of the uses of force against Plaintiff Thomas in July 2000.

<div align="center">

**b.**      **Plaintiff Thomas**

</div>

Like Crosby, Clark knew that chemical agents only worsened Thomas's behavior; he also knew that addressing Thomas's behavior through alternative means such as videotaping, medication, or counseling could improve Thomas's behavior without force. He knew that medical staff had twice stated that Thomas's severe mental illness were a contraindication to the use of chemical agents and that at least one officer had indicated that chemical agents had no effect on Thomas's behavior.   Clark also knew that officers had been able to resolve incidents with Thomas using non-violent means.   Despite having this knowledge, Clark nonetheless authorized officers to use chemical agents against Thomas when he was in mental health crisis on September 20, 21, 23, and 24 of 2000.

Clark's mistaken argument that "it was not [his] job" to ascertain whether officers accurately reported the circumstances leading up to approval of gas exemplifies his deliberate indifference.[395]   As the supervisor of "anyone in uniform at FSP," and in light of his knowledge of the risk of harm to inmates at FSP, Clark had a duty to ensure that inmates were not abused with chemical agents (otherwise, there would be no need to contact the Duty Warden prior to using force).   Nevertheless, Clark testified that he *never* declined to "take the officer's word" regarding their description of the situation prompting a use of force.[396]   Clark's statements that "it was not his job" do not absolve him of

---

[395] *See* (Doc. 287) at p. 7.
[396] *See* Ex. 25 at p. 118.

responsibility for his actions; on the contrary, they show Clark's deliberate indifference to the violence he was authorizing.

Clark was directly involved in the violation of Thomas's rights and the causal connection is clear.  If Clark had declined to authorize the use of chemical agents against Thomas for the same reasons cited by Captain Kelsay, the guards would not have used chemical agents against Thomas.  By choosing not to take any action to determine whether it was necessary to gas Thomas four times in five days, Clark permitted Thomas to continue to be unnecessarily gassed.

### c.       Plaintiff Massie

Clark was also directly involved in violating Massie's rights.  He, like Crosby, was deliberately indifferent to the risk of harm to Massie.  Clark knew that Green's use of chemical agents had skyrocketed after Crosby discontinued the requirement that uses of chemical agents be videotaped.  Despite this knowledge, Clark authorized the use of chemical agents against Massie site unseen on October 8, 2000.  If Clark had not so authorized, Massie would not have been gassed.  Clark directly participated in the violation of Plaintiff Massie's constitutional rights.  As with Thomas, Clark's deliberate indifference is exemplified by his argument that "it was not [his] job" to ascertain whether officers were accurately reporting the circumstances leading to the approval of Massie's gassing.[397]  These facts support Plaintiffs' allegations that Clark was deliberately indifferent to the risk that they would be harmed in violation of the Eighth Amendment. Plaintiffs have presented sufficient evidence to establish the causal connection necessary for supervisory liability between

---

[397] *See* Ex. 25 at p. 7.

Clark's knowing actions and inactions and the violations of Plaintiffs' rights.  Plaintiffs have also established that material facts remain in dispute regarding whether Clark was deliberately indifferent to violations of their constitutional rights.

### 4.     Defendant Carter Violated Plaintiff Ulrath's Rights

Plaintiff Ulrath has alleged that Carter was deliberately indifferent to the substantial and known risk that Ulrath would be subjected to the use of chemical agents in violation of his Eighth Amendment rights.  Carter allowed Shipley to gas Ulrath on October 8, 2002.  Carter violated Ulrath's constitutional rights because he was deliberately indifferent to the substantial risk that Ulrath would be harmed with chemical agents.  Carter knew that guards abused inmates.[398]  Yet, he did nothing to address the dramatic increase in the numbers of chemical agent uses while he was Warden.  He knew that seven healthcare staff reported the use of chemical agents as a disciplinary method because the CMA wrote it in a report, but did nothing to remedy or address the issue.  Carter knew that Crosby had kept Shipley out of the building because he presented a danger to inmates.  And he knew that Shipley was back in the building because Clark met with him every day to discuss the prior night's uses of force, and Shipley had used force against other inmates prior to gassing Ulrath, some of which Carter personally approved.[399]  Finally, Carter knew Shipley was dangerous because he signed a letter in December 2001 suspending Shipley for conduct unbecoming an officer.[400]

Despite this knowledge, Carter did not require videotaping of gassings at FSP.  He allowed Shipley to have direct contact with severely mentally ill inmates including Ulrath.[401]

---

[398] *See* Ex. 73 at p. 35.
[399] *See* Ex. 70; Ex. 25 at pp. 85-86.
[400] *See* Ex. 71.
[401] *See* Ex. 73 at pp. 83-85.

Despite the fact that he knew FSP housed severely mentally ill inmates, he took no action to prevent these inmates from being gassed with chemical agents.[402]  He permitted the gassing of inmates, including severely mentally ill inmates, who were yelling in their cell or banging on their cell doors when there was no legitimate penological justification for doing so.[403]

These facts support Ulrath's allegations that Carter was deliberately indifferent to the risk that he would be harmed in violation of the Eighth Amendment.  Plaintiffs have produced sufficient evidence to establish the causal connection between Carter's knowing actions and inactions and the violation of Ulrath's rights.  Plaintiffs have established that material facts remain in dispute regarding whether Carter was deliberately indifferent to violations of Ulrath's constitutional rights.

### 5.    Defendant Rathmann Violated Plaintiff McKinney's Rights

McKinney has alleged that Rathmann was deliberately indifferent to the substantial and known risk that McKinney would be subjected to the use of chemical agents in violation of his Eighth Amendment rights.  Rathmann personally authorized and/or approved the use of chemical agents against McKinney on June 15, 2004; June 21, 2004; June 22, 2004; and May 13, 2005.  The application of the *Hudson* factors show that the uses of force against McKinney violated the Eighth Amendment.  As a result of these uses of force, McKinney suffered second-degree burns, severe pain, and psychological trauma, including flashbacks and an inability to sleep because he fears officers will again unjustifiably gas him.[404]

Rathmann authorized and approved the gassing of McKinney when there was no penological justification for any use of force.  McKinney was gassed at FSP in June 2004

[402] *See generally id.*
[403] *See* Ex. 8.
[404] *See* Ex. 5 at pp. 42-44; Ex. 9 at p. 64.

when he was quiet in his cell.[405]  Guards gassed him when he asked for his food tray after officers denied him his meals in May 2005.[406]  Even if McKinney was yelling in his cell or banging on his cell door, there was no need to use force in response to his behavior.  There is no penological purpose for gassing mentally ill inmates who are alone in their cells and simply being noisy.

Rathmann violated McKinney's constitutional rights because he was deliberately indifferent to the substantial risk that McKinney would be harmed with chemical agents. Rathmann personally authorized uses of force against McKinney. McKinney would not have been gassed if Rathmann had not authorized it.  Additionally, Rathmann personally approved McKinney's uses of force after the fact without even waiting for the report of the inspector.  He did not consider McKinney's extensive mental health history in making any determinations regarding gassing McKinney, even though McKinney was gassed immediately after being released from suicide watch.  Rathmann knew that "frequent fliers" and severely mentally ill inmates were housed at FSP.  He also knew that FSP had a history of abuse of inmates. Despite this knowledge, Rathmann refused to require videotaping chemical agent uses.  He also refused to establish safeguards to ensure that severely mentally ill inmates would not be abused with chemical agents, and showed no concern that McKinney had been repeatedly gassed when confronted with the facts of McKinney's case during his deposition.

These facts support McKinney's allegations that Rathmann was deliberately indifferent to the risk that he would be harmed in violation of the Eighth Amendment. McKinney has presented sufficient evidence to establish the causal connection between

---

[405] See id.
[406] See Ex. 93 at p. 54.

Rathmann's knowing actions and inactions and the violation of McKinney's rights.  He has established that material facts remain in dispute regarding whether Rathmann was deliberately indifferent to violations of his constitutional rights.

><center>**6.    Defendant Sapp Violated Plaintiffs Thomas's and Massie's Rights**</center>

Plaintiffs Thomas and Massie have established that the uses of force against them violated the Eighth Amendment and that material facts remain in dispute regarding whether Sapp was deliberately indifferent to the substantial and known risk that they would be subjected to the use of chemical agents in violation of their Eighth Amendment rights.[407]

Sapp violated Thomas and Massie's constitutional rights because he was deliberately indifferent to the substantial risk that Plaintiffs would be harmed with chemical agents.  Sapp reviewed and approved the uses of force on Thomas that occurred on September 20, 21, 23, 24, and 26, 2000.  He reviewed and approved the first four uses of force on September 25, 2000, so he knew that Thomas had already been gassed four times in five days when he subsequently approved Thomas's September 26, 2000 gassing.  Sapp also knew that Thomas was having symptoms of psychosis and mania and that he had blisters and burns all over his body.  Despite this knowledge, he took no action to prevent the further use of force against Thomas, or to ensure that he received proper mental health treatment.  Thomas was gassed again on September 26, 2000 because Sapp failed to take *any* action.  Sapp approved the September 26, 2000 gassing even though he knew that Thomas had been gassed five times in six days, and knew that guards violated FDOC policy during Thomas's previous gassings.

Prior to approving Thomas's six gassings in September 2000, Sapp knew that medical

---

[407] Due to a scrivener's error in paragraph 361 of Plaintiffs' Second Amended Complaint, Defendant Sapp was erroneously included in Ulrath's claims for damages.   Plaintiff Ulrath does not pursue claims against Sapp.

<center>75</center>

staff and guards had stated on multiple occasions that chemical agents should not be used against Thomas because of the severity of his mental illnesses and his classification as an S-3 inmate.  Sapp also knew that Thomas had been gassed 13 times in 2000 at FSP before September 2000, and that Thomas successfully responded to mental health care, yet chemical agents had no effect on Thomas's behavior in his cell.  Sapp even knew that videotaping past incidents with Thomas could help resolve those incidents without using of force.

Sapp also approved the October 8, 2000 use of force against Massie even though he knew that Green had an extensive disciplinary history and knew that the number of times Green used chemical agents against inmates skyrocketed after he and Crosby discontinued videotaping of gassings. Sapp also knew there was a long history of abuse of inmates at FSP and that there was a dramatic increase in the use of chemical agents after guards killed Frank Valdes.  He further knew that guards at FSP wrote false use of force reports and manipulated videotape machines in order to hide abuse of inmates; he even saw that Green's report was written in two different officers' writing.   Finally, he knew that FSP housed severely mentally ill inmates.  Despite this knowledge, Sapp issued rubber-stamp approvals to all uses of force and never required videotaping of chemical agents.   He allowed guards to use chemical agents against these and other inmates when the inmate was merely being noisy in his cell, which is without penological justification.  Additionally, Sapp personally approved the gassings of Thomas and Massie.  Guards would not have continued to gas Thomas and would not have gassed Massie if Sapp had required videotaping, disapproved the uses of force against Thomas, disapproved any of Green's uses of force, or taken *any steps at all* to protect mentally ill and other inmates from abuse.

These facts support Thomas's and Massie's claims that Sapp was deliberately indifferent to the risk that they would be harmed in violation of the Eighth Amendment. Plaintiffs have presented sufficient evidence to establish the causal connection necessary between Sapp's knowing actions and inactions and violations of Plaintiffs' rights.

**III.**     <u>None of the Defendants in this Case are Entitled to Qualified Immunity</u>

     **A.**     **Introduction**

Every Defendant in this case has moved for summary judgment on the basis of qualified immunity. Simply put, because: (1) all Defendants have either maliciously and sadistically gassed Plaintiffs, or were deliberately indifferent to the fact that Plaintiffs were maliciously and sadistically gassed, and (2) it was already clearly established that doing so was unlawful, Defendants are not entitled to qualified immunity on any grounds.

     **B.**     **Legal Standard**

To receive qualified immunity, a public official must show that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.[408] It is undisputed that the uses of force were within the scope of Defendants' authority. Consequently, Plaintiffs must show that their allegations, if true, establish a constitutional violation.[409] Qualified immunity shields an official performing discretionary functions from civil liability only "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[410]

---

[408] *Courson v. McMillian*, 939 F.2d 1479, 1489 (11th Cir. 1991).
[409] *Hope v. Peltzer*, 536 U.S. 730, 736 (2002).
[410] *Hope*, 536 U.S. 730 (2002) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

The rights at issue must have been clearly established so that a reasonable officer would understand that his conduct is unlawful.[411]   The Court must look to whether pre-existing law and the information available to the official at the time that the conduct occurred gave him notice that his actions violated the law.[412]   "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful."[413]   When the law gives an official "fair warning," the official is on notice that his conduct is unlawful even "in novel factual circumstances" that no court has specifically addressed.[414]   A defense of qualified immunity can fail even if case law has not specifically addressed the exact factual scenario at issue in a case.[415]   For example, in *Skrtich*, the Eleventh Circuit found that guards who inflicted a beating in the context of a cell extraction were not entitled to qualified immunity, despite no prior case addressing that particular context.[416]   The Eleventh Circuit held that the body of case law readily established the unconstitutionality of beating an unresisting prisoner in any context.[417]

### 1.      Constitutional Violation

The first step in the qualified immunity analysis is to determine whether plaintiff's allegations, if taken as true, establish a constitutional violation.[418]   This Court has held that Plaintiffs' Second Amended Complaint stated an Eighth Amendment claim against all Defendants,[419] and Plaintiffs have developed a record that supports their allegations.

---

[411] *Hope,* 536 U.S. at 739.

[412] *Id.*

[413] *Id.* citing *Mitchell v. Forsyth,* 472 U.S. 511, 535 (1985); *Anderson v. Creighton,* 483 U.S. 635, 640 (1987).

[414] *Hope*, 536 U.S. at 740-41.

[415] *Id.*

[416] *Skrtich*, 280 F.3d at 1304.

[417] *Id.*

[418] *See Hope v. Peltzer*, 536 U.S. 730 (2002).

[419] *See* (Docs. 193, 215).

According to the standards above, Plaintiffs have presented sufficient facts to support their claims that Defendants Green and Shipley violated their rights under the Eighth Amendment by using excessive force against them and that Defendants Crosby, Carter, Sapp, Clark, and Rathmann were deliberately indifferent to the violations of Plaintiffs' constitutional rights.

### 2.    Clearly Established

As discussed above, it is clearly established that using chemical agents maliciously and sadistically against inmates is a violation of law. This principle was clearly established prior to the dates of Defendants' abuse of Plaintiffs with chemical agents -- the first date claimed in this matter being September 2000. It is similarly clearly established that "the failure to take reasonable steps in the face of a history of widespread abuse which created a known substantial risk of serious harm to inmates or his adoption of custom or policies which result in deliberate indifference to the constitutional rights of prison inmates is unlawful."[420] This principle was similarly well-established before September 2000.[421]

### C.    Application of Qualified Immunity Law to Plaintiffs' Record Evidence Plainly Establishes that None of the Defendants are Entitled to Qualified Immunity

### 1.    Defendants Green and Shipley are not Entitled to Qualified Immunity

Defendant Green's use of chemical agents against Plaintiff Massie violated Massie's Eighth Amendment rights. The law in the Eleventh Circuit has been clear since well before October 8, 2000 that guards cannot use force maliciously and sadistically. Green should be particularly well-apprised of this law because he was named as a defendant in *Skrtich v.*

---

[420] *See Valdes v. Crosby*, 450 F.3d 1231 (11th Cir. 2006).
[421] *See LaMarca v. Turner*, 995 F.2d 1526, 1539 (11th Cir. 1993)

*Thornton* based on his abuse of an inmate at FSP in 1998. *Skrtich* is a seminal case holding that it has been clearly established since at least 1998 that qualified immunity is unavailable to correctional officer defendants who use force maliciously and sadistically. Green's malicious and sadistic use of chemical agents against Massie was clearly established as unlawful. The facts support Massie's allegation that Green used force against him maliciously and sadistically in violation of the Eighth Amendment when it was clearly established that it was unlawful. Therefore, Green is not entitled to qualified immunity.

Similarly, Shipley's use of chemical agents against Ulrath violated Ulrath's Eighth Amendment rights. The law in the Eleventh Circuit has been clear since well before October 8, 2002 that guards cannot use force against inmates maliciously and sadistically. Shipley's malicious and sadistic use of chemical agents against Ulrath was also clearly established as unlawful. The record evidence submitted by Ulrath establishes that Shipley used force against him maliciously and sadistically in violation of the Eighth Amendment when it was clearly established that to do so was unlawful. Shipley is therefore also not entitled to qualified immunity.

> ### 2.    Defendants Crosby, Clark, Carter, Rathmann, and Sapp are not Entitled to Qualified Immunity

Crosby violated Plaintiffs' constitutional rights because he was deliberately indifferent to the substantial risk that they would be harmed with chemical agents. Similarly, Clark violated Thomas and Massie's constitutional rights because he was deliberately indifferent to the substantial risk that they would be harmed with chemical agents. Furthermore, Carter violated Ulrath's constitutional rights because he was deliberately indifferent to the substantial risk that Ulrath would be harmed with chemical agents. Finally, Rathmann violated

McKinney's constitutional rights because he was deliberately indifferent to the substantial risk that McKinney would be harmed with chemical agents.

As detailed above, the law in the Eleventh Circuit was clear prior to September 20, 2000 that a correctional supervisor can bear liability for violations of the Eighth Amendment that occurred as a result of his deliberate indifference. The record facts support the allegations of Plaintiffs that Defendants were deliberately indifferent to the risk that they would be harmed in violation of the Eighth Amendment when it was clearly established that to do so was unlawful. Accordingly, Defendants are not entitled to qualified immunity.

## IV.   Continuing Violations Create Triable Issues for Injunctive Relief

### A.   Introduction

In this case, Plaintiffs have plainly established a constitutional violation -- i.e., severely mentally ill and physically vulnerable prisoners at FSP are needlessly gassed with chemical agents simply for manifesting unavoidable symptoms of their mental illnesses even though they pose no threat of harm to self or others at the time. Plaintiffs seek injunctive and declaratory relief against Defendants McDonough and Bryant that would protect Plaintiffs -- who are mentally ill and physically vulnerable inmates -- from being abused with chemical agents and would prevent guards from using chemical agents against inmates maliciously and sadistically. Plaintiffs Thomas and Ulrath also seek an injunction to prevent their transfer to FSP.

"That the Eighth Amendment protects against future harm to inmates is not a novel proposition."[422]   The PLRA did not significantly change the law governing the power of the

---

[422] *Helling*, 509 U.S. at 33.

federal courts to grant injunctive relief to prisoners who establish a constitutional violation.[423]   The PLRA states injunctive relief is proper when "the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."[424]

In order to obtain injunctive relief, Plaintiffs must establish "the violation of the Federal right of a particular plaintiff or plaintiffs."[425]   A federal court's power to grant injunctive relief is dependent on the presence of a constitutional violation and the relief granted must be designed to cure the violation.[426] Once constitutional violations have been found, federal courts have equitable powers to formulate appropriate relief.[427]   Federal courts have used this power and awarded injunctive relief.[428]   Courts award broad injunctive relief when it is necessary to give prevailing plaintiffs the relief to which they are entitled.[429]   The Supreme Court has stated, "[t]he scope of injunctive relief is dictated by the extent of the violation established."[430]

When fashioning injunctive relief against prison officials, federal courts generally offer institutional defendants the opportunity to submit remedial plans that address the constitutional violations identified.  This process helps ensure that the relief ordered against prison systems is narrowly tailored and the least intrusive means possible.  For example, in

---

[423] *See Smith v. Arkansas Dept. of Correction*, 103 F.3d 637, 647 (8th Cir. 1996); *see also Williams v. Edwards*, 87 F.3d 126, 133, n.21 (5th Cir. 1996).
[424] 18 U.S.C. § 3626(a)(1)(a)(2).
[425] *Johnson v. Breeden*, 280 F.3d 1308, 1324 (11th Cir. 2002) (citing 18 U.S.C. § 3626(a)(1)(A)).
[426] *LaMarca v. Turner*, 995 F.2d 1526, 1542-43 (11th Cir. 1993).
[427] *See Madrid v. Gomez*, 889 F. Supp. 1146, 1280 (N.D. Cal. 1995).
[428] *See Smith v. Arkansas Dep't of Correction,* 103 F.3d 637 (8th Cir. 1996).
[429] *Id.* at 646.  *See also McCargo v. Vaughn*, 778 F.Supp. 1341, 1342 (E.D. Penn. 1991).
[430] *Lewis v. Casey,* 516 U.S. 804 (1996).

*Skinner v. Uphoff*,[431] and *Austin v. Wilkinson*,[432] courts allowed the defendants to submit remedial plans proposing measures to protect inmates and extending only as far as necessary to correct the constitutional violation identified in the Court's factual findings and then ordered systemic injunctive relief.

In order to receive injunctive relief against Defendants McDonough and Bryant, Plaintiffs must demonstrate that either 1) a history of widespread abuse put Defendants on notice of the need to correct the alleged deprivation, and they failed to do so; 2) Defendants' custom or policy resulted in deliberate indifference to constitutional rights; or 3) facts support an inference that Defendants directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so."[433]  Plaintiffs have sufficient evidence to establish the causal connection between Defendants' deliberate indifference and the violations of Plaintiffs' rights.

From the moment McDonough took over as FDOC Secretary, he has known that the culture Crosby left at FDOC and FSP poses a substantial risk to Plaintiffs.  Specifically, he testified at Crosby's sentencing hearing that, on the day he succeeded Crosby, his office "was a crime scene taped off with tape. . ."[434]  He further emphasized to Judge Covington:

> the senior leadership of the department did great damage to the Department. It affected people, it affected systems.  In a hierarchical system, where at the bottom of that, you have people with virtually no rights -- inmates -- I see that as a very dangerous thing.  But throughout the Department there was pockets of corruption, pockets of ill discipline, pockets of people who had gotten into their minds that they could take the law into their own hands, that they were above the law, or aside from the law, and that they were powerful enough in

---

[431] 234 F. Supp.2d 1208, 1217-18 (D. Wyo. 2002).
[432] 189 F. Supp.2d 719, 754 (N.D. Ohio 2002).
[433] *Valdes v. Crosby*, 450 F.3d 1231, 1237 (11th Cir. 2006).
[434] Ex. 118 (McDonough testimony excerpt Crosby sentencing hearing)

> their own hierarchical structure, in their own isolation within the department,
> that they could do what they wanted and get away with it.[435]

Despite this knowledge of a history of widespread abuse at FSP, there has been a failure to

correct the policies and practices that cause inmates to be unconstitutionally gassed at FSP.

Defendant McDonough and Bryant's reliance on the failure of plaintiff Doby to

establish an entitlement to injunctive relief is misplaced.[436]  In *Doby*, this court held that the

evidence (all deposition excerpts from inmates who stated that they had observed guards

abusing inmates at FSP with chemical agents) did not establish the existence of an ongoing

constitutional violation that warranted injunctive relief. [437]  Although the injunctive relief that

Plaintiffs in this action have requested is similar to the relief requested in *Doby*, Plaintiffs in

this action have established a substantial record that inextricably links Defendants' actions

and inactions to the fact that they are at continuing substantial risk of again being abused

with chemical agents without penological justification.

In their Motion, McDonough and Bryant rely on facts that are disputed, such as

whether chemical agents caused Plaintiffs' second degree burns and whether Plaintiffs were

suffering from acute psychiatric conditions when they were sprayed with chemical agents.

Both Plaintiffs and Plaintiffs' experts, Drs. Burns and Stopford, have provided testimony that

supports Plaintiffs' claims on these issues.  Additionally, Defendants argue that it is better to

use chemical agents than other types of force in situations that Plaintiffs maintain require no

force of any type to control.  This argument fails because Plaintiffs have provided ample

---

[435] *Id.*
[436] *Doby v. Berry*, 2006 WL 35118611, *2 (M.D. Fla. 2006).
[437] *Id.*

support for their position and the question of whether the use of force against Plaintiffs was justified remains an issue of fact to be determined at trial.

The relief that Plaintiffs request includes several specifics; however, in deference to Defendants' status as correctional administrators, Plaintiffs requested generally that the Court require Defendants to submit a plan to the Court that remedies the violations alleged in the Second Amended Complaint.   Defendants have entirely failed to address almost all of Plaintiffs' requests for relief, and have addressed the remaining requests in a manner that fails to remedy the Constitutional violations Plaintiffs are likely to suffer at FSP.

The policies and practices regarding chemical agents at FSP continue to violate Plaintiffs' Eighth Amendment rights.  As recently as July 25, 2007, Plaintiff McKinney was gassed twice in one day at FSP shortly after being transferred from UCI.[438]  This occurred only weeks after Dr. Rod Hall, Defendants' mental health expert and the former long-time Director of Mental Health for FDOC, recommended that McKinney be evaluated for placement in inpatient care. [439]  After being gassed, McKinney was immediately referred back to inpatient care at UCI.[440]  As will be demonstrated below, the policies Defendants cite in their motion for summary judgment -- which are supposed to prevent Plaintiffs unconstitutional gassings -- have not substantively changed since 2000, and are so ineffective that even McKinney, a known Plaintiff in this litigation, was gassed twice just recently.  Accordingly, all Plaintiffs are at risk of being unconstitutionally gassed at FSP.

---

[438] *See* Ex. 42.
[439] *See* Ex. 94 at pp. 88-91.
[440] Compare Exs. 42 and 85.

**B.    Defendants' New Videotaping Procedure Fails to Significantly Reduce the Likelihood that Plaintiffs will be Unconstitutionally Gassed**

Plaintiffs acknowledge that, as a result of this lawsuit, Defendants have taken the positive step of instituting a procedure reinstituting the videotaping of non-spontaneous uses of chemical agents under certain conditions.[441]   Defendants' videotaping procedure, however, is unquestionably insufficient to remedy the majority of the unconstitutional conduct that has occurred, and will continue to occur, at FSP.  There are three main reasons why Defendants' videotaping procedure is inadequate to reduce the likelihood that Plaintiffs will be unconstitutionally gassed in the future.

First, even if all uses of chemical agents at FSP were videotaped from the moment an inmate begins yelling until the time the inmate is returned to their cell after decontamination, videotaping would still only alleviate the most blatant type of unconstitutional gassing -- e.g., the gassings endured by Massie and Ulrath.  Stated differently, so long as FSP guards are permitted to gas severely mentally ill inmates simply for manifesting their illnesses by yelling or banging on their door, the only effect videotaping will have will be to create a videotaped record of an unconstitutional gassing.  Consequently, while Plaintiffs admit that Defendants' videotaping procedure may have lessened the likelihood that bad actors such as Defendants Green and Shipley will be able to gas inmates for no reason, it has no effect on preventing the unnecessary gassing of mentally ill prisoners for reasons that would not prompt a gassing at UCI.  As a result, the videotaping of gassings is insufficient, by itself, to alleviate the unconstitutional gassings that have occurred, and will continue to occur, to Plaintiffs such as Thomas and McKinney.  Plaintiffs' concerns have been confirmed by the fact that McKinney

---

[441] *See* (Doc. 306-7).

was gassed twice on videotape just last month even though Defendants knew that McKinney is severely mentally ill and is in need of inpatient care at UCI.

Second, Defendants' videotaping procedure contains an exception that can easily be interpreted by guards in a manner that will swallow the rule.  Pursuant to Procedure 602.002(7)(c)(3), the videotaping of non-spontaneous uses of chemical agents is still not required if a videotaped warning has previously been given to an inmate any time during the eight-hour shift in which the potentially abusive guard is posted at FSP.[442]  This rule allows guards to gas inmates with impunity anytime within the 8-hour period after an inmate has been warned on video and is shown on video not to be creating a disturbance.  Hence, it fails to prevent the exact type of unconstitutional gassing taught by Montrez Lucas to FSP trainees -- i.e., gassings where a guard decides once he "had to obtain chemical agents, he would use it even if the inmate had decided to comply with orders." [443]  Defendants' arguments regarding the effectiveness of FSP's fixed-wing cameras in deterring abuse are highly overstated.  As explained by Randall Polk in his 30(b)(6) deposition, "[y]ou cannot see inside a cell from a fixed wing, so could I tell everything that was going on? No, sir."[444]

Defendants nonetheless state that an exception to the handheld videotaping rule is necessary to prevent inmates from engaging in conduct that is known as "gaming" the system.  Defendants fear that inmates will yell and bang on the door until the camera arrives, and will cease creating a disturbance once the camera arrives.  Defendants want to be able to punish inmates who "game the system" by gassing them rather than issuing them disciplinary

---

[442] *See* (Doc. 306-7).
[443] Ex. 98 at pp. 4-5; *Valdes*, 450 F.3d at 1240; *Mathews*, 480 F.3d at 1272.
[444] *See* Ex. 119 ((Rule 30(b)(6) deposition of Randall Polk) at p. 49.

reports even though they poses no threat of harm to anyone.  Chase Riveland explains why

Defendants' procedure is inadequate:

> In my opinion, there is no penological justification for gassing inmates who are allegedly "gaming" the system. Even if an inmate stops his alleged misbehavior upon arrival of the video camera and restarts his alleged misbehavior after the video camera departs, it is my opinion that the video camera provides the appropriate deterring effect, and that the use of chemical agents to alter the inmate's behavior in this circumstance is unacceptable correctional practice and procedure. Gassing an inmate in this circumstance is done solely to punish an inmate for his "gaming" the system and not to protect the safety and security of other inmates and staff.
>
> FDOC's recently established policy regarding videotaping uses of chemical agents with a handheld camera fails to meet acceptable correctional standards by providing for a potential eight (8) hour period of time in which an inmate may be gassed without additional videotaped warnings.[445]

As discussed by Riveland, if videotaping has the same effect as gassing -- i.e., stopping the

disturbance -- gassing the inmate is, by its very nature, excessive force.[446]  Videotaping

serves to control the inmate's behavior without violence.[447]

Defendants' procedure also does nothing to address the situation of inmates such as

Thomas and McKinney, inmates who have repeatedly been gassed twice within an 8-hour

period, and were not gaming the system when they were noisy in their cells on these

occasions.  For instance, Thomas was sprayed at 5:55 P.M. on September 20, 2000 and was

sprayed again at 2:00 A.M. on September 21, 2000.  Moreover, McKinney was sprayed at

6:37 P.M. on June 21, 2004 and was sprayed again at 1:45 A.M. on June 22, 2004.  These

inmates were not "gaming" the system, as gassing them should have had the appropriate

---

[445] See Ex. 8 at 62-63.

[446] See id.

[447] See id.

deterrent effect.   But under Defendants' procedure, observers will not be able to see if a severely mentally ill inmate was gassed for conduct that is a manifestation of mental illness.

Third, Defendants' procedure is insufficient because, as Crosby showed, it can easily be revoked at the conclusion of these proceedings.  The Eleventh Circuit recognizes:

> [s]ubsequent events, such as improvements in the allegedly infirm conditions of confinement, while potentially relevant, are not determinative. When a defendant corrects the alleged infirmity after suit has been filed, a court may nevertheless grant injunctive relief unless the defendant shows that absent an injunction, the institution would not return to its former, unconstitutionally deficient state."[448]

In this case, Plaintiffs have shown that FSP has a history of constantly changing its videotaping rules based upon the preferences of the particular individual in charge at any given moment.  Defendant Sapp -- who currently serves as the FDOC Deputy Secretary and was produced to testify at a Rule 30(b)(6) deposition on behalf of FDOC -- conceded that the only substantive change that has occurred at FSP since 2000 is that, as a result of this lawsuit, non-spontaneous uses of chemical agents against inmates are now generally videotaped with a handheld camera.[449]   Randall Polk, Assistant Warden at FSP does not believe that videotaping has reduced the number of gassings at FSP.[450]   As he testified during a Rule 30(b)(6) deposition, there are no policy changes that are having a significant impact on gassings at FSP.[451]   According to Polk, if the number of inmates gassed at FSP has decreased, it is because of "a difference in the weather [or] a difference in the inmates."[452]

---

[448] *LaMarca v. Turner*, 995 F.2d 1526, 1541-42 (11th Cir. 1993).
[449] *See* Ex. 110 at pp. 20-25.
[450] *See* Ex. 119 at pp. 110-117.
[451] *Id.* at 116.
[452] *Id.* at 111-12.

At this point, it is not surprising that Defendants have taken *some* action as a result of this lawsuit. However, according to FDOC, these actions have not affected the numbers or character of uses of chemical agents at FSP. Polk's statements, on behalf of McDonough, regarding the ineffectiveness of videotaping are significant because they demonstrate a lack of commitment to protecting Plaintiffs from being abused with chemical agents at FSP, and show that this policy is likely to change after this lawsuit unless the Court orders differently. McDonough knows that the culture Crosby left at FDOC and FSP poses a substantial risk to Plaintiffs. This Court should act to ensure that any positive strides that have occurred do not backslide and further increase the risk of harm to Plaintiffs.

   C.   **Contrary to Defendants' Assertions, Severely Mentally Ill Inmates at FSP Continue to be Gassed with no Safeguards in Place**

The cycle of gassing "frequent fliers" at FSP continues today in violation of acceptable correctional standards.[453] During his May 23, 2007 deposition, Dr. Hall stated that he had spoken with FDOC earlier in the day and recommended that McKinney be given "consideration for inpatient care."[454] Subsequently, on May 25, 2007, McKinney was transferred to UCI.[455] McKinney was transferred back to FSP on July 6, 2007, only to be gassed twice on July 25, 2007.[456] Subsequently, on July 31, 2007, McKinney was transferred back to UCI, where he remains today.[457]

McDonough and Bryant argue that only 19% percent of inmates sprayed with chemical agents between January 2005 and November 2006 were sprayed more than once.

---

[453] *See* Ex. 8 at p. 62-63.
[454] *See* Ex. 94 at pp. 88-91.
[455] *See* Ex. 85.
[456] *See* Ex. 42.
[457] *See* Ex. 85.

However, it is severely mentally ill inmates who are most likely to be gassed repeatedly because they cannot conform their behavior to FSP rules.  Twenty-one (21) S-3 inmates were gassed at FSP more than four (4) times during that period.[458]  Severely mentally ill people will continue to be gassed at FSP simply for yelling or banging on their cell.  One reason this is occurring is because there are insufficient inpatient mental health beds in the FDOC system.  According to FDOC, the inpatient mental health facility at UCI is operating at full capacity.[459]  Moreover, FDOC has admitted in its own budget requests for Fiscal Year 2007-08 that there is a "shortage of mental health inpatient beds, expected to be exacerbated by projected inmate growth over the next few years."[460]  Accordingly, there are still seriously mentally ill inmates at FSP who would be at UCI if there were more inpatient beds.

Further, Dr. Watkins-Ferrell conceded during her Rule 30(b)(6) deposition that it can take up to 90 days for an FSP inmate who is in need of inpatient care to see a psychologist who has the ability to refer them to UCI.[461]  During this period, as Dr. Watkins-Ferrell testified, "mental health is not consulted on a routine basis" prior to the authorization of the use of gas on inmates at FSP because "that's not part of the policy."[462]  She agreed that there is no "scenario that exists today at the FSP whereby a mental health reason would prevent the gassing of [an] inmate."[463]  Therefore, if any of the Plaintiffs in this case were to be transferred to FSP, they are at risk of immediately being gassed with chemical agents simply for engaging in the same conduct (yelling or banging on their cell) that currently does not

---

[458] See Ex. 4 at pp. 5-16.
[459] *See* Ex. 120 (FDOC chart of UCI inpatient bed capacity).
[460] *See* Ex. 121 (FDOC 2007-08 Budget Request).
[461] *See* Ex. 116 at pp. 53-57.
[462] *See id.* at pp. 96-100.
[463] *See id.* at pp. 98-99

cause them to be gassed in inpatient care.  As evidenced by the fact that Defendants gassed McKinney twice on the same day at FSP on July 25, 2007 -- only days before Defendants' summary judgment motion was filed -- and then immediately transferred McKinney to inpatient care at UCI, FSP continues to lack safeguards to prevent the gassing of severely mentally ill individuals.[464]

As explained above, Crosby acknowledged that severely mentally ill inmates were gassed at FSP because of a lack of inpatient bed space.[465]   And, according to FDOC, it appears as if this problem is only going to get worse because the inmate population continues to expand.  This is particularly problematic since, any inmate who yells or bangs on his cell door at FSP will likely be gassed despite his mental illness and regardless of whether the behavior they are exhibiting is a result of his mental illness.  For this reason, Dr. Nguyen explains that "it is neither necessary nor acceptable to gas S-3 inmates with chemical agents in order to stop them from yelling or banging on their cell door.  These actions can be stopped through mental health intervention which is preferable to using force in these situations."[466] According to Dr. Gibbs, gassing S-3 inmates "makes them more paranoid, frightened and fearful, and it makes them less trusting and more angry which is detrimental to the mental health services attempting to be provided to them."[467]   Simple solutions that have been used in other jurisdictions to solve this problem include: (1) establishing a no-gas policy for mentally ill inmates; (2) consulting with mental-health staff ***prior*** to using gas on

---

[464] *See* Exs. 42, 85.
[465] Ex. 6 at pp. 68-69.
[466] *See* Ex. 114.
[467] *See* Ex. 89.

S-3 inmates; and (3) creating "no-gas" wings or lists for certain inmates with acute medical or mental health conditions.[468]

### D.    Guards at FSP Continue to Lack the Training Required to Prevent the Gassing of Mentally Ill Inmates such as Plaintiffs

Defendants have argued that acutely mentally ill inmates are not gassed because guards are now trained to address these situations. This argument vastly overstates the "mental health training" received by guards that is supposedly intended to remedy this problem.  As conceded by Dr. Watkins-Ferrell, the "mental health training" received by guards -- also known as "Osterback Training" -- has not changed since at least 2001.[469] There are, however, special modes of training that are given to guards at UCI to deal with mentally ill inmates.[470]  But FSP guards do not receive this training, as they have repeatedly admitted in depositions that they are not trained to make determinations as to which inmates are mentally ill and which inmates are intentionally trying to create a disturbance.  For instance, Crosby conceded that guards are unable to distinguish between severely mentally ill inmates declaring a psychological emergency and inmates who were intentionally seeking to cause a disturbance.[471]  And when asked whether he is capable of determining whether an inmate is acting out because of a mental illness, Keith Musselman, a current Sergeant at FSP, plainly stated that "I've never been trained in psychology or anything.  I'm not a psychological specialist, so I can't make that determination if he's having a mental problem."[472]

---

[468] *See* Exs. 5 at pp. 55-56 and Ex. 8 at pp. 63.
[469] *See* Ex. 116 at pp. 77-81.
[470] *See* Ex. 5 at p. 50.
[471] *See* Ex. 6 at 70-71.
[472] *See* Ex. 106 at p. 50.

As Defendants concede, officers and supervisors at FSP "presume[s] that if an inmate is confined at FSP, he is able and expected to comply with and conform his behavior to the Department's rules and regulations."[473]   Because of this presumption, Musselman admitted that, in his role as Sergeant, he would gas an inmate he personally witnessed eating his own feces so long as that inmate was given medical clearance for gassing.[474]   But an inmate's mental health status is *never examined* prior to gassing.   Therefore, even inmates who exhibit obvious signs of mental illness will be cleared by medical staff for gassing because the inmate has mental health problems, not "medical problems."   Thus, FSP is no safer for severely mentally ill inmates today than it was in 2000.

### E.   Review of Uses of Chemical Agents at FSP is Ineffective in Preventing Severely Mentally Ill Prisoners from being Gassed

Despite Defendants' assertions that there is adequate review of all uses of chemical agents at FSP, further inspection reveals that the review process is effectively a rubber-stamp evaluation that creates the appearance of meaningful oversight.   Not one of Plaintiffs' gassings has been disapproved during this review process.[475]   As Plaintiffs established, Defendants have approved use of force reports that have been forged, contain technical errors, and admit that certain inmates were gassed with tear gas without the proper warnings. Moreover, because prisoners at FSP are presumed to be mentally competent regardless of the extensive evidence to the contrary, the review process will never disapprove of the gassing of a mentally incompetent inmate so long as the FSP medical office was contacted prior to the gassing.   In his 30(b)(6) deposition, Polk admitted that no consideration is given to the fact

---

[473] *See* (Doc. 306 at p. 10).
[474] *See* Ex. 106 at p. 50.
[475] See Ex. 8.

that an inmate has just returned from inpatient care because "[i]f he's no longer in inpatient care, then he's an inmate at Florida State Prison and we will handle him accordingly."[476]

Defendants place great emphasis on the fact that morning meetings are held at FSP to discuss uses of force.[477]   These meetings, however, are no different than the meetings Crosby, Carter, Rathmann, Sapp, and Clark attended.   As the stories of Thomas and McKinney illustrate, it is meaningless to review uses of force without an institutional recognition that FSP houses inmates who are too severely mentally ill to be gassed and must be treated in the same manner as when they were at UCI.   Critically, when asked to name a real-life example of an actual inmate who had been transferred to inpatient care as a result of these "morning meetings," Randall Polk and Dr. Watkins-Ferrell were unable to do so.[478]

Donna Hoffman from the FDOC Inspector General's office additionally admitted two troubling details during her Rule 30(b)(6) deposition regarding the post-use-of-force review process.   First, as Defendants concede, much of the post use of force review that has occurred since January 2007 involves inspection of videotapes.[479]   But the Inspector General does not review videos of uses of chemical agents unless the inmate had already filed a complaint about excessive force.[480]   As evidenced by the examples of Thomas and McKinney, inmates are often too mentally ill to immediately file complaints regarding improper uses of chemical agents.   Consequently, a vital aspect of the post use of force review process is often not employed for the most vulnerable inmates.   Second, no one at FDOC tracks the number of

---

[476] *See* Ex. 119 at p. 87.
[477] *See* (Doc. 306 at p. 14).
[478] *See* Ex. 119 at pp. 41-45; Ex. 116 at p. 160.
[479] *See* (Doc. 306 at p. 14).
[480] *See* Ex. 122 at p. 57.

uses of force against particular inmates.[481]  No institutional safeguards have been instituted to prevent a repetition of what has already occurred to Thomas and McKinney.

F.      Asthmatics Continue to be Gassed at FSP

Plaintiffs Thomas, Frazier, and Morgan were gassed with chemical agents even though they were diagnosed with asthma.  FDOC policy does not prohibit the use of chemical agents against asthmatics.  It does provide that medical staff will indicate whether there are contraindications to the use of chemical agents against an inmate.  However, this policy was insufficient to prevent known-asthmatics Thomas, Frazier, and Morgan from being gassed multiple times.  Thomas was most recently gassed at FSP in July 2003; Frazier on January 4 and 11, 2001; and Morgan on July 3, 2004 and August 25, 2004.  Defendants have not implemented any safeguards to prevent Plaintiffs from being gassed again.  Former Defendant Musselman stated that asthmatics currently get gassed at FSP.[482]

Dr. Stopford states that the use of chemical agents has severe effects on individuals with pre-existing asthma, including immediate and lasting exacerbation of asthma, dizziness, and loss of consciousness.  McDonough and Bryant know that asthmatic inmates face a substantial risk of being harmed if they are exposed to the use of chemical agents.  Defendants' continued failure to prohibit the use of chemical agents against asthmatic inmates continues to place Thomas, Frazier, and Morgan at a significant risk of harm.

G.      Defendants Continue to use CS Gas in Confined Spaces at FSP

FDOC policy continues to allow the use of CS tear gas against inmates who are confined in small cells with limited ventilation.  Guards used CS gas against Plaintiffs

---

[481] *See* Ex. 122 at pp. 61-63.
[482] *See* Ex. 106 at pp. 76-77.

Thomas, Massie, Echols, and McKinney.  Plaintiff McKinney was gassed with CS most recently on July 25, 2007 while he was locked in his cell.

In his report of November 1, 2006, Dr. Stopford discusses the effects associated with using CS gas against people in confined spaces.  These effects include death, exacerbation of asthma, asthma attacks, acute bronchitis, heart failure, other respiratory difficulties, eczema, and skin burns.[483]   Defendants know that Plaintiffs have suffered some of these effects because Plaintiffs' medical records have put them on notice.  Defendants know that these extremely serious risks are associated with the use of CS gas against Plaintiffs in confinement.  Their continued failure to prohibit the use of chemical agents against inmates in confinement is deliberately indifferent.

### H.    Defendants Knowingly Fail to Provide Proper Decontamination Procedures

Defendants also continue to fail to provide decontamination procedures for inmates exposed to chemical agents.  Dr. Stopford states:

> the practice of washing prisoners in a shower without soap is ineffective for complete decontamination of the skin and continued pain after this procedure would be expected.  If decontamination after exposure to CS or CN is delayed 2 hours or more, one would expect an increased risk of skin burns. It is my opinion that the decontamination practices at FSP would be expected to cause prolonged pain and put prisoners at risk of skin burns.[484]

Defendants know that soap and cold water are required elements of a proper decontamination procedure.  A FDOC memorandum dated February 2, 2000 states that inmates are not allowed to wash themselves with soap after being gassed with chemical agents because the particular soap that FDOC provides to inmates is not suitable for decontamination because

---

[483] *See* Ex. 9 at pp. 11-19.
[484] *See* Ex. 9 at 24.

it contains oil.[485] Defendants' failure to purchase appropriate soap for inmates at FSP even though they know that soap is required to prevent burns is deliberately indifferent. Plaintiffs have thus presented sufficient evidence to proceed to trial on their injunctive relief claims.

## V.   Plaintiffs Thomas's, Ulrath's, Butler's, Frazier's, Williams's, and Morgan's Claims are Not Moot

### A.   Applicable Law on Mootness and/or Standing

The central purpose of standing is to ensure the existence of an actual case or controversy.  Where a Plaintiff seeks forward-looking relief, he must be able to show an invasion of a legally protected interest which is concrete and particularized, and the threatened injury must be actual or imminent, not conjectural or hypothetical.[486]  When the threatened acts that will cause injury are authorized or part of a policy, it is significantly more likely the injury will occur again.[487]  Additionally, where plaintiffs are in the defendants' physical custody involuntarily and, as such, cannot avoid exposure to defendants' challenged injurious policy, then plaintiffs have standing to pursue their claims.[488]  The Supreme Court recognizes that a claim is not moot based on lack of standing even if a Plaintiff is not currently subject to the challenged conduct if the challenged conduct is "capable of repetition but evading review."[489]  Here, even Plaintiffs who are not currently housed at FSP have standing to pursue their injunctive claims because they are at imminent risk of being transferred to FSP and again being abused with chemical agents.

---

[485] *See* Ex. 108.
[486] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).
[487] *31 Foster Children v. Bush*, 329 F.3d 1255, 1266 (11th Cir. 2003).
[488] *Id.*
[489] *Honig v. Doe*, 484 U.S. 305, 318-319 (1988).

**B.     Defendants Continue to Frequently Transfer Plaintiffs in-and-out of FSP**

Both this Court and Judge Steele of the U.S. District Court, Middle District of Florida (Fort Myers division), have already found that Plaintiffs have standing to bring injunctive claims of the nature included in the Second Amended Complaint.  In *Brown v. Crosby*, a proposed class action of inmate Plaintiffs, including many of Plaintiffs in this action, who challenged FDOC's use of chemical agents against inmates in confinement systemwide, Judge Steele found that Plaintiffs had properly asserted that they had suffered injury in fact, that there was a causal connection between Plaintiffs' injury and the Brown defendants' conduct, and that the Court had a basis by which it could provide redress.[490]     After Defendants attempted to raise this same argument in this action, this Court, citing Judge Steele's ruling in Brown, similarly found that Plaintiffs' injunctive relief claims were neither futile nor subject to dismissal.[491]

Defendants McDonough and Bryant argue that Plaintiffs Thomas, Ulrath, Butler, Frazier, Williams and Morgan do not have standing to pursue their claims for injunctive relief because "they are not imminently or immediately likely to be housed" at FSP, and therefore do not meet the standing requirements in *Lujan* and *31 Foster Children*.[492]    FSP is the institution designated to house S-3 close management inmates.[493]  Approximately 85% of inmates at FSP are classified as S-3.[494]    FDOC mental health classifications fluctuate according to the services that inmates receive, not what they need.[495]  All Plaintiffs have an

---

[490] *See Brown v. Crosby*, Case No. 2:03-cv-526-DNF, Doc. 109 at 6-7 (M.D.Fla. 2003)
[491] (Doc. 135) at pp. 20-21, (Doc. 193).
[492] *See* (Doc. 253).
[493] *See* Ex. 116 at 77.
[494] *See id.* at 68.
[495] *See* Ex. 5 at 52-56.

extensive history of mental health problems; even if they are currently stable or refusing medications and therefore assigned a lower S-grade, they can at any time seek mental health care, which would result in the change in their mental health classifications to S-3.[496]   In that event, transfer to FSP is a near certainty.  As Doyle Kemp stated in his affidavit attached to Defendant McDonough and Bryant's Motion, FDOC's decision to transfer an inmate from one institution to another is based on a combination of factors including mental health grade and CM status.[497]   Plaintiffs currently suffer from diagnosed mental health problems and continue to be housed in CM, so they continue to face an imminent risk of again being housed at FSP.

Defendants McDonough and Bryant's reliance on the statement that "[t]he Department has no current intention to transfer any of these Plaintiffs to FSP",[498] is misplaced.  While it may be true that at this precise moment FDOC does not intend to transfer Plaintiffs to FSP, that intention can change at any moment, which leaves FDOC's "current intention" meaningless.  In fact, Defendant McDonough transferred Plaintiff Ulrath from Charlotte Correctional Institution back to FSP on May 18, 2007, mere days after submitting a pleading and supporting affidavit to this Court arguing that Plaintiffs lack standing.[499] The transfer of Plaintiff Ulrath back to FSP immediately after Defendants' presented express statements to the contrary shows that Plaintiffs are in fact at risk of being transferred back to FSP at any time regardless of Defendants' assertions.

---

[496] *See id.*
[497] (Doc. 253-2) at p. 4.
[498] (*Id*). at 3.
[499] *See* Ex. 63 at 3.

100

Plaintiff Ulrath is not the only Plaintiff in this case who continues to be transferred back to FSP.  Thomas was transferred to FSP four times over a three-year period.[500]  He was transferred from inpatient care at UCI to FSP in June of 2003 and gassed with chemical agents mere weeks later, which necessitated his return to inpatient care at UCI.  Morgan has been transferred to FSP five times in the last four years.[501]  McKinney[502] has been transferred to FSP nine times in the last five years.[503]  His most recent transfer from inpatient care at UCI to FSP was in July 2007.[504]  FSP guards gassed him twice in one day mere weeks after his return to FSP, leading to his return to inpatient care at UCI.  All of these facts support Plaintiffs' argument that McDonough has the power to transfer each and every one of the Plaintiffs in this case back to FSP at any time and uses it.  Thus, Plaintiffs do in fact meet the requirements of *Lujan* and *31 Foster Children* because they continue to be in the custody of the Defendants, there is a high likelihood of transfer to FSP, and the injurious conduct is authorized or a part of a policy.

Finally, because McDonough has the power to move inmates in and out of his institutions, Plaintiffs can be moved in and out of FSP with such frequency that their standing to pursue prospective injunctive relief would perpetually be in flux.  The issues that Plaintiffs are trying to remedy through their request for injunctive relief would evade judicial review.  Finding that Plaintiffs do not have standing would give Defendants the power to shape the

---

[500] *See* Ex. 13 at 2-3.
[501] *See* Ex. 123 (Morgan internal movement log) at 5-6.
[502] Defendants McDonough and Bryant do not argue that Plaintiff McKinney lacks standing to pursue injunctive relief.  Plaintiff McKinney's facts are included as yet another example of a Plaintiff continually being transferred in and out of FSP.
[503] *See* Ex. 85 at 3.
[504] *Id.*

litigation because they can easily move Plaintiffs in and out of FSP, thus keeping the issues presented in the injunctive claim out of court.

Plaintiffs are imminently or immediately likely to again be housed at FSP.  Based on the fact that some of the Plaintiffs were recently transferred back to FSP and that all of the Plaintiffs continue to suffer from mental health problems and reside on close management, Plaintiffs can reasonably expect to be transferred back to FSP.  The possibility of such transfers is not "hypothetical or conjectural" but is "actual or imminent."

## VI.    **Plaintiffs Have Exhausted Their Administrative Remedies**

### A.    **Introduction**

Plaintiffs have exhausted all administrative remedies that were available to them under FDOC's grievance scheme as required by 42 U.S.C. § 1997e(a).  The Eleventh Circuit describes FDOC's three-part scheme as follows:

> The Florida DOC has an inmate grievance procedure, which requires an inmate first to file an informal grievance with the person responsible for the particular problem. Fla. Admin. Code Ann. r. 33-103.005(1) (2001). Next, if an inmate desires review of the answer to an informal grievance, he must file a formal grievance directed to the warden or deputy warden of his facility. Id. r. 33-103.006. Lastly, the inmate may file an appeal of his grievance to the DOC Secretary. Id. r. 33-103.007. The DOC Secretary has 30 days to respond to an inmate's appeal. Id. r. 33-103.011(3)(c).[505]

Several Defendants' motions for summary judgment have not argued that certain Plaintiffs failed to exhaust administrative remedies.  The Supreme Court has confirmed that failure to exhaust is an affirmative defense under the PLRA.[506]  Because exhaustion is an affirmative defense, the Eleventh Circuit, in addition to other Circuits, has held that exhaustion is waived

---

[505] *Lyons v. Serrano*, 205 Fed. Appx. 719, 723 (11th Cir. Sept. 18, 2006).
[506] *Jones v. Bock*, 127 S.Ct. 910, 918-926 (2007).

if not timely raised by Defendants in their motion for summary judgment.[507]  For the Court's convenience, Plaintiffs attach a chart summarizing the damages claims in this case.[508]

### B.      Plaintiffs Have Exhausted their Claims for Injunctive Relief

The Eleventh Circuit has suggested that exhaustion of administrative remedies may be required in cases where prison inmates seek injunctive relief to prevent future unconstitutional harm.[509]  As will be demonstrated below, Plaintiffs have fully exhausted all of their administrative remedies in seeking both damages *and* injunctive relief.  Nevertheless, Plaintiffs respectfully submit that Defendants McDonough and Bryant have now waived, for summary judgment purposes, any right to raise the affirmative defense of failure to exhaust administrative remedies by failing to move for summary judgment on this basis.[510]  Moreover, any attempt by Defendants to raise any such arguments in a permissive reply would be improper.[511]

### C.      Plaintiff Curt Massie Properly Exhausted Administrative Remedies

Defendants Green, Sapp, and Clark do not dispute that Massie fully exhausted his administrative remedies.[512]  Accordingly, Massie's claims against these Defendants should be permitted to go to trial.  Nevertheless, Massie fully complied with FDOC's grievance

---

[507] *See Green v. Schwartz*, 138 Fed. Appx. 184, 185-86 (11th Cir. June 17, 2005); *see also Handberry v. Thompson*, 446 F.3d 335, 342-43 (2d Cir. 2006); *Ray v. Kertes*, 285 F.3d 287, 293-95 (3d Cir. 2002); *Perez v. Wis. Dept. of Corr.*, 182 F.3d 532, 536 (7th Cir. 1999); *Holland v. Goord*, No. 05-CV-6295, 2006 WL 1983383 at *4 n.2 (W.D.N.Y. July 13, 1006).

[508] *See* Ex. 124 (Plaintiffs' demonstrative damages claims chart).

[509] *See Alexander v. Hawk*, 159 F.3d 1321, 1328 (11th Cir. 1998); *Simpson v. Holder*, 200 Fed. Appx. 836, 840 (11th Cir. Aug. 23, 2006)

[510] *See* (Docs. 253, 306).

[511] *See Fromm-Vane v. Lawnwood Medical Center, Inc.*, 995 F.Supp. 1471, 1475 (S.D. Fla. 1997).  In the event the Court grants leave for replies, it is impermissible for Defendants to raise new bases for dismissal at that point.  Given the presumption against replies in the Middle District of Florida, there is a paucity of case law on the scope of replies.  Nevertheless, replies are limited by other Courts to issues raised in the motion and the response, and do not serve as a second chance to raise arguments not previously raised.

[512] *See* (Docs. 289, 304, 305).

procedure by filing: (1) an informal grievance on October 16, 2000; (2) a formal grievance on November 3, 2001; and (3) a grievance to the FDOC Secretary on December 28, 2000.[513]

### D.      Plaintiff Eugene Ulrath Properly Exhausted Administrative Remedies

Defendants Shipley, Carter, and Sapp, do not dispute that Ulrath fully exhausted his administrative remedies.[514]   Accordingly, Ulrath's claims against these Defendants should be permitted to go to trial in light of the discussion above demonstrating that these Defendants are not entitled to qualified immunity.   Ulrath complied with FDOC's grievance procedure by filing: (1) an informal grievance on November 25, 2002; (2) formal grievances on December 12, 2002 and December 25, 2002; and (3) a grievance to the FDOC Secretary on December 23, 2002.[515]   In addition, Ulrath filed over ten other grievances that discussed the unlawful gassings he endured.[516]

### E.      Defendant James Crosby's Arguments with Regard to Massie, Ulrath, and McKinney are Meritless

Even though his fellow supervisory Defendants -- Bradley Carter, George Sapp, and Allen Clark -- concede that Massie and Ulrath have properly exhausted their administrative remedies, Crosby incorrectly argues that their claims should be dismissed because "[n]ot a single claim against Crosby contained in the Second Amended Complaint is stated or set forth or even suggested in any one of the grievances filed [sic] Ulrath, Massie and McKinney."[517]   In addition to being incorrect, Crosby's argument conflicts with Supreme Court and Eleventh Circuit precedent.

---

[513] *See* Ex. 52.
[514] *See* (Docs. 295, 303, 304).
[515] *See* Ex. 59.
[516] *See id.*
[517] *See* Doc. 297 at p. 16.

First, Massie's grievance to Warden Crosby clearly begs Crosby for relief such as "Sgt. Green's employment with the state [be] terminated [and that] chemical weapons should not be used except in a riot and only to save lives."[518]  Despite the fact that Crosby never read the grievances addressed to him.[519]  Massie's grievance nonetheless complains about Crosby's malicious and sadistic policy of keeping known inmate abusers on the wings at FSP and permitting these abusers to gas inmates simply for reasons subjectively determined to constitute "disturbances."  Similarly, Ulrath's grievance begs for "appropriate corrective and disciplinary action [to] be taken [and] I do not know any of the officers' name[s].  I do not want DOC to use chemical agents as punishment [and] . . . I ask that all use of chemical agents be documented on videotape."[520]

It is difficult to envision inmate grievances that could better address dissatisfaction with Crosby's stated policies of refusing to videotape gassings and allowing inmates to be gassed as "discipline" for engaging in conduct such as yelling or banging on their door.  Moreover, on August 29, 2000, a letter was sent to the FDOC IG's office naming Crosby as a person who permits inmates to be abused with chemical agents and who refuses to videotape non-spontaneous gassings.[521]  Consequently, any perceived lack of notice that Crosby complains about regarding what was happening at FSP was caused solely by Crosby's own intentional decisions to: (1) not read grievances; (2) not review use of force reports, and (3) not demand that videotaped records be made of uses of chemical agents.

---

[518] See Ex. 52.

[519] See Ex. 6 at p. 233, 243; Valdes, 450 F.3d at 1242; Mathews, 480 F.3d at 1274 (establishing that Crosby delegated the reading of grievances and use of force reports to his administrative assistant, Rhonda Horler).

[520] See Ex. 59.

[521] See Ex. 125 (September 12, 2000 IG summary).

In addition to being factually incorrect, Crosby's arguments are also contradicted by case law.  The Supreme Court has plainly held that "nothing in the [PLRA] imposes a 'name all defendants' requirement' . . ."[522]  Moreover, the Eleventh Circuit has explicitly held that, in prison cases, "[e]veryone involved in the grievance process knows who the warden and commissioner are.  There is no point in making a prisoner name them in his grievance, unless they were somehow personally involved."[523]  Accordingly, because Massie and Ulrath have filed thorough administrative grievances that provided "all of the information concerning [their] claims that [they] ha[d] or reasonably could obtain"[524] from their completely confined, small prison cell, the Court should determine that Massie and Ulrath have properly exhausted their administrative remedies in this case.  Finally, the Northern District of Florida has rejected Crosby's previous attempt to make this argument, holding that "Defendants have been named in this case because, as alleged, they are responsible for either the creation or the implementation of rules and policies of the FDOC.  No arguments have been presented which demonstrate that the grievance process would have been any more effective or efficient had Plaintiff specifically named them in his grievances."[525]  Similarly, given that Crosby did not read any grievances inmates submitted, it is unlikely that he somehow would have corrected the alleged constitutional violations Plaintiffs named him in their grievances.  Section (VI)(G) of this Response will separately address how McKinney properly exhausted his claims against Rathmann and Crosby given what has been discussed in this Section.

---

[522] *Jones v. Bock*, 127 S.Ct. 910, 922 (2007).
[523] *Brown v. Sikes*, 212 F.3d 1205, 1209-10 (11th Cir. 2000); *see also Brown v. Runnels*, No. 2:03-cv-1224, 2006 WL 2849871 at *4 (E.D. Cal. Oct 3. 2006) (declining to dismiss for non-exhaustion based on failure to specifically grieve about supervisor's actions); *Irvin v. Zamora*, 161 F.Supp.2d 1125, 1134-35 (S.D. Cal. 2001).
[524] *Id.*
[525] *Muhammad v. Crosby*, No. 4:05cv193 (N.D. Fla. Nov. 9, 2006).

### F.      Plaintiff Jeremiah Thomas Properly Exhausted Administrative Remedies

Unlike in Massie and Ulrath's cases, Defendants Crosby, Sapp, and Clark all contend that Thomas failed to properly exhaust his administrative remedies.[526]  Prior to discussing the specifics of Thomas's exhaustion, it is important to highlight the Eleventh Circuit's stated policy justifications for requiring exhaustion of administrative remedies:

> (1) to avoid premature interruption of the administrative process; (2) to let the agency develop the necessary factual background upon which decisions should be based; (3) to permit the agency to exercise its discretion or apply its expertise; (4) to improve the efficiency of the administrative process; (5) to conserve scarce judicial resources, since the complaining party may be successful in vindicating rights in the administrative process and the courts may never have to intervene; (6) to give the agency a chance to discover and correct its own errors; and (7) to avoid the possibility that "frequent and deliberate flouting of the administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures.[527]

Moreover, FDOC states that the purpose of their grievance procedure is to "provide an inmate with a channel for the administrative settlement of a grievance . . . [to] assist the department by providing additional means for internal resolution of problems and improving lines of communication  . . . [and to] provide a written record in the event of subsequent judicial or administrative review."[528]

In adjudicating whether Thomas exhausted his administrative remedies, it is submitted that: (1) Thomas's exhaustion efforts have complied with even the strictest reading of Florida's exhaustion rules set forth in the Florida Administrative Code; and (2) Thomas's exhaustion efforts have accomplished each of the stated policy objectives outlined by the Eleventh Circuit and FDOC.   As recognized by the Supreme Court, all that is required to

---

[526] *See* (Docs. 289, 297, and 304).
[527] *Brown v. Sikes*, 212 F.3d at 1208 (citing *Alexander*, 159 F.3d at 1327).
[528] *See* Fla. Admin. R. 33-103.001(1).

properly exhaust administrative remedies is for a prisoner to "complete the administrative review process in accordance with the applicable procedural rules."[529]

After being gassed six times in seven days -- concluding on September 26, 2000[530] -- Thomas was admitted to the Crisis Stabilization Unit (CSU) at UCI on September 29, 2000, where he remained until being transferred back to FSP on June 18, 2003.[531]   According to FDOC, confinement in a CSU is "intended for inmates who are experiencing acute emotional distress."[532]   FDOC's stated goal for their CSU is to achieve "rapid stabilization of acute symptoms and conditions."[533]   The only persons who may be sent to CSU's are persons suffering from a "mental disorder,"[534] which is defined by FDOC as "an impairment of the emotional processes, of the ability to exercise control of one's actions, or of the ability to perceive reality or to understand, which impairment substantially interferes with a person's ability to meet the ordinary demands of living . . ."[535]   Moreover, persons in inpatient mental health facilities are presumed by FDOC to be mentally incompetent.[536]   Thomas has been declared incompetent by FDOC mental health staff as late as January 2005.[537]

Despite suffering from severe mental disorders requiring intensive treatment at an FDOC CSU, Thomas filed an informal grievance with the assistance of an advocate on October 2, 2001.[538]   The informal grievance complained that excessive force was used

---

[529] *Jones v. Bock*, 127 S.Ct. at 922 (quoting *Woodford v. Ngo*, 126 S. Ct. 2378, 2384 (2006).
[530] *See* Ex. 42.
[531] *See* Ex. 13.
[532] *See* Fla. Admin. R. 33-404.101(3)(d).
[533] *See* Fla. Admin. R. 33-404.103(9).
[534] *See* Fla. Admin. R. 33-404.101(2)(b).
[535] *See* Fla. Admin. R. 33-404.103(3).
[536] *See* Fla. Admin. R. 33-404.108(2); 33-404.205.
[537] See Ex. 126 (Competency determination).
[538] *See* Ex. 127 (Thomas's grievances composite); Ex. 128 (Lisa White Shirley decl.).

against Thomas (a mentally ill man) by gassing him six times in seven days for reasons that were unnecessary to restore order, and specifically names Defendants Crosby, Sapp, and Clark.[539]   The grievance also stated that Thomas suffered second-degree burns as a result of being repeatedly gassed and, thus, sought money damages to remedy past harm and injunctive relief to remedy future harm.[540]   Thomas's specific request for money damages and injunctive relief was not inappropriate or erroneous, as Defendants incorrectly suggest in their filings,[541] but was done out of an abundance of caution given existing Eleventh Circuit precedent holding that "prisoners seeking monetary damages and injunctive relief should exhaust administrative grievance procedures that were arguably futile and inadequate before filing a section 1983 action regarding prison conditions."[542]

Thomas's informal grievance was sent to the Warden because he was "the staff member who [was] responsible in the particular area of the problem."[543]   Thomas used the appropriate Form DC6-236 outlined by FDOC's rules.[544]   At this point, the recipient of the informal grievance is required to "state that the grievance is either approved, denied, or returned without action.  The response shall also state the reason or reasons for the approval, denial, or return"[545] Moreover, according to FDOC rules, the only time deadline assigned to informal grievances is that they must be filed within a reasonable time:

---

[539] *See* Ex. 127.
[540] *Id.*
[541] *See* (Docs. 289 at pp. 23-24, 297 at pp. 6-7, and 304 at pp. 6-7).
[542] *Alexander v. Hawk*, 159 F.3d 1321, 1325 (11th Cir. 1998) *see also James v. Davis*, No. 9:05-2733, 2006 WL 2171082 at *17 (D.S.C. July 31, 2006) (holding that the prison acted improperly by returning grievances unprocessed on the grounds that "Plaintiff could not grieve a complaint which sought money damages (contrary to the PLRA.")).
[543] *See* Ex. 127; Fla. Admin. R. 33-103.002(12).
[544] *See* Ex. 127; Fla. Admin. R. 33-103.005(2).
[545] *See* Fla. Admin. R. 33-103.005(4)(b).

> Informal Grievances . . .[m]ust be received within a reasonable time of when the incident or action being grieved occurred. ***Reasonableness shall be determined on a case-by-case basis***. Availability of witnesses and relevant documentary evidence are factors, among others, which should be looked at in determining reasonableness.[546]

To reiterate, upon receiving Thomas's informal grievance on October 5, 2001, the Warden or his designee had only three choices: (1) approve the grievance; (2) deny the grievance; or (3) return the grievance without action.[547]  In this case, the Warden's designee neither denied nor returned the grievance without action, but rather, stated that "[y]our informal grievance is noted and will be forwarded to the Inspector General for review and any action deemed appropriate."[548]  Had the Warden's designee been operating under the impression that Thomas's informal grievance was untimely, the rules clearly and explicitly state that he was required to either deny Thomas's grievance as untimely, or return the grievance without action citing untimeliness as the reason.[549]  Because the Warden's designee neither denied the grievance nor returned it as untimely, Thomas's informal grievance must be treated as being "approved" insofar as it was forwarded to the IG for review.  Finally, had the Warden's designee denied Thomas's informal grievance as untimely, FDOC rules would have required the following to be included in the response: "[y]ou may obtain further administrative review of your complaint by obtaining form DC1-303 . . ."[550]  The absence of this language in the response to Thomas's informal grievance further establishes that his informal grievance was approved and treated as timely filed.

---

[546] *See* Fla. Admin. R. 33-103.011(1)(a) (emphasis added).
[547] *See* Fla. Admin. R. 33-103.005(4)(b).
[548] *See* Ex. 127.
[549] *See* Fla. Admin. R. 33-103.005(4)(b); 33-103.011(1).
[550] *See* Fla. Admin. R. 33-103.005(4)(d).

Accordingly, Thomas's informal grievance was: (1) filed on the proper FDOC forms; (2) adjudicated to be timely filed; (3) approved to the extent it was forwarded to the inspector general; and (4) properly drafted in that it clearly grieved the fact that it was unconstitutional to gas him six times in seven days because he is mentally ill.  Upon receiving the Warden's approval of his informal grievance on October 5, 2001, Thomas filed a formal grievance with the Superintendent reiterating the complaint raised in his informal grievance.[551]

As with Thomas's informal grievance, Thomas's formal grievance was not denied as untimely.[552]  Instead, Thomas's grievance was "forwarded to the inspector General for further review of alleged staff misconduct."[553]  Unlike Thomas's informal grievance, Thomas's formal grievance was "returned without processing" for two erroneous reasons: (1) Thomas's grievance was deemed to have raised more than one issue or complaint; and (2) the grievance was deemed improper because it asked for monetary and injunctive relief.  As discussed above, Thomas had no choice but to ask for monetary and injunctive relief in his grievance given the state of the Eleventh Circuit law at the time.[554]  Moreover, Thomas was clearly not raising more than one issue or complaint at the time, as his grievance only asked for "assurances that the security staff will not use chemical agents on me in any situation when I am not causing harm to myself, staff, other prisoners, or state property."[555]  In other words, Thomas was specifically grieving the "one issue" that severely mentally ill people such as himself should not be gassed for simply yelling or banging on the door.

---

[551] *See* Ex. 127.
[552] *Id.*
[553] *Id.*
[554] *Alexander v. Hawk*, 159 F.3d 1321, 1325 (11th Cir. 1998).
[555] Ex. 127.

It is well-settled that "[p]rison officials may not take unfair advantage of the exhaustion requirement . . . [and] a remedy becomes 'unavailable' if prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting.."[556]   Moreover, "exhaustion may be achieved in situations where prison officials fail to timely advance the inmate's grievance or otherwise prevent him from seeking his administrative remedies."[557]   Notably, Thomas's informal grievance and formal grievance were adjudicated by the same individual, Paul C. Decker.[558]   As such, it was plainly arbitrary and capricious for Mr. Decker to have adjudicated Thomas's informal grievance as properly filed but suddenly to have found problems with the exact same language written in Thomas's formal grievance.  In sum, Thomas's formal grievance was: (1) filed on the proper FDOC forms[559]; (2) adjudicated to be timely filed; (3) forwarded to the inspector general for further review; and (4) properly drafted in that it clearly and concisely grieved the fact that it was unconstitutional to gas him six times in seven days given that he was mentally ill.  Accordingly, Thomas properly exhausted his claim at the formal grievance level, and should be adjudicated by this Court to have done so.

Upon receiving the return of his formal grievance on October 31, 2001, Thomas filed his final appeal to the FDOC Secretary.[560]   On this occasion, the reason for returning Thomas's appeal was changed.  Instead of concluding that Thomas's grievance was improper for including more than one issue, the Secretary stated that Thomas was "grieving issues that

---

[556] *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006); *see also Miller v. Norris*, 247 F.3d 736, 740 (8th Cir. 2001) ("We believe that a remedy that prison officials prevent a prisoner from 'utiliz[ing]' is not an 'available' remedy under § 1997e(a) . . . ").
[557] *Abney v. McGinnis*, 380 F.3d 663, 667 (2d Cir. 2004)
[558] *See* Ex. 127.
[559] *See* Fla. Admin. R. 33-103.006(1); Ex. 127.
[560] *See* Ex. 127.

are past the timeframe to file on."[561]   The Secretary's decision was patently improper because, pursuant to FDOC Rule 33-103.014, the Secretary has no authority to retroactively deny a grievance as "past the timeframe to file on." [562]   The Secretary's authority was limited to deciding the sole issue of whether Thomas's grievance to the Secretary was timely filed.[563] There is no dispute in this case that Thomas's appeal to the Secretary was timely filed on November 14, 2001.[564]   Thus, the only issue is whether Thomas had fully exhausted his administrative remedies by filing his November 14, 2001 appeal to the Secretary.  Because the plain language of FDOC Rule 33-103.014 prohibits the Secretary from retroactively denying a grievance based upon the date on which an informal grievance was filed, Thomas unequivocally exhausted his administrative remedies under FDOC's rules.

Justice Breyer's concurrence in *Woodford* recognizes that the "PLRA's proper exhaustion requirement is not absolute."[565]   Specifically, Justice Breyer endorsed the approach taken by the Second Circuit, which has held that, although the PLRA's exhaustion requirement is mandatory, certain caveats apply.[566]   For instance, Courts may waive the exhaustion requirement when: 1) "prison officials inhibit an inmate's ability to utilize administrative grievance procedures"; 2) "'special circumstances' . . . excuse a prisoner's failure to exhaust"; or  3) administrative remedies may not be "available" to prisoners seeking redress of their grievances.[567]   In essence, the Second Circuit has crafted an

---

[561] *Id.*

[562] *See* Fla. Admin. R. 33-103.014 (1)(a)-1(t) (listing the *only* acceptable reasons for returning a grievance or an appeal without processing.

[563] *See* Fla. Admin. R. 33-103.014 (1)(l).

[564] *See* (Docs. 289 at p. 22, 297 at pp. 6-7, and 304 at p. 8).

[565] *Woodford v. Ngo*, 126 S. Ct. at 2393.

[566] *See id.* (citing *Giano v. Goord*, 380 F.3d 670, 677 (2d Cir. 2004)).

[567] *Id.*

exception to exhaustion on a case-by-case basis if a Court determines that "'Special circumstances' may exist that amount to a 'justification' for not complying with administrative procedural requirements."[568]  Because the *Woodford* majority did not dispute that the Second Circuit's exceptions to exhaustion apply to PLRA cases, exhaustion is not required if any of the three circumstances enumerated above can be established.

In addition to the fact that Thomas properly exhausted his administrative remedies as required under FDOC rules, each of the exceptions outlined by the Second Circuit also exists in Thomas's case.  First, countless Courts have held that prisoners whose grievances are rejected with no avenue of appeal available -- e.g., by returning them as unrecorded or "unprocessed" -- have exhausted their administrative remedies for PLRA purposes.[569] Thomas's grievances were returned as "unprocessed" for reasons that were either plainly inconsistent with FDOC's grievance rules, or were arbitrary and capricious.  As such, on this basis alone, the Court should find that Thomas's grievances to all three levels as required under FDOC's rules was sufficient exhaustion of his administrative remedies.

Second, in all three of Thomas's grievances, he received a response stating that his complaints were reviewed by the Inspector General.[570]  It is well-settled that if the grievance

---

[568] *Id.*

[569] *See Hernandez v. Schriro*, No. 05-CV-2853, 2006 WL 2989030 at *4 (D. Ariz. Oct. 18, 2006); *Smith v. Baugh*, No. 3:05-0860, 2006 WL 2771039 at *5 (M.D. Tenn. Sept. 25, 2006) (holding that plaintiff exhausted where his grievances were returned unprocessed); *Fuller v. California Dep't. of Corrections*, No. 04-1276, 2006 WL 2385177 at *3 (E.D. Cal. Aug. 17, 2006) (refusing to dismiss for non-exhaustion where a second-level appeal was returned for defects of form); *James v. Davis*, No. 9:05-2733, 2006 WL 2171082 at *17 (D.S.C. July 31, 2006) (holding that return of grievances unprocessed left Plaintiff without any ability to exhaust administrative remedies); *Bennett v. Douglas County*, No. 8:04cv285, 2006 WL 1867031 at *2 (D. Neb. June 30, 2006); *Cain v. Dretke*, No. C-04-364, 2006 WL 1663728 at *3 (S.D. Tex. June 13, 2006) (holding that remedies unavailable when a grievance was returned unprocessed, marked "inappropriate" for no apparent reason); *Wood v. Idaho Dep't. of Corrections*, No. 04-CV-99, 2006 WL 694654 at *6 (D. Idaho, Mar. 16, 2006) (holding that a prisoner whose grievance was returned exhausted because he had done all he could do).

[570] *See* Ex. 127.

process actually results in an investigation of an issue, administrative remedies should be deemed exhausted no matter how well or badly the prisoner set it out, since the purpose of exhaustion will have been served.[571]   In this case, Thomas plainly provided FDOC with the notice necessary to "let the agency develop the necessary factual background upon which decisions should be based [and] . . . to give the agency a chance to discover and correct its own errors."[572]   As Donna Hoffman of the Inspector General's Office confirmed during her Rule 30(b)(6) deposition, once an inmate's grievance is submitted to the IG's office, the grievance should be approved by the reviewing official.[573]   Accordingly, because all of FDOC's responses to Thomas's grievances stated that the allegations set forth in his grievances were reviewed by the IG's office, Thomas's grievances should have been approved.   On this additional basis, the Court should find that Thomas's grievances to all three levels required under FDOC's rules sufficiently exhausted his administrative remedies.

Third, it is well-settled that prison officials may waive the defense of lack of exhaustion; if they decide the merits of the grievance, they cannot later rely on the prisoner's procedural missteps as a basis for dismissal.[574]   The reasons cited for refusing to process Thomas's grievances were inconsistent.   Once Thomas's informal and formal grievances were not denied on timeliness grounds, FDOC waived the ability to retroactively deny the

---

[571] *See Ambriz v. Kernan*, No. 05-1298, 2007 WL 214594 at *6 (E.D. Cal. Jan. 25, 2007) (finding exhaustion because the "responses of the reviewers flesh out the circumstances of which plaintiff was complaining."); *Baskerville v. Blot*, 224 F. Supp.2d 723, 730 (S.D.N.Y. 2002) (finding exhaustion on account of the fact that the "apparent investigation of plaintiff's assault claim and the rendering of a decision by the CORC appears to be consistent with the purpose of the PLRA."); *J.P. v. Taft*, 439 F.Supp.2d 793, 826 (S.D. Ohio 2006 (holding that grievance prompting investigation was sufficient for exhaustion purposes).

[572] *Brown v. Sikes*, 212 F.3d at 1208 (citing *Alexander*, 159 F.3d at 1327).

[573] *See* Ex. 122 at p. 66.

[574] *See Thomas v. Knight*, 196 Fed. Appx. 424, 427-28 (7th Cir. 2006); *Camp v. Brennan*, 219 F.3d 279, 281 (3d Cir. 2000); *Strope v. Collins*, No. 06-3150 2006 WL 3390393 at *3 (D. Kan. Nov. 22, 2006); *Jones v. Stewart*, 457 F.Supp.2d 1131, 1134-37 (D. Nev. 2006); *Kretchmar v. Beard*, No. 05-6108, 2006 WL 2038687 at * 5 (E.D. Pa. 2006).

grievances for issues of timeliness.  Moreover, because the Secretary did not believe that Thomas's grievances contained a "one-issue" defect, this defect cannot be relied upon as a basis for arguing that Thomas failed to exhaust.

Even though Thomas had already fully and properly exhausted his administrative remedies after filing his November 14, 2001 grievance with the Secretary, Thomas still filed four other grievances to try to additionally comply with the PLRA's exhaustion requirements in the best manner possible.[575]   On each of these occasions, Thomas's grievance was not processed.  Nevertheless, by filing seven grievances, it is clear that Thomas was not trying to circumvent the grievance procedure; on the contrary, his grievances gave FDOC more than sufficient notice and opportunity to resolve the issues about which Thomas was complaining.[576]  Because FDOC did not resolve these issues, Thomas was transferred back to FSP in 2003 and gassed twice more.[577]   Under similar circumstances, Courts have held that "although each of his efforts, alone, may not have fully complied, together his efforts sufficiently informed prison officials of his grievance and led to a thorough investigation of the grievance as to satisfy the purpose of the PLRA or to constitute 'special circumstances' justify[ing] any failure to fully comply with DOCS' exhaustion requirements."[578] Accordingly, for all three reasons stated above, this Court should find that Thomas has exhausted his administrative remedies.

Finally, even if Thomas's grievances were untimely, the Court should excuse Thomas's lack of timeliness because he was in a CSU as of September 2000, and was unable

---

[575] *See* Ex. 127.
[576] *See Brown v. Sikes*, 212 F.3d at 1208 (citing *Alexander*, 159 F.3d at 1327).
[577] *See* Ex. 13 and Ex. 42.
[578] *Hairston v. LaMarche*, No. 05-cv-6642, 2006 WL 2309592 at *8, 11 (S.D.N.Y. Aug. 10, 2006).

to file any coherent grievances without the assistance of counsel.  Courts have acknowledged that administrative remedies are "unavailable" to prisoners during periods in which inmates are either physically or mentally incapable of filing grievances.[579]  As stated by Dr. Burns, "Thomas was in no condition to file coherent grievances after he was gassed at FSP because of his mental illness and the abuse that he suffered in September 2000 . . . Writing and filing a grievance detailing all six of the incidents in which he was abused with chemical agents in September 2000 would have been impossible for him after the incidents."[580]

Defendants cite the fact that Thomas filed a grievance in March 2001 and July 2001 as evidence that Thomas was mentally competent to file grievances.[581]  Review of these grievances confirms that the opposite conclusion is true.  Thomas's March 2001 grievance is completely incoherent, complaining about a "head talking to me and in front of my cell."[582] The only copy of Thomas's July 2001 grievance that Plaintiffs were provided during discovery is cut-off; but it also appears incoherent, as Thomas appeared to have tried to file an emergency appeal to the Secretary asking for privacy.[583]  Given the fact that FDOC's own rules recognize that Thomas was presumed to be mentally incompetent by virtue of his

---

[579] *See Whitington v. Sokol*, 491 F. Supp. 2d 1012, 1020 (D. Colo. 2007); *Days v. Johnson*, 322 F.3d 863, 867 (5th Cir. 2003) (noting that "one's personal ability to access the grievance system could render the system unavailable."); *accord Holcomb v. Director of Corr.* 2006 WL 3302436 at *6-7 (N.D. Cal., Nov. 14, 2006) (holding that delay in filing grievances is excusable if outside of Plaintiff's control); *Pavey v. Conley*, 170 Fed. Appx. 4, 9 (7th Cir. 2006); *Ullrich v. Idaho*, No. CV-04-352, 2006 WL 288384 at *3 (D. Idaho Feb 6, 2006) (dismissing for non-exhaustion, but directing prison officials to appoint someone to assist the plaintiff, who alleged mental illness and denial of psychiatric treatment; stating that prison officials should not, in bad faith, prevent mentally incompetent person from exhausting administrative remedies upon finally receiving assistance to prepare grievance).

[580] *See* Ex. 5 at pp. 54, 55; Ex. 128.

[581] *See* (Docs. 297 at p. 11 and 304 at p. 11).

[582] *See* Ex. 129 (Thomas's incoherent grievance attempts).

[583] *Id.*

detention at a CSU,[584] the Court should find that administrative remedies were "unavailable" to Thomas until he was able to secure assistance from counsel to file his grievances or until he was released from inpatient care.  Accordingly, Thomas should be deemed to have exhausted all administrative remedies as required under the PLRA.

### G.    Plaintiff Michael McKinney Properly Exhausted Administrative Remedies

After being gassed with the entire arsenal of chemical agents over 25 times,[585] McKinney specifically asked Defendants Rathmann and Crosby to stop the policy of gassing him with chemical agents simply for yelling or banging on his cell door.  On February 28, 2005, McKinney filed an informal grievance that was processed but denied by FDOC officials.[586]  Upon learning of the denial of his informal grievance, McKinney filed a grievance with the Warden on March 14, 2005 that again complained of the health effects of the numerous unjustified gassings he had endured.[587]  This grievance was also processed but denied.[588]  Finally, on April 4, 2005, McKinney filed a grievance with FDOC Secretary Crosby addressing the same issues[589]  This appeal was also processed and denied.  Because McKinney exhausted all three levels of review and identified his exact concern -- i.e., that he was being gassed with excessive and unjustified use of chemical agents in a constant manner -- McKinney's damages and injunctive relief claims should be permitted to go forward.

Rathmann objects that McKinney did not specifically list the gassings he endured during June 2004 when he complained that "I have been gassed with chemical agents so

---

[584] *See* Fla. Admin. R. 33-404.108(2); 33-404.205.
[585] *See* Ex. 42.
[586] *See* Ex. 130 (McKinney grievances composite).
[587] *Id.*
[588] *Id.*
[589] *Id.*

many times since I been locked down on C.M."[590]  Rathmann's objection is unsupported by case law, as it is well-settled that "[w]hen the administrative rulebook is silent, a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought.  As in a notice pleading system, the grievant need not lay out the facts, articulate legal theories, or demand particular relief.  All the grievance need do is object intelligibly to some asserted shortcoming."[591]  Here, McKinney provided notice that he was grieving the fact that Crosby and Rathmann's policies were responsible for him being repeatedly gassed even though he posed no threat to self or others, and that he was suffering adverse health effects as a result of these malicious and sadistic gassing policies.  As McKinney has done all that could be expected to place Crosby and Rathmann on notice of their constitutional violations, he has exhausted his administrative remedies under the PLRA.  Finally, for the same reasons expressed in the discussion pertaining to Ulrath and Massie, McKinney's grievances sufficiently placed Crosby on notice that the policies Crosby originated at FSP -- with respect to using gas to "discipline" inmates who "misbehaved" -- led to the inevitable result in which a "frequent flier" (i.e. McKinney) was repeatedly gassed with chemical agents and suffered adverse health consequences.  Despite this warning, neither Crosby nor Rathmann changed any policies at FSP, and McKinney was subsequently gassed six more times.[592]

---

[590] *See id;* Doc. 294 at p.5.
[591] *Strong v. David,* 297 F.3d 646, 650 (7th Cir. 2002), *accord Kikumura v. Osagie*, 461 F.3d 1269, 1283 (10th Cir. 2006); *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004).
[592] *See* Ex. 42.

## CONCLUSION

Because Plaintiffs have met their burden of submitting evidence establishing that each Defendant in this case may be held liable for their individual actions with regard to Plaintiffs' gassings with chemical agents, and have established that material facts remain in dispute that entitle Plaintiffs to proceed to trial on their claims for damages and injunctive relief, they respectfully request that the Court deny Defendants' motions for summary judgment. Plaintiffs respectfully request the opportunity to participate in oral argument regarding the issues presented in Defendants' motions for summary judgment.

Respectfully submitted,

s/ George E. Schulz, Jr.
George E. Schulz, Jr., Esq.
Fla. Bar No. 169507
Leon Fresco, Esq.
Holland & Knight LLP
50 North Laura Street, Suite 3900
Jacksonville, Florida 32202
(904) 353-2000
(904) 358-1872 (facsimile)

Cassandra Capobianco, Esq.
Christopher M. Jones, Esq.
Kristen Cooley Lentz, Esq.
Florida Institutional
Legal Services
1010-B NW 8th Avenue
Gainesville, FL 32601
(352) 375-2494
(352) 358-0910 fax

Randall Berg, Esq.
Florida Justice Institute
100 S.E. 2nd Street
Miami, Florida 33131
(305) 358-2081
(305) 358-0910 fax

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 27, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

s/ George E. Schulz, Jr.
Fla. Bar No. 169507

# 4817751_v1

120