**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**


JEREMIAH THOMAS, KELVIN FRAZIER,
REGINALD WILLIAMS, PAUL ECHOLS,
MICHAEL McKINNEY, CHARLES MORGAN[1]
and ANTONIO WARD,

               Plaintiffs,

vs.                                     Case No. 3:04-cv-917-J-32JRK

WALTER McNEIL and RANDALL BRYANT,
in their official capacities,

               Defendants.

_____


**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

      Plaintiffs Jeremiah Thomas, Kelvin Frazier, Reginald Williams, Paul Echols, Michael

McKinney, and Antonio Ward are inmates of the Florida prison system who have repeatedly

been sprayed by correctional officers with chemical agents for causing disturbances in their

cells on the close management wings at Florida State Prison ("FSP").  With two exceptions,[2]

the plaintiffs each have long documented histories of serious mental illnesses and allege that

at the times they were sprayed, they did not have the mental capacity to conform their

_____

   [1]Charles Morgan was released from custody just before this case went to trial.  Plaintiffs having filed no objection, defendants' September 8, 2008 ore tenus motion to dismiss Morgan is now **granted**.  See Doc. 422, Def. Ex. 17; Doc. 426 at 273-75 (September 8, 2008 trial transcript discussion of Morgan's status).  Three additional plaintiffs and twenty-eight other defendants have been dismissed from this suit during its pendency.

   [2]As is further discussed below, the record does not support that Kelvin Frazier or Reginald Williams fit this profile.

behavior to follow the prison rules, such that the decision to spray them constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.  The defendant Florida Department of Corrections ("DOC") officials,[3] on the other hand, argue that while the prison's mental health classification system designated the plaintiffs as suffering from serious mental illnesses, they nonetheless retained the capacity to conform their behavior to the rules of FSP; thus DOC's gassing of plaintiffs did not violate the Constitution.  Plaintiffs, represented by counsel, seek an injunction which would prevent the DOC from spraying them while housed in close management at FSP without first conducting a mental health consultation to evaluate whether they possess the mental faculties to understand and follow their jailer's instructions.

This is a hard case.  The DOC's already difficult job is complicated by the fact that so many of its inmates have mental health issues and the DOC, with limited resources, must try to find the right balance between maintaining the good order and discipline necessary to run a correctional facility while at the same time accommodating the mental health treatment needs of inmates.  On the other hand, a mentally ill inmate, who is under the total control of the DOC, has a constitutional right not be subjected to painful discipline for actions over which that inmate has no control.  Both sides agree that the Eighth Amendment to the United States Constitution does not prevent correctional officers from spraying inmates with chemical agents to compel compliance with the rules of the ward, but the parties also acknowledge that this is only true when the inmate has the mental capacity to conform his

---

[3]Walter McNeil is the Secretary of the Florida Department of Corrections and Randall Bryant is the warden at Florida State Prison.

behavior to those rules.  The issue presented by this case is whether the plaintiff inmates, who have been designated by the DOC as having the ability to conform their behavior to the prison's standards, have nonetheless demonstrated that at the time they were sprayed, this was no longer true (and was known or should have been known not to be true by the DOC) such that spraying them was cruel and unusual punishment and, if so, whether the DOC's policies with regard to mental health services at FSP have now evolved such that plaintiffs face no real risk of being subjected to the same Eighth Amendment violation in the future. Four years of litigation and five trial days later, the question is still close.[4]

---

[4]This case went to trial only as to whether prospective injunctive relief is warranted, these plaintiffs (as well as some others no longer in the case) having either settled or dismissed their claims for damages.

## I.   Findings of Fact[5]

### A.  Background Information and Relevant Prison Policies

The DOC houses over 75,000 inmates in 60 correctional institutions.[6]  The mental

health of all inmates is evaluated upon entry into a correctional institution and at certain other

times during an inmate's term of incarceration.  The DOC mental health classification system

assigns each inmate one of six possible categories, ranging from "S-1," the lowest possible

designation, reserved for inmates who have no significant impairment and require no mental

health services, through "S-6," which is the highest possible category reserved for inmates

who are acutely and severely mentally ill requiring full time institutionalized care at a

psychiatric hospital facility.  DOC security staff do not have access to inmates' medical or

---

[5]Pursuant to Fed.R.Civ.P. 52(a)(1), the Court makes these findings upon evaluation of the evidence, including the stipulations in the parties' joint pretrial statement (Doc. 395) and the testimony and exhibits admitted at the five day bench trial conducted before the undersigned on September 3-9, 2008 (see Docs. 411-414, 416, 418-427).  Where the evidence to support a relevant finding was in dispute, the Court has weighed the evidence on both sides to determine what facts "are more likely true than not true."  Eleventh Circuit Pattern Jury Instructions (Civil Cases) 2005, Basic Instruction 6.1.  Particular record cites are included when a point was in dispute or obscure.  Citations to trial transcripts are noted by Docket number, followed by a "Tr." page number.

A few weeks after the trial ended, defendants moved (Doc. 430) to supplement the trial record to add certain documents about a non-party inmate (Jasmin Hunter) who was discussed by several witnesses during the trial and about whom other records were admitted over defendants' objection. Plaintiffs oppose the motion (Doc. 432).  Upon consideration, the Court **denies** defendants' motion and those additional documents (of record as Exhibit 1 to Doc. 429) were not considered in reaching decision in this case.  Both sides had ample opportunity to prepare their case and defendants do not suggest that the records they seek to admit (which are from May of 2007) were unavailable to them before or even during the trial.  To admit additional evidence over objection at this late date would cause prejudice and/or create even further delay.

[6]Another 15,000 inmates are supervised by the DOC in various less restrictive facilities such as work camps and road prisons.

mental health records and do not have knowledge of an inmate's S- status, except as might be gleaned from an inmate's own statement or staff observations regarding an inmate's interactions with mental health staff.

Inmates with a rating of S-4, S-5, or S-6 are housed in special correctional facilities where inpatient psychiatric care is available.  Inmates designated as S-1 or S-2 (those having no more than a mild impairment and needing few or no mental health services), are housed in any of a number of DOC facilities throughout the state.  Inmates designated as S-3 (those prescribed psychotropic medications who have moderate impairment in adaptive functioning due to serious mental illnesses such as schizophrenia, bipolar disorder or major depression or schizotypal or borderline personality disorders), are housed in one of five DOC facilities.  FSP, located in Starke, Florida, is one of these five facilities.[7]  Although FSP houses some inmates who are classified as S-1 or S-2, its primary mission is to house S-3 inmates and at any one time, a majority of FSP's 1,400 inmates are designated as S-3.

At FSP, nearly 80% of the inmates are housed in Close Management ("CM") cells, which are completely enclosed individual nine-by-seven foot prison cells with a solid steel door containing a small window and a flap (known as a "food flap") through which food, medication, and other items may be passed.  An inmate is housed on a wing of CM cells when he demonstrates an inability to live in the open population at FSP or another DOC facility by virtue of receiving an excessive number of disciplinary infractions, the severity of those infractions, or because of escape attempts.  Inmates housed on CM wings have

---

[7]The others are Santa Rosa, Charlotte, Union and, for female S-3 inmates, Lowell.

significant restrictions of privileges and property compared to inmates housed within an institution's open population.  Within the CM wings, there are three gradations ranging from CM-I, which is the most restrictive, through CM-III, which is less so.[8]  Within the DOC system, FSP is designated as the primary facility for housing S-3 inmates who are on CM status.

As with other DOC facilities, and regardless of any CM designation or S- status, all inmates housed at FSP are expected to abide by the rules of the facility.  These rules prohibit creating a disturbance.  At FSP, and particularly on the CM wings where officers' visibility into individual cells is limited, yelling and banging on a cell door may be deemed by security to be a disturbance both because it disturbs other inmates and because an inmate's yelling or banging can create enough noise that staff cannot hear other inmates who may need assistance.  Additionally, an inmate's yelling and banging often incites other inmates to join in, multiplying the commotion and increasing the risk that an inmate in need may not be heard.  When an inmate refuses to comply with an order from the staff to stop yelling or

---

[8]The parties stipulated that inmates are housed in CM units "by themselves" and the testimony generally was that each CM cell at FSP houses a single inmate.  The Court notes, however, that the recent <u>Osterback</u> decision (which examined CM housing throughout the Florida DOC system) states that CM-II and CM-III inmates "are usually housed with two inmates in each cell . . . to assist them in transitioning back into the open population by interacting with another inmate."  <u>Osterback v. McDonough</u>, 549 F.Supp.2d 1337, 1356-57 (M.D. Fla. 2008).  For purposes of this decision, and based on the parties' stipulation, the Court presumes that the plaintiff inmates were housed in single inmate CM cells while at FSP.

Although the record reflects that most CM inmates at FSP are designated as CM-1 (the most restrictive classification), plaintiffs did not attempt to link the level of their CM status with the degree of likelihood that they would be sprayed with chemical agents and the Court makes no findings in that regard.

banging on a cell door, the inmate may be subject to a "non-spontaneous" or planned use of force to compel compliance.  A non-spontaneous use of force is permitted in instances where an inmate is engaging in certain prohibited behavior that does not involve harm or the immediate threat of harm to a staff person or another inmate.  As its name implies, a period of time lapses before non-spontaneous force may be used.  During this time, other alternatives to using force are exhausted,[9] authorization is secured from a warden for the non-spontaneous use of force, and a video cameraman is brought to the scene to record the event.  Within the DOC, the non-spontaneous use of force may take several forms including cell extraction, use of electronic immobilization devices, videotaping the inmate, a show of force, batons, noise flash distraction devices, or use of chemical agents which are sprayed at an inmate.[10]  During the late 1990's, the primary method by which correctional officers at

_____

[9]DOC procedures (33-404.107) state that no force of any kind can be used against an inmate "with a diagnosed mental illness" except as a last resort, other than in cases of emergency or when the force is less likely to result in injury to the inmate or staff.  See Doc. 421, Ex. 41 at BATES 4100015; Doc. 422, Ex. 1 (DOC use of force procedures). The parties did not put on evidence as to how the diagnosis of a mental illness is conveyed to security staff (other testimony suggests it is not) or whether the exhaustion of other alternatives that is undertaken with respect to all non-spontaneous uses of force satisfies the "last resort" requirement applicable to mentally ill inmates.  The Court therefore makes no findings as to whether the FSP correctional staff are complying with this procedure or whether any failure to do so presents any constitutional concern.

[10]As opposed to a "non-spontaneous" use of force, a "spontaneous" use of force is permitted where an inmate's conduct is of a type that presents immediate danger to the inmate or another person.  Thus, a spontaneous use of force happens immediately to stop an inmate's action.  The spontaneous use of force must be justified to supervisors after the fact but not beforehand.  While the uses of chemical agents at issue in this case are "non-spontaneous" uses, chemical agents are also one of the types of force which correctional officers are permitted to use spontaneously.  Several months before the trial, and following an incident in which an officer was stabbed through the food flap by an inmate at FSP, the DOC determined that on CM wings, an inmate's refusal to comply with an order to remove

FSP gained a recalcitrant inmate's compliance with an order was by cell extraction.  In a cell

extraction, a team of five correctional officers enters an inmate's cell and forcibly restrains

and removes him.  Most inmates (and often the guards as well) suffer injuries during a cell

extraction.  In 1999, inmate Frank Valdes died at FSP as a result of correctional officers'

actions during a cell extraction- - the medical examiner found that Valdes was likely beaten

to death.[11]  Shortly after that incident, use of chemical agents became the primary method

of enforcing the rules where non-spontaneous force is needed.  Records from 2000 through

2006 show that chemical agents were used on inmates at FSP hundreds of times each year

(including a high of over 600 times in 2003).  See Doc. 422, Ex. 7, BATES 3726.  While the

DOC records admitted at trial do not differentiate between spontaneous and non-

spontaneous uses during these periods, plaintiffs' correctional systems expert, Chase

_____

the inmate's hand or arm from an open food flap posed an immediate risk of danger, warranting the spontaneous use of force, which Assistant Secretary of Institutions George Sapp testified is generally accomplished by immediately spraying an inmate through the food flap with chemical agents.  See Doc. 424 at Tr. 41-42.  Before this change, (which Sapp testified [Doc. 424 at Tr. 72-73] was accomplished through word of mouth communication to the correctional staff and is not a written policy) the failure to follow an order to close a food flap had not been deemed to pose an immediate risk and therefore only the non-spontaneous use of force was permitted in those instances.  Some of the non-spontaneous uses of chemical agents reviewed for this case (including one portrayed in a video the Court watched before trial, Doc. 421 at Ex. 65), involved an inmate's failure to remove his arm from the food flap.  Under the new policy, an inmate can be immediately sprayed with chemical agents upon refusing an order to close the food flap.  Though discussed at trial and relevant to some of the issues here, the propriety of that particular policy change is not challenged in this case.

[11]Although the Court agreed with defendants at trial that this case was not the place to "retry" the Valdes case, DOC officials testified that the DOC instituted drastic changes at FSP following his death.  The Court takes judicial notice of Frank Valdes' autopsy report. See Valdes v. Crosby, 390 F.Supp.2d 1084, 1098 (M.D. Fla. 2005), aff'd, 450 F.3d 1231 (11th Cir. 2006).  See also Fed.R.Evid. 201.

Riveland, whose report was admitted without objection, compared these overall figures with the DOC inspector general logs for 2001 through July of 2004 and determined that for those periods, over 90% of the chemical agent uses were designated as non-spontaneous. See Doc. 421, Ex. 48 at BATES 4800020. More recent records for 2007 and 2008 show that the numbers of uses of chemical agents at FSP have significantly abated, particularly for non-spontaneous uses, where the numbers have fallen off to only a few such occasions each month. See Doc. 422, Ex. 7 at BATES 3720, Ex. 15.[12]

A particular protocol is required before a correctional officer can non-spontaneously spray an inmate with chemical agents to enforce compliance with an order, such as to stop yelling or banging on a cell door. First, a correctional officer attempts to de-escalate the situation by communicating with the inmate to attempt to gain his compliance. Doc. 421, Ex. 39 at BATES 3900095. If de-escalation efforts fail, and with permission of a supervisor and clearance from medical staff who review an inmate's medical chart (but not an inmate's mental health chart) for any contraindications to the use of chemical agents, a correctional officer begins videotaping the incident[13] and, once final verbal efforts to convince the inmate

_____

[12]Assistant Secretary Sapp testified that there is likely a correlation between the February 2008 policy change converting "food flap" violations to spontaneous uses and the drop in the ratio of non-spontaneous uses to spontaneous uses of chemical agents. See Doc. 424 at Tr. 42-43. Compare Doc. 422, Ex. 15 at BATES 3877-79 (showing 13 non-spontaneous uses of chemical agents and no spontaneous uses between January 1, 2008 and February 6, 2008) with BATES 3879-89 (showing 8 non-spontaneous uses of chemical agents and 84 spontaneous uses between February 11, 2008 and July 28, 2008). See Doc. 426 at Tr. 168-71 (testimony of FSP chief of security Major Daniel Hopkins, explaining chart and confirming change).

[13]Some of the inmates here were sprayed with chemical agents at a time when the DOC videotaping policy contained an exception for FSP that did not require videotaping of uses

to comply are exhausted, a second correctional officer administers three one-second bursts of a chemical agent (usually oleoresin capsicum ("OC"), also known as pepper spray) into the inmate's cell through the food flap.  The food flap door is then closed and an inmate is given approximately five minutes to comply with the order.  Although circulation fans on the wing are turned off before chemical agents are used, according to FSP Major Hopkins (and as viewed by the Court on videotapes), enough of the gas escapes from the cell that the staff involved are exposed to an uncomfortable degree.  If, after five minutes, the inmate is still not complying, a second round of chemical agents (usually OC again) is administered in the same manner (three one-second bursts).  If the inmate still refuses to comply, a third round of chemical agents is administered,[14] this time using a stronger chemical agent (orthochlorbenzal malononitrile ("CS"), sometimes called tear gas).[15]   This third administration of chemical agents is not videotaped.[16]  If at any time during this process, the inmate declares that he is experiencing a psychological emergency or if officers notice

_____

of chemical agents.  That exception was eliminated in January 2007 and FSP's videotaping policy is now in conformity with the other DOC facilities.

[14]An earlier DOC protocol for the use of chemical agents permitted this third spraying only after medical staff were consulted to determine whether other options were available, including "psychological intervention."  See Doc. 421, Ex. 35 at BATES 3500018.

[15]Some of the plaintiffs were sprayed with a third chemical agent- - chloroacetophone ("CN"), which the DOC stopped using after medical concerns were raised about its effect on some inmates.  See Doc. 421, Ex. 35 at BATES 3500030-31.

[16]Videotaping is also not required if an inmate stops his disruptive behavior once officers arrive with the videocamera and chemical agents on hand, but then restarts the behavior once those officers leave.  Such inmates are deemed to be "gaming" the system and DOC rules do not require that subsequent uses of chemical agents to compel compliance be videotaped.

behaviors that they believe are consistent with symptoms of acute mental illness, the use of force procedures are suspended and mental health staff (or medical staff in their absence) are called to evaluate.

Assuming that the use of chemical agents eventually induces the inmate to comply with the order to stop the disturbance,[17] he is ordered to submit to handcuffing so that he can be taken to the shower to wash off the remaining chemicals.  Although the manufacturers' labels on chemical agent dispensers direct that soap be used to wash off the product, Assistant Secretary Sapp testified that at the manufacturers' training sessions, the manufacturers directed that soap not be used.  Dr. Ira Dushoff, defendants' burns expert, testified that substances in some soaps can cause the skin to burn where chemical agents have been applied.  DOC protocol therefore requires that an inmate be offered a cool shower with no soap following the administration of chemical agents.  Once the inmate showers, he is seen by medical staff for evaluation.  During this time, the inmate's cell is decontaminated by removing and washing all bedding and clothing, and washing all surfaces including the floor.  Sometimes, inmates will refuse to submit to handcuffing to be taken to the shower after being sprayed with chemical agents.  When that happens, medical staff are called to

_____

[17]If an inmate refuses to comply after this third use of chemical agents or if such use is contraindicated by medical staff, supervisors may order other actions, such as a cell extraction, to compel an inmate's compliance.  Indeed, some of the chemical agents DOC uses are known to be ineffective at controlling behavior 40% of the time when used against persons with active mental illnesses, which plaintiffs' toxicology expert explained may be due to the altered perceptions of the mentally ill.  Doc. 421, Ex. 39 at BATES 3900006-08; Doc. 421, Ex. 82 at Tr. 124-25.  Evidence at trial suggested that the behavior of at least two of the plaintiffs seemed at least occasionally to be unaffected by the chemical agents used against them.  See Doc. 421, Ex. 1 at BATES 0100079; Doc. 422, Ex. 8.

the cell front to talk to the inmate, who is offered the opportunity to shower every thirty minutes for the next two hours.  An inmate who refuses to take a shower is subject to receiving a disciplinary report, which is in addition to the disciplinary reports the inmate may receive for causing the disturbance and for disobeying the order to stop causing the disturbance that resulted in the use of chemical agents to compel him to stop.  As with any use of force, after chemical agents are used against an inmate, he is referred to mental health staff for an evaluation within the next 24 hours, excluding weekends and holidays.

Exposure to chemical agents can cause physical injury- - indeed, the use of chemical agents is intended to temporarily cause intense physical pain, a burning sensation in the mucus membranes, involuntary closing of the eyes, gagging, paralysis of the larynx, disorientation, anxiety and panic.  Doc. 426 at Tr. 70-71 (testimony of defendants' toxicology expert, Richard Lipsey, Ph.D.).  These effects are meant to be short-lived and when the products are used in accordance with manufacturers' directions, it appears they are. However, these effects can be more severe and/or longer lasting when ventilation is limited, when proper decontamination procedures are not timely followed, or when the person sprayed has a particular sensitivity to the product.

Plaintiffs' toxicology expert, Woodhall Stopford, M.D., examined the plaintiffs, visited the wings at FSP, reviewed the reports of chemical agent usage and determined that the area is improperly ventilated during uses of chemical agents, decontamination procedures are ineffective, and some of the plaintiffs have pre-existing conditions, such that the effects of chemical agent usage were in fact far more severe than their prescribed use would

imply.[18]  Doc. 421 at Ex. 50 (expert report and attachments of Woodhall Stopford, M.D.); Doc. 426 at Tr. 249.  Defendants' toxicology expert testified that chemical agents can cause second degree burns if contacted areas are not washed.  Doc. 426 at Tr. 112.  Dr. Donald Gibbs, a psychiatrist and neurologist who formerly served as a senior psychiatrist at FSP, stated that he observed burns on the faces, eyes and bodies of inmates who he treated after their exposure to chemical agents and, while treating such inmates, the chemical agents still lingering about them was sometimes so strong that he "personally experienced dramatic effects of choking, difficulty breathing, and other symptoms as a result of inhaling gas while providing psychiatric services" to such inmates.  Doc. 421, Ex. 62.  Moreover, the training materials provided to correctional officers learning to use chemical agents require officers to secure medical clearance for themselves before engaging in training and further warn that persons suffering from, among other ailments, heart problems, panic disorders or stress, respiratory disorders, skin allergies, bronchial asthma, high blood pressure, or diabetes may find their conditions aggravated by exposure to chemical agents, "possibly to a severe degree."  Doc. 421, Ex. 39 at BATES 3900032-33.  It is clear from this record that physical injuries may be suffered by exposure to chemical agents.

Additionally, Dr. Gibbs stated that in his experience of treating inmates at FSP in 2003 and 2004, the use of chemical agents on mentally ill inmates exacerbated their symptoms, making them "more paranoid, frightened and fearful," and "less trusting and more angry," all of which is "detrimental" to the ability to treat the inmates' mental illnesses.  Doc. 421, Ex. 62.

---

[18]Dr. Stopford's assessments as to each individual plaintiff are addressed below.

Psychiatrist Kathryn Burns, M.D., plaintiffs' correctional mental health expert, who examined

the plaintiffs, reviewed their records, and visited FSP, likewise testified that in her opinion,

the plaintiffs suffered psychological effects from the use of chemical agents including feelings

of intense helplessness, fear of dying, attempts at suicide and exacerbation of other

symptoms of mental illness.[19]   Doc. 421 at Ex. 49.   It is clear from this record that

psychological injuries may also be suffered by exposure to chemical agents.

Unlike at FSP and other institutions housing S-3 inmates, inmates designated as S-4,

S-5, or S-6 are housed in intensive treatment facilities where they are not sprayed with

chemical agents when non-spontaneous force is needed.  Union Correctional Institution

("UCI") is a DOC correctional institution across the street from FSP that has intensive

treatment facilities that house S-4 and S-5 inmates.[20]  As with other institutions, inmates at

UCI must abide by the facility's rules and even inmates designated as S-4 or S-5 are

generally considered to have the capacity to do so.  See Doc. 427 at Tr. 81-82 (testimony

of Dr. Peggy Watkins-Ferrell, Lead Senior Psychologist at FSP); Doc. 427 at Tr. 164-65,

187-88 (testimony of clinical psychologist Dr. Roderick Hall, former DOC mental health

director).  As with FSP, at UCI, banging on a cell door or yelling can be deemed to be a

---

[19]Dr. Burns' assessments as to each individual plaintiff are addressed below.  Defendants urge the Court to discredit Dr. Burns' testimony because she believed the plaintiffs' accounts about the uses of chemical agents against them instead of also considering what security staff said regarding those uses of force.  While the Court takes that into account, given Dr. Burns' qualifications and the supporting opinion of other witnesses such as Dr. Gibbs, the Court finds her opinions regarding the psychological effects of chemical agents on plaintiffs are to be credited.

[20]S-4 inmates are housed in a "transitional care unit" or "TCU" at UCI; S-5 inmates are housed in a "crisis stabilization unit" or "CSU" at UCI.  UCI also houses some S-3 inmates.

disturbance.  At UCI, however, the non-spontaneous use of chemical agents is not permitted to quell such a disturbance.  Instead, the first approach at UCI is to have mental health staff intercede to counsel the inmate and make medication adjustments as necessary.  DOC initially addresses these disturbances with mental health intervention instead of with security measures because when S-4, S-5, or S-6 inmates manifest inappropriate behaviors, the DOC has determined that it is possible that the symptoms of their mental illness have exacerbated to the extent that they cannot control their actions or that their reactions to particular situations are disproportionately magnified due to the exacerbation of their mental illness symptoms, and not due to recalcitrance.  Thus, even though inmates at UCI may engage in the same types of disturbances that are met with security measures at FSP, DOC has determined that the first order of intervention for inmates at UCI will be mental health treatment.  Doc. 427 at Tr. 185-87 (testimony of Dr. Hall); Doc. 424 at Tr. 11-13, 21-22 (testimony of Assistant Secretary Sapp).  Dr. Olga Infante, a psychiatrist who worked from 1999 through roughly 2005 treating inmates at UCI and occasionally at FSP, testified that the difference between the two facilities in terms of security and mental health management was "night and day."  Doc. 425 at Tr. 231.  Dr. Infante testified that at UCI, mental health and security staff work together as a team, and that inmates can usually be counseled into cooperating, even with submitting to physical restraints, when mental health staff intercede.

Dr. Infante explained that banging and yelling are behaviors that might signal an exacerbation of the mental illnesses from which S-3 and S-4 inmates can suffer, such as the

bipolar component of those suffering from schizoaffective disorder.[21]   Thus, for an S-3

inmate, who the DOC would otherwise expect to be able to conform his conduct to the prison

rules, these behaviors may be a sign that an inmate has decompensated.  This could be

caused from the pressures of living under the strict conditions of a CM wing, from the effects

of psychotropic medications (which Dr. Infante testified can sometimes cause internal

restlessness, an effect particularly difficult for an inmate to manage in the isolation of a cell),

or perhaps from an inmate's failure to take his medication.[22]  Dr. Infante testified that at UCI,

security staff could afford to be more tolerant of some of these behaviors, such as yelling,

that staff at FSP have to address more harshly because of the greater security risk present

on the CM wings at FSP.  She further testified that because the mental health of inmates

housed at UCI is monitored so closely, early intervention results in fewer incidents of inmate

disturbances than at FSP.  Dr. Infante explained that the more episodes of decompensation

a person experiences, the more difficult it is to stabilize and restore that person to his

previous level of functioning.  Doc. 425 at Tr. 240.  Assistant Secretary Sapp testified that

facilities such as UCI that provide in-patient treatment naturally have greater mental health

resources that allow closer supervision and monitoring of inmates.  Dr. Infante and Sapp

both testified, however, that if mental health intervention is unsuccessful in coercing an

---

[21]S-3 and S-4 inmates may be diagnosed with the same mental illness.  The difference in designation reflects the level of mental health care the inmate is expected to need.  While inmates at either level receive therapy and medication as appropriate, an S-3 is expected to be able to manage his illness in an outpatient setting whereas an S-4 inmate requires in-patient treatment.

[22]Inmates have the right to refuse medication except when ordered by a doctor to save the inmate from harming himself or another.

inmate's compliance with an order the staff deem must be complied with, as a last resort, correctional officers at UCI will perform a cell extraction to compel an inmate's compliance.

Based on evaluation (which occurs at regular intervals throughout an inmate's term of incarceration and on request by staff or the inmate himself), an inmate's mental health designation may transition from one level to another. This transition may be gradual or sudden and while certain variables can be triggers for change (such as receiving upsetting news, involvement in an altercation, or having a medication adjustment), other times change can occur for no apparent reason. When an S-3 inmate experiences this transition- - decompensates- - he may become confused, disorganized and disoriented, impacting his ability to follow orders because he has become preoccupied with internal thoughts and is rendered incapable of understanding or conforming to demands. If the mental health of an S-3 inmate at FSP deteriorates to the extent that the inmate is due to be re-designated as an S-4, he is transitioned out of FSP and moved to a facility where a more intensive level of treatment is available, usually UCI. Likewise, when the mental health of an inmate housed at UCI improves to the extent that the inmate is due to be re-designated as an S-3, he is moved back to the facility where he came from- - usually FSP.

Some inmates have a history of transitioning back and forth from FSP to UCI. Known as "frequent-fliers," these inmates are treated at UCI and returned to FSP, only to quickly decompensate and be sent back to UCI- - sometimes after having been sprayed (even repeatedly) with chemical agents for disturbances they caused in their short stay at FSP. The security and mental health staff who testified or gave statements were generally all familiar with this phenomena (though it is apparently less prevalent now than it was in the

past due to measures discussed below).  Dr. Infante testified that once she became aware of this problem, she would "hold" an inmate being released from UCI's in-patient area in a non-hospital confinement area at UCI that houses S-3 inmates to see if the inmate would adjust in a confinement setting without deteriorating.  Doc. 425 at Tr. 234-35.  However, the bed space at UCI is limited and Dr. Infante testified that there was sometimes pressure to move an inmate out of the in-patient facility to make room for an inmate awaiting transfer to UCI from elsewhere and that occasionally space had to be made in areas such as medical holding rooms to house inmates.  Former Warden James Crosby testified that he believed that seriously mentally ill inmates were returned to FSP from UCI due to insufficient bed space at UCI.  Doc. 426 at Tr. 241-42.  Former FSP senior nursing supervisor, Tina Battles, issued a memo to her nursing staff in 2004 advising that S-3 inmates in CM housing can become psychotic or decompensate without warning and that mental health staff would provide the nurses with a list of inmates mental health suspected might have decompensated or become psychotic.  Battles' order to her staff was that they should advise security staff that the use of chemical agents was contraindicated for any inmate on that list.[23]  Battles testified that the memo and list of inmates were an effort to address the frequent flier problem and that the inmates on the list were those who were awaiting transfer to UCI.  Battles further testified that the policy was discontinued, however, when a new warden came to FSP.

---

[23]Apparently plaintiff Jeremiah Thomas was named on such a list back in 2000.  See Doc. 421, Ex. 1 at BATES 0100040-43.

Dr. Burns testified that in her experience and research with the mental health and correctional community, it is unusual for a "supermax" facility such as the CM wings at FSP to house seriously mentally ill inmates because the long term social isolation, sensory deprivation and forced idleness of the setting exacerbate the symptoms of the mentally ill, who generally have fewer coping skills than the rest of the population.[24]  Therefore, it is not surprising, she explained, that an S-3 inmate in CM housing at FSP who is eventually sent to UCI for in-patient treatment (such as following an episode of decompensation which results in the inmate being sprayed with chemical agents) would experience an improvement in his mental health, sometimes even without further intervention.  With the inmate's return to the conditions on the CM wings at FSP, however, the symptoms can be expected to again worsen and the cycle is repeated.  Doc. 421, Ex. 49 at BATES 4900004-05; Doc. 425 at Tr. 15-28.

Dr. Tuong Nguyen, who previously served as the DOC's medical director at UCI and FSP, stated that she too observed the frequent flier phenomenon between FSP and UCI's in-patient facility and she believed that inmates "were being gassed with chemical agents at FSP for behavior that was consistent with their diagnosed mental illnesses."  Doc. 421, Ex. 47 at BATES 4700001-02.  Dr. Nguyen observed that chemical agents were used far more frequently at FSP than at UCI, which also housed S-3 inmates at the time, and she alerted DOC officials to her concern but did not see the result of any action that may have been taken.  Id.  During her tenure, Dr. Nguyen instructed medical staff to review charts of S-3

---

[24]Dr. Burns explained that even people with no pre-existing mental illness can be expected to experience psychological distress in such a setting.

inmates to determine whether there were mental health contraindications against the use of chemical agents.  Id.

Richard Stalder, defendants' well qualified correctional expert,[25] testified that Florida's practice of housing S-3 inmates in close management conforms with standard correctional practices for large correctional systems of similar size because Florida appropriately vests the decision as to an inmate's S-status designation with mental health professionals.  Thus, if mental health professionals deem an inmate to be an S-3, the DOC should be able to assume that the inmate can conform his actions to the demands of a facility, even when the facility is highly restrictive and has burdensome rules, such as the CM wings at FSP.  Having said that, however, Stalder was also of the opinion that the "frequent flier" syndrome represented a possible breakdown in care that should be addressed at higher levels.  Stalder testified that as the frequency with which an inmate's condition destabilizes and restabilizes increases, so too should the frequency with which the inmate's treatment plan and designation are reviewed.  Thus, while such an inmate may not be manifesting truly acute signs that correctional staff are trained to watch for (such as serious self-mutilation), the mere fact that the inmate is being repeatedly transferred back and forth from an out-patient to an in-patient facility should at least trigger more monitoring at higher levels of

---

[25]Mr. Stalder served sixteen years as secretary of the Louisiana Department of Public Safety and Corrections, is a past president of both the National Association of State Correctional Administrators and the American Correctional Association (an accrediting body which issues model standards and whose membership includes facilities that meet a majority of those standards), and has reviewed, audited, written and spoken about various local, state, federal and foreign correctional facilities, practices, concerns and goals.  See Doc. 426 at Tr. 6-9.

administration to ensure that an inmate truly is competent before being returned to a facility where he will be expected to follow orders or be compelled by force to do so. <u>See</u> Doc. 426 at Tr. 57-60.

Peggy Watkins-Ferrell, Ph.D., FSP's lead senior psychologist for the past three and a half years, explained that sometimes inmates feign symptoms in an attempt to secure a transfer to a facility where the conditions are considered better. Doc. 427 at Tr. 102-05. Dr. Watkins-Ferrell testified that in her experience, she does not believe inmates are being sprayed with chemical agents at FSP for exhibiting behaviors which are simply uncontrollable symptoms of their mental illness and that she has confidence that the S-classification system correctly assesses those with an S-3 grade as having the ability to conform their behavior. She testified that during the post-use of force evaluations, her staff are not routinely finding that the inmates are acutely mentally ill such that they could not control their behavior. However, when the DOC performs mental competency evaluations that follow a use of force to determine the appropriate manner in which to discipline the inmate, these evaluations sometimes find the inmate was not competent at the time he was sprayed. Additionally, Dr. Watkins-Ferrell further stated that "on any given working day" "one or two inmates" are referred out of FSP for placement in a facility such as UCI where in-patient treatment is available and, as further discussed below, a new transition unit at UCI ("O-Dorm") houses upwards of 100 S-3 inmates who have been designated for transfer from FSP to an in-patient facility. Doc. 427 at Tr. 83-84, 87. <u>See also</u>, Doc. 421, Ex. 46B at BATES 4600029 (chart of FSP inmates on waiting list for TCU from June 1, 2007 through April 18, 2008). Thus, the record supports that there are (or at least have been) CM inmates

at FSP for whom the S-3 designation is no longer appropriate.

The Florida Correctional Medical Authority, created by the Florida legislature as an independent agency to monitor the delivery of health care services in Florida's prisons, issued a 2005/2006 report advising DOC that mentally ill inmates may suffer symptoms that result in behaviors such as yelling incessantly, refusing to obey orders or lashing out without provocation and may have difficulty following "the strict rules of a prison setting."  Doc. 421, Ex. 53 at BATES 5300357-58.  The CMA cautioned that security staff who are not trained to address these types of behaviors may respond inappropriately in ways that "aggravate the prisoner's conduct." Id. at BATES 5300357.  And even earlier, in its 2002/2003 report,[26] the CMA expressed continuing "significant concern" that chemical agents were being inappropriately used on inmates in close management or confinement settings at DOC facilities resulting in serious medical consequences including chemical burns, and the exacerbation of mental health symptoms, which in one instance led to an inmate's suicide. Id. at BATES 5300247.  The CMA suggested that the DOC improve the situation by considering adopting confrontation avoidance techniques such as are used by the Federal Bureau of Prisons, which involves mental health consultation before the non-spontaneous use of chemical agents are administered.  Id. at BATES 5300237, 5300247.  This recommendation was again reiterated in the CMA's 2003/2004 report, but the DOC chose not to adopt it.

---

[26]The CMA report for fiscal year 2002/2003 is styled "2003-2004 Annual Report." See Doc. 421, Ex. 53 at BATES 5300231-64.

Some of the issues discussed above were highlighted by the <u>Osterback</u> litigation, which addressed conditions of confinement (including the delivery of mental health services) for inmates housed on CM wards throughout the state.[27]  In recognition of both that litigation and to address the overall increase in numbers of mentally ill inmates throughout Florida's prisons (a trend that is consistent nationwide), the DOC has implemented policies that were not in place on some of the occasions when plaintiffs were sprayed with chemical agents. One of these new policies provides additional training for security staff working on CM wings to teach them to recognize the signs and symptoms that may indicate the onset of acute mental illness.  In the past (or at least during James Crosby's 1998-2001 tenure as FSP warden), security staff did not consult with mental health staff regarding inmate behavior, even when security staff observed signs they believed signaled that an inmate was unable to conform his conduct. Doc. 426 at Tr. 241-42. Now, under the "<u>Osterback</u> training,"[28] FSP chief of security Major Daniel Hopkins explained that during rounds (which occur every thirty minutes) security staff watch for behaviors, such as not eating, not showering, or not going to recreation, that might be signs that an inmate is experiencing a mental health problem. Major Hopkins explained that while the first step is usually to ask the inmate what the

---

[27]<u>See</u> <u>Osterback v. McDonough</u>, 549 F.Supp.2d 1337 (M.D. Fla. 2008).  While the delivery of mental health services to CM inmates was an important feature of the <u>Osterback</u> litigation, the case addressed several other conditions unrelated to mental health services, such as access to recreational and educational opportunities.  <u>Id.</u>

[28]The <u>Osterback</u> training was included as part of a Revised Offer of Judgment accepted by the <u>Osterback</u> plaintiffs and adopted by the Court in December 2001.  <u>Osterback</u>, 549 F.Supp.2d at 1341.  It is not clear how soon thereafter the training program went into effect (though it was apparently in place by December 2003 when the <u>Osterback</u> defendants moved to terminate the injunction).  <u>Id.</u>

problem is, if the security staff cannot resolve the issue with the inmate, he will be referred to mental health for consultation.  Assistant Secretary Sapp testified that staff are trained to watch for inmates who are engaging in behaviors that are unusual for that inmate and to report those observations to the mental health staff.  Dr. Watkins-Ferrell testified that the acute symptoms of mental illness are recognizable to lay persons and that security staff now frequently refer inmates to mental health for evaluation when they have concerns about inmate behavior, even if the symptoms are not necessarily acute.  See also, Doc. 421, Ex. 39 at BATES 3900047-58 (printed training materials).  However, Sergeant Keith Musselman, a DOC employee who has worked at FSP and who received the Osterback training in January 2007, testified that when an inmate is causing a disturbance, he is not able to distinguish whether the inmate's behavior is caused by mental illness or from a desire to be disruptive.  Doc. 427 at Tr. 42-43; Doc. 422, Ex. 18. at Tr. 49-50.  Dr. Hall testified that even mental health professionals have difficulty distinguishing between behavior that is willfully noncompliant or maladaptive and behavior that is a sign of acute impairment in functioning for which the person cannot be held entirely accountable.  Doc. 427 at Tr. 186-88.

Dr. Watkins-Ferrell also testified regarding the new DOC policy that inmates subjected to a use of force are to be seen by mental health staff within one working day of the incident. It is not clear when this policy came into effect[29] but Dr. Watkins-Ferrell testified that it gives mental health staff an additional opportunity to evaluate the inmate and to determine whether any changes need to be implemented with regard to that inmate's mental health care.  Doc.

_____

[29]The Osterback decision, which exhaustively reviewed the mental health services afforded inmates on CM wings, does not mention it.  Osterback, 549 F.Supp.2d 1337.

427 at Tr. 87-90.  While this protocol obviously does nothing to evaluate the mental health of an inmate immediately before force is used against him, it does provide an additional check that within the twenty-four hours thereafter (excluding weekends and holidays), the inmate's mental health is being assessed, thereby reducing the likelihood that an inmate who is no longer capable of conforming his behavior would be sprayed with chemical agents on multiple days in a row.

Another recent policy, effected on July 31, 2008, establishes particular housing protocols for inmates transitioning between FSP and UCI.  One of these is "O-Dorm," a special housing unit at UCI for FSP inmates designated by mental health staff as needing transfer to the in-patient facility at UCI or another in-patient facility as soon as a bed becomes available.  Dr. Watkins-Ferrell testified that approximately 114 inmates are housed in O-Dorm, meaning that 114 inmates who had been designated as S-3 at FSP- - approximately 15% of the S-3 population- - are awaiting transfer to an in-patient treatment facility.  Inmates housed on O-Dorm may not be non-spontaneously sprayed with chemical agents to quell a disturbance or compel compliance with an order.  Instead, if the assigned security staff are unable to resolve the situation, security staff who have been specially trained in crisis intervention ("CIT staff") will counsel an inmate causing a disturbance.  If the CIT staff cannot resolve the problem, mental health staff are called in to counsel the inmate and if they cannot de-escalate the situation, emergency medical treatment may be ordered.  See Doc. 422, Ex. 16 (July 31, 2008 DOC memo establishing O-Dorm).

A second new housing arrangement is "N-Dorm," which is 90-day transitional housing for inmates who are newly readmitted to FSP following release from UCI.  Disruptions by

inmates housed in N-Dorm are treated by security staff as are those in O-Dorm, except that the decision to call mental health staff is at the option of the CIT staff and the non-spontaneous use of chemical agents is permitted if CIT staff deem it to be appropriate. See Doc. 422, Ex. 16 (July 31, 2008 DOC memo establishing N-Dorm). Dr. Watkins-Ferrell also testified that N-Dorm provides inmates with continuity of care because the same mental health team that treated the inmate at UCI's in-patient facility is monitoring the inmate's progress in N-Dorm before the inmate moves to the regular wing at FSP, so if an inmate is not really ready for that transition at the end of his 90 days, his mental health status can be reassessed. Doc. 427 at Tr. 85-86.

Plaintiffs favor these recent changes at FSP, but argue they fall short of providing the level of mental health intervention available at DOC facilities such as UCI, where mental health staff evaluate inmates before any non-spontaneous force is used against them. Plaintiffs contend that because their mental health status had slipped below S-3 at the time they were sprayed, they are entitled to those additional protections afforded to S-4 inmates which ensure that an inmate has the capacity to conform his behavior before non-spontaneous force is used against him to compel his conformance. Plaintiffs therefore argue that their Eighth Amendment rights can only be adequately protected by a policy that provides for mental health staff to visit with the inmates before chemical agents are used non-spontaneously. Mr. Stalder (defendant's corrections expert) testified that such course is not standard correctional practice for inmates in large correctional systems who are not assigned to an in-patient care facility. Assistant Secretary Sapp testified that a protocol that involves mental health consultations with security staff before the use of chemical agents

might be a good practice if resources were available to implement it but that on the CM wing at FSP, the presence of mental health staff during an inmate disturbance could endanger staff and compromise correctional staff's ability to regain control of the situation.   Dr. Watkins-Ferrell and Dr. Roderick Hall (the former mental health director for DOC), both testified that a practice of bringing mental health providers to cell front during a disturbance would be harmful to the doctor/patient therapeutic relationship.   In their view, the inmates' S-status is usually correctly assessed and if mental health providers came to cell front during a disturbance, their judgment would usually be that the use of chemical agents is not contraindicated.  The problem with that course, argue Dr. Watkins-Ferrell and Dr. Hall, is that inmates would begin to associate mental health staff with security staff, making the very precarious nature of an incarcerated patient/therapist relationship even more fragile, for what, ultimately, is no good end if security will still be permitted to use chemical agents against the inmates in most cases.  Dr. Infante, on the other hand, testified that while she was working at UCI, the usual practice was for mental health professionals to visit inmates side-by-side with security staff when inmates were violating rules and to counsel the inmate right then and there.  Dr. Infante testified that the doctor/patient therapeutic relationship was not harmed by the presence of security staff during these sessions and that inmates understood that the doctor was there to try to help them. Doc. 425 at Tr. 257-58.  Ronald McAndrew, who served as warden at FSP in 1996-1997, testified that he required mental health staff to counsel with inmates before the non-spontaneous use of chemical agents was permitted and that the number of such uses dropped dramatically during his tenure as a

result of this intervention.  Doc. 423 at Tr. 90-91.[30]   Plaintiffs' correctional systems expert,

Chase Riveland, testified that many state prison systems he surveyed require mental health

intervention before chemical agents are used.  Doc. 424 at Tr. 165- 70.  Psychiatrist Dr.

Burns also supports mental health intervention before chemical agents are used.  Dr. Burns,

an expert in the delivery of psychiatric services in correctional settings, explained that there

are other similar situations (such as parole recommendations, or disciplinary report

competency evaluations) when inmates might be tempted to believe that mental health staff

are acting as agents of security staff but that mental health staff can explain the situation to

the inmate so he understands and accepts it.  Doc. 425 at Tr. 73-80.  Another alternative,

testified Dr. Burns, is to have a mental health professional other than an inmate's usual

treater be the one to intercede in these circumstances so the inmate continues to have trust

in his on-going relationship with his regular mental health care provider.  Moreover, if mental

health staff interact with inmates before chemical agents are used, the inmate might

voluntarily comply with orders (as they often do at UCI), or the inmate might be deemed

incompetent- - both of which would avoid force being applied.

Plaintiffs further contend that the current policies are ineffective in that they rely on

security staff to recognize signs of mental illness when some DOC staff acknowledge that

even with training, they cannot distinguish between signs that are manifestations of mental

---

[30]During McAndrew's tenure, FSP was not designated as DOC's main facility for housing S-3 CM inmates.  While there was testimony that the availability of mental health resources has greatly increased since then, so too has the need for such services and the Court therefore recognizes that protocols McAndrew successfully used to diffuse situations may not be available or appropriate at FSP today.

illness and those of mere recalcitrance.  Additionally, Dr. Hall, a clinical psychologist with over twenty years of correctional experience who served as DOC's mental health director during periods of time when the DOC was focusing on improving its delivery of mental health services, testified that in his experiences and evaluations of other states' systems, security staff should not be trained to serve as adjuncts to the mental health staff because their functions are so discrete.  Doc. 427 at Tr. 177.

Plaintiffs are also concerned that the recent DOC policy changes are not permanent. The exception for FSP with regard to the DOC videotaping policy and the recent change in the designation of an open food flap as a basis to use spontaneous force are arguably evidence that any voluntary change in DOC policy (as opposed to one that is judicially enforced) cannot be relied on to remain in place.  Additionally, while only one of the remaining plaintiffs is currently housed at FSP and apparently none of them have been recently sprayed with chemical agents, plaintiffs contend that they are subject to being returned to FSP and being sprayed again once the specter of this litigation has ended.  The DOC agrees that plaintiffs may be returned to FSP and, presumably, if they engage in disturbances while there, they may be sprayed with chemical agents to compel their compliance.  Indeed, during this litigation, just days after the DOC announced that it had no present intention of returning certain plaintiff inmates back to FSP, the DOC transferred one of them back to FSP.  See Doc. 253, Ex. A; Doc. 421, Ex. 22 at BATES 2200045.  To further support the basis for their concern, plaintiffs put on evidence of occasions on which the new protocols have not been followed and evidence of other inmates who have recently been sprayed with chemical agents, even with the new protocols.  However, while the cited

29

context and history of the non-spontaneous use of chemical agents at FSP is relevant, this case is not brought as a class action [31] and does not call for the Court to determine whether the rights of other inmates have been violated or whether DOC policy as a whole is unconstitutional.  Rather, to be entitled to prospective injunctive relief, each plaintiff must show that the DOC has conducted itself in a way that violates his own Eighth Amendment rights.  The plaintiffs' individual histories must therefore be examined.

**B.  Plaintiffs' Histories**

**Jeremiah Thomas** is a 36 year old inmate serving a 30 year sentence for second degree murder, attempted robbery with a firearm, and other charges.  Thomas has been diagnosed with schizoaffective disorder bipolar-manic and antisocial personality disorder with severe borderline features and has been housed in the in-patient facility at UCI since July 2003.  See generally, Doc. 421,  Ex. 1 & 2 (Thomas' inmate and medical and mental health files).[32]  He also has asthma.  Thomas has been incarcerated for over fifteen years now and his DOC records reflect repeated treatment (including periods of involuntary commitment) for mania, behavior control problems, impulse control and substance abuse.  These notes

_____

[31]Some of the plaintiffs, with other inmates not parties to this suit, filed a class action lawsuit in 2003 for injunctive relief challenging the non-spontaneous use of chemical agents against inmates housed in CM units throughout Florida's correctional system.  See Brown v. Crosby, Case No. 2:03-cv-526-FtM-29DNF (M.D. Fla. 2003).  Plaintiffs voluntarily dismissed the suit in 2005 shortly after Judge Steele denied a motion for class certification.

[32]Plaintiffs submitted inmate files for Thomas, McKinney, Echols, Ward and Frazier. Defendants provided supplements to the files for three of the plaintiffs (McKinney, Echols and Ward) that show their activity through July 2008.  The Court assumes that Thomas and Frazier remain in the facilities in which they were housed as of the last entry in the files plaintiffs submitted.  No party submitted an inmate file for Williams.

further reflect that Thomas is periodically non-compliant with his medications, which leads him to decompensate. Thomas' symptoms include auditory hallucinations, impaired thought process, and paranoid delusions and his behaviors while incarcerated have included acute agitation, maniacal banging on his cell door (to the point of breaking his own hand- Doc. 421, Ex. 2 at BATES 0200020), eating his feces, pouring urine on his hands, exhibitionistic masturbation, urinating on his mattress, attempting to cut his penis and repeated suicide attempts. Thomas' file reflects that he has been repeatedly moved among several facilities.

Relevant here, Thomas was transferred from FSP to UCI for inpatient mental health care on January 10, 2000 following an incident on January 6, 2000 at FSP in which Thomas, after refusing to obey orders to stop banging on his cell walls and threatening staff, likewise refused to permit nursing staff to medicate him. As a result, five officers entered Thomas' cell to restrain him so that a nurse could administer medication. In the process, officers struck Thomas on his back, forcing his face into a window screen, handcuffed him, pulled him to the ground, applied leg irons, and held him in place while the nurse gave him a shot. The five officers then brought Thomas to the FSP medical staff where he was evaluated and sent to UCI for medical treatment which included receiving stitches to his chin and nose.

On February 3, 2000, Thomas was sent back to FSP. He was sprayed with chemical agents four times in the next month, each time for yelling or banging. A DOC psychiatrist later determined (for purposes of related disciplinary proceedings) that Thomas was not mentally competent on at least two of those occasions. On March 2, 2000, officers brought a videocamera to cell front and this "show of force" compelled Thomas to permit restraints to be placed on him so medications could be administered. The next day, March 3, 2000,

Thomas was creating a disturbance but a correctional supervisor declined to order the administration of chemical agents because he was aware that chemical agents were ineffective in altering Thomas' behavior except during their immediate application. Thomas was instead escorted to the clinic for evaluation and sent from there to UCI. Later disciplinary proceedings determined Thomas was not mentally competent at the time of the March 3 incident.

On April 11, 2000 Thomas was again returned to FSP. Two days later, Thomas tried to hang himself in his cell. Medical staff told correctional officers that Thomas could not be sprayed with chemical agents. FSP issued a disciplinary report to Thomas for destruction of property for ripping the towel (that he apparently used to try to hang himself) but the DOC psychiatrist determined he was not competent at the time of the incident. Thomas was sent to UCI on April 17, 2000 where he again attempted suicide. Thomas remained at UCI for three months, designated as an S-5 during at least part of his stay there, returning to FSP on July 13, 2000. Within hours, Thomas was sprayed with chemical agents because he was screaming profanity at staff and refused orders to stop screaming. During the following twenty-one days, Thomas was sprayed with OC, CS and/ or CN at least seven times, including twice on one day, each time for yelling and banging or kicking in his cell (once he was also throwing feces under the cell door). On August 16, 2000, when Thomas was causing a disturbance in the shower and spit at an officer, officers brought a videocamera to the area and this show of force resulted in Thomas voluntarily submitting to handcuffs without further incident. On August 31, Thomas was admitted to the FSP infirmary for observation after he tried to hang himself. After psychiatric consultation, he was returned

to the wing in stable condition.

On September 19, 2000, Thomas declared a psychological emergency and cut himself.  Mental health staff were brought to his cell front to counsel with him and Thomas was taken to the FSP clinic on September 20.  Thomas agreed to be returned to his wing.  He was sprayed with chemical agents later that day and again in the early hours of September 21, both times for yelling and banging in his cell.  Mental health staff who saw Thomas on September 21 upon referral from medical staff learned Thomas had not taken his medications for the past two days and noted that he "could be decompensating- - showed poor control of behavior."  Doc. 421, Ex. 2 at BATES 0200079.  The sprayings continued.  On September 23, 24, 25, and 26- - four days in a row, Thomas was sprayed for yelling and banging or kicking in his cell.  On September 24, a nurse performing a post-use of force examination noted that Thomas' responses to questions were inappropriate and delusional, he smelled of urine, and his skin was blistering and broken from chemical burns.  Mental health staff found Thomas disheveled and hostile and noted that his mood fluctuated with labile effect- - all signs, reports Dr. Burns, that Thomas was experiencing an exacerbation of his schizoaffective disorder.  Staff performing Thomas' post-use of force exams during this time repeatedly noted multiple chemical burns on his body.

On September 27, Thomas was finally removed from his CM cell to the FSP infirmary where medical staff reported that Thomas suffered first to third degree burns on his back, abdomen, arms, elbows, and buttocks.  The severity of his burns prompted medical staff to consider sending him to a special burn treatment facility.  On September 29, 2000 Thomas was sent to UCI's in-patient care unit where he remained for over three years.  During that

time, Thomas remained in a crisis stabilization unit for over six months and Dr. Infante testified that "it seemed like forever" before she was able to stabilize Thomas.  Doc. 425 at Tr. 252.  Dr. Infante testified that Thomas suffers from one of the most difficult diagnoses that mental health professionals treat, schizo effective disorder, bipolar type, which causes him to respond to internal stimuli and become delusional while maintaining a very high energy level alternating with periods of depression.  Id. at 245-46.  She said Thomas was loud and belligerent and it was difficult for her to assess whether his behaviors were caused by his psychosis or whether they were a schizo effective induced mania.  Id. at 246.  Further complicating his treatment, the stabilizing psychotropic medications Thomas was prescribed cause internal restlessness which, in Thomas' case, led him to make incessant noise, sing, or tap.  Id. at 248-49.  Dr. Infante also testified that Thomas, like some other inmates, would sometimes stop taking his psychotropic medications to experience the "high" that comes on as the illness takes over.  Id. at 246-47.

On June 18, 2003 (during a period of time Dr. Infante was not working at UCI), Thomas was transferred back to FSP.  On July 20, 2003, Thomas was sprayed with chemical agents for creating "a minor disturbance" on the wing by kicking his cell door, cursing at staff and refusing orders to cease.  Doc. 421, Ex. 1 at BATES 0100260.  Two days later, Thomas was sprayed with both OC and CS for again creating "a minor disturbance" on the wing by kicking his cell door, cursing staff and refusing orders to cease.  Doc. 421, Ex. 1 at BATES 0100272.  Thomas was then returned to UCI on July 25, 2003 where he remains today.  While at UCI, Thomas has on occasion been cited for kicking his cell door and yelling but the record shows that he sometimes will voluntarily submit to restraints which

allow medical staff to administer medication.  The warden reviewed a November 2003 incident where this sequence occurred and noted there was "excellent [coordination] between the Medical and Security staff to resolve an issue."  Doc. 421, Ex. 1 at BATES 0100284.  However, as recently as March 2008, when Thomas threatened to hang himself, officers had to conduct a cell extraction when Thomas refused to voluntarily submit to handcuffing.  Doc. 421, Ex. 1 at BATES 0100289-90.

Plaintiffs' toxicology expert, Dr. Stopford, examined Thomas and reviewed his file, reporting that Thomas' exposures to OC, CS and CN caused him to suffer from second degree burns, although sometimes these were exacerbated because Thomas refused (out of fear Thomas reported) to leave his cell to shower. Dr. Stopford found Thomas' asthma was aggravated from the exposure to chemical agents and noted Dr. David Frank, a DOC psychiatrist, stated that the use of chemical agents could aggravate a pre-existing mental illness.

In 2005, psychiatrist Dr. Burns, plaintiffs' correctional mental health expert, also interviewed Thomas and reviewed his file.  She found that even though Thomas was receiving mental health treatment at UCI, he continued to experience active psychotic symptoms, including auditory hallucinations, thought disorganization and delusions.  Dr. Burns reported that Thomas is "terrified of even a remote possibility of transfer back to FSP," but she recognizes that UCI is a treatment facility whose mission is to stabilize and treat inmates for ultimate return to their sending facility.  Doc. 421, Ex. 49 at BATES 4900021. Indeed, the DOC's Consent to Inpatient Mental Health Care form advises inmates that if they are transferred to an in-patient treatment center, "the length of stay in inpatient care will

depend upon how quickly [the inmate's] condition improves, but is usually no longer than four weeks in a Crisis Stabilization Unit [such as the S-5 facility at UCI], three months in a Transitional Care Unit [such as the S-4 facility at UCI], or four days in a permanent institution infirmary [such as the FSP infirmary]." See, e.g., Doc. 421, Ex. 3 at 0300078, Ex. 12 at BATES 1200062. Thus, the goal of Thomas' treatment at UCI remains to allow him to be returned to FSP.

**Michael McKinney**, is a 39 year old inmate serving a life sentence (and other lesser sentences being served consecutively) for first degree attempted murder (and other lesser offenses). See generally, Doc. 421, Ex. 3 & 4 (McKinney's inmate and medical and mental health files); Doc. 422, Ex. 5 (McKinney's supplemental medical, mental health, and security files through July, 2008). McKinney was incarcerated in various DOC facilities between the ages of 16 and 19 and he began serving his current sentence in 1989 at age 20. A DOC psychological screening report from the age of 16 showed McKinney had marginal intellectual functioning and propensities for anger and anti-social behaviors. The psychologist predicted that as an inmate, he could be very difficult to handle because of his volatile tendencies. And indeed, by 2007, McKinney had over 320 disciplinary reports, a record of behavior which a psychological assessment team termed "pathological." Doc. 421, Ex. 4 at BATES 0400133. McKinney has a history of self-injurious behavior over his term of incarceration, including several drug overdoses, episodes of head banging, repeated self-inflicted lacerations, and setting fires in his cell. He has been diagnosed at various times as having an adjustment disorder with depressed mood, antisocial personality disorder, and major depression with recurrent psychotic ideations.

McKinney was housed in various DOC facilities (including FSP) between 1989 and 1999, when he returned to FSP.  DOC records show McKinney was non-spontaneously sprayed with a combination of OC and/or CS chemical agents at FSP four times in 2001 (earlier records are not in the file).  The use of force forms show that on each of those occasions, McKinney was sprayed for causing a disturbance on the wing by yelling and/or kicking and beating his cell door.  The same behavior resulted in McKinney being sprayed six times at FSP in 2002 (including twice on the same day) until he was transferred to the FSP infirmary with a diagnosis of major depression after he tried to hang himself in his cell on August 21, 2002.  From the infirmary, McKinney was sent to UCI on September 16, 2002 where he was treated with medication and therapy and then transferred back to FSP on December 16, 2002.  He spent December 18 and 19 in the FSP infirmary in December with a diagnosis of being suicidal and homicidal, bipolar and psychotic and he returned to the FSP infirmary on December 22 and remained there for eight more days.   Three days later he returned to the FSP infirmary and stayed for the month of January before returning to the wing.   On March 5, 2003, McKinney was sprayed with OC and CS on two separate occasions for yelling obscenities and kicking and beating on his cell door.  The next day, on doctor's orders, officers used force to restrain McKinney who was exhibiting bizarre behavior by standing on his sink and jumping off.  He was brought to an FSP infirmary isolation cell where he remained for a week until being transferred to UCI on March 13, 2003.  At UCI, McKinney was designated as an S-5 and was treated with medication and therapy for the next several weeks.  On May 25, 2003, while still at UCI, McKinney set a fire in his cell.  He was in and out of the UCI infirmary for several days and on May 29, 2003, chemical agents

were used on McKinney at UCI because he was causing a disturbance in his cell by yelling and screaming.[33]  Doc. 421, Ex. 3 at BATES 0300031-32.  McKinney was returned to FSP on June 6, 2003.  On June 16, 2003 and on July 15, 2003, McKinney was sprayed with OC and CS at FSP for yelling obscenities at staff and kicking and/or beating on his cell door. The next day he was sent to the FSP infirmary and from there, he was transferred back to UCI for psychiatric observation and treatment of depression where he remained until August 7, 2003.  Treatment notes for July 31, 2003 reflect that McKinney reported he felt he was "doing well coping while [at UCI] but does not know how he will cope at FSP as he believes he has to be on guard against unwarranted gassings."  Doc. 421, Ex. 4 at BATES 0400053.

After his August 7, 2003 return to FSP, McKinney was sprayed with OC and CS on September 6 and he declared a mental health emergency on October 6, 2003, telling a psychological specialist he was going to have to hurt himself. The next day, McKinney threw feces at a staff member and was sprayed with chemical agents (both OC and CS) when he refused to submit to restraints so officers could search his cell; officers eventually performed a cell extraction to remove McKinney.  Later that same day, McKinney was sprayed with OC and CS for yelling and kicking in his cell and again, four days later, McKinney was sprayed

---

[33]The non-spontaneous use of chemical agents to quell such a disturbance at UCI appears, from all testimony, to be a departure from the standard practice at UCI.  Neither the correctional staff use of force reports nor the mental health treatment notes show whether mental health professionals spoke with McKinney to try to resolve the situation without resorting to the use of force.  McKinney's UCI in-patient treatment records for May 29, 2003 state that McKinney was making threats to hurt himself. Doc. 421, Ex. 4 at BATES 0400043. It is not clear whether these threats were made in conjunction with (or perhaps were even the content of) the "yelling and screaming" reported by security officers, which justified the use of force.  Doc. 421, Ex. 3 at BATES 0300031.

with OC and CS for yelling and kicking his bunk. Two days later, McKinney was brought to the emergency room at FSP due to injuries suffered after banging his head on his steel bunk and cell door. He was then admitted to UCI where he accused FSP correctional staff of spitting in his food. Two weeks later, he returned to FSP but was admitted to the emergency room the following day after jumping down a flight of eight stairs, head-first. He received a laceration to his head which required seven staples to close and he reported that he wanted to kill himself. It appears McKinney was discharged to the wing on November 3, 2003 and remained there without incident until February 8, 2004 when he was sprayed three days in a row for yelling and cursing at staff and banging and kicking his cell door.[34]   He was sprayed again on February 24, 2004 and again on March 9, 2004 and outpatient therapy reports from February and March note he was exhibiting a poor adjustment to confinement and was being referred to psychiatry for assessment. Following many of the occasions on which McKinney was sprayed with chemical agents, he refused to be seen by medical staff for a post-use of force examination and refused to take a decontaminating shower (which regularly earned him a disciplinary report, in addition to the ones received for causing the initial disturbance and for disobeying orders to stop causing the disturbance).

McKinney's records continue in this fashion. On June 15, 2004, McKinney was sprayed at FSP for the same types of behaviors and was moved into the FSP infirmary the next day, where DOC psychiatrist Dr. Philip Springer reported that although McKinney's

---

[34]There is a use of force report for the February 10, 2004 incident (see Doc. 421, Ex. 3 at BATES 0300051) but this use of chemical agents is inexplicably not included on the list of use of force incidents from FSP gathered from the Inspector General's database (see Doc. 421, Ex. 38 at 3800010).

behavior had been improving, he had now been in another altercation with security and showed little insight into his "episodes of rage."   Doc. 421, Ex. 4, BATES 0400076. McKinney consented to receiving in-patient treatment saying, "I can't help myself." Doc. 421, Ex. 3 at BATES 0300078.  However, Dr. Springer noted that McKinney had been treated as an S-3 throughout his period of incarceration[35] and that, despite his fatigued appearance, agitated behavior, angry mood and affect, skewed perception, and poor insight and judgment, McKinney retained positive and healthy thoughts.  Doc. 421, Ex. 4, BATES 0400076.  McKinney remained in the infirmary for five days before Dr. Springer determined he should be returned to security.  McKinney was sprayed four hours later for kicking and banging his cell door and yelling obscenities at the staff.  He was sprayed again the next day and was transferred to UCI for one week before being sent back to FSP.  He was sprayed again four times in the first six months of 2005 and was transferred back and forth from UCI twice more during that time.  Records show that on May 13, 2005, McKinney consented to being prescribed Paxil (a psychotropic medication).  Doc. 422, Ex. 5 at BATES 2131.  On July 20, 2005, McKinney returned to FSP and was sprayed with chemical agents three more times over the next twenty-two months.

A psychologist who met with McKinney after he declared a psychological emergency on November 30, 2006 noted that although McKinney became "increasingly angry and belligerent" during their meeting and "burst into screaming curses and threatened to 'do

---

[35]Dr. Springer's assessment is inconsistent with records from McKinney's time at UCI where, for example, he was designated as an S-5 on March 13, 2003. See Doc. 421, Ex. 4 at BATES 0400038.

something' to get out of his cell," the psychologist assessed McKinney as being "more angry about not getting his way than a psych emergency" and therefore returned him to the wing. Doc. 422, Ex. 5 at BATES 2733-34.   On May 25, 2007 McKinney went back to UCI and records show on May 30, 2007, McKinney consented to being prescribed Prozac (a psychotropic medication).   Doc. 422, Ex. 5 at BATES 2133.   McKinney stayed at UCI for seven weeks and a July 2, 2007 treatment note states he was not on any medication, although he was designated as an S-4.   Doc. 422, Ex. 5 at BATES 2179.   Four days later, McKinney came back to FSP for three weeks, during which time he refused to leave his cell to participate in mental health group therapy.   On July 25, 2007, McKinney refused to remove his arm from his food flap and was sprayed twice with OC and finally with CS before complying with the order to remove his hand.[36]   As on many past occasions, McKinney refused to leave his cell for a decontaminating shower and refused to be seen for a post-use of force medical exam.   Later that day after receiving his evening meal, McKinney again refused to remove his arm from his food flap and he was again sprayed with OC.   For the second time that day, he refused to leave his cell for a decontaminating shower or to be seen by medical personnel.   The following day, an FSP psychologist tried to meet with McKinney at his cell front on two occasions but McKinney refused.   The psychologist noted that security personnel reported that

---

[36]In July 2007, an inmate's refusal to remove his arm from a food flap did not justify the spontaneous use of force.   Before trial, in connection with earlier proceedings, the Court watched and listened to the videorecording of this incident, which is now also included in the record on CD-rom.   See Doc. 422, Ex. 8.

> the usual next day [post use of force] evaluation could not be expected as [McKinney] was still considered a security risk due to hostile acting out behavior.  Security again reported that inmate [McKinney] remained easily agitated with a negative, 'I don't care' type attitude this afternoon.  Security recommended return to complete the [post use of force] assessment tomorrow-7/27/08 [sic].  Security officer reported that cell-front stimulation appeared to exacerbate acting out behavior and oppositional-defiant attitude at this time.

Doc. 422, Ex. 5 at BATES 2191.   Treatment notes from the following day report that McKinney was on no medication, did not appear to be in crisis and had no evidence of psychosis, but his use of force history indicated that his ability to function adequately in his current environment appeared problematic and he would therefore be referred to a supervisor for further consideration of an appropriate level of care.  Doc. 422, Ex. 5 at BATES 2192.   Finally, on July 31, 2007, and apparently only after Dr. Hall reviewed McKinney's file for purposes of this case and asked DOC's mental health director to intercede, McKinney was transferred to UCI.  See Doc. 427 at Tr. 132-33.  The mental health team report justifying the emergency referral states that McKinney

> presents [with] 5 use of force incidents [within] the past 3 months [and] six within the past year.  [Inmate] refuses case management consist[e]ntly [and] [r]efuses med[ications] for the past 2 y[ea]rs.  Has a blanket refusal for group therapy.  26 [disciplinary reports] in past 2 y[ea]rs.  5 [disciplinary reports] in past 6 mo[nths].  3 uses of force in past 2 weeks.

Doc. 421, Ex. 4 at BATES 0400117.  The referral notes further explain that McKinney has made a poor adjustment to incarceration noted by having set fire to his cell twice in 2005, and having made threats of self injurious behavior three times in 2005.  When coupled with his history of hundreds of disciplinary reports, he was assessed as having "very poor impulse

control/anger [management] skills." Doc. 421, Ex. 4 at BATES 0400117. The referral further states that on examination, McKinney's thought processes were clear and coherent but he nonetheless had evidence of a formal thought disorder, marked by suspicious thoughts and paranoid features, personalizing and magnifying real and imagined insults, expecting malevolent reactions from peers and others and suspecting plots at times. McKinney was noted as being able to identify coping skills but as being unable to implement them. Doc. 421, Ex. 4 at BATES 0400118. Dr. Hall testified that while none of McKinney's mental health evaluations indicated any acute impairment that warranted immediate referral to an inpatient unit, McKinney's long, established pattern of repeated conflicts, disciplinary reports and refusals to participate in treatment indicated that "a more structured and intensive setting" was needed to address McKinney's health care needs. Doc. 427 at Tr. 132.

McKinney has remained at UCI since July 31, 2007 and while there, he has continued to engage in combative behavior, accumulating additional disciplinary reports for fighting, and disobeying orders. At UCI, however, such incidents do not generally result in his being sprayed with chemical agents.

Dr. Burns interviewed McKinney and reviewed his file in 2006 while he was housed at FSP. She found him to be paranoid and suspicious and he confided in her that he did not trust medical or mental health staff and therefore refused to take medication they prescribed. She recounted his history of disciplinary reports and repeated episodes of being sprayed with chemical agents, which she found exacerbated his psychiatric condition and resulted in him being hesitant to call for help, even when he knows he needs it. Dr. Burns testified that McKinney was likely symptomatic on occasions when he was sprayed but that security

personnel, whose training teaches them to recognize only bizarre or particularly unusual behaviors, would likely fail to appreciate that an inmate like McKinney was exhibiting acute symptoms of serious mental illness.  Instead, security staff interpret symptoms of mental illness as "bad and disruptive" behavior, which is treated with force rather than with mental health intervention. Doc. 425 at Tr. 175-80.  Dr. Burns further testified that inmates whose mental illness symptoms include paranoia and fear are often afraid of security personnel, especially when security officers have just sprayed them with chemical agents, and such inmates are therefore reluctant to leave their cells (which requires an inmate's hands to be cuffed behind his back) for a decontaminating shower or for a post-use of force exam.  Dr. Stopford, plaintiffs' toxicology expert, was unable to examine McKinney because McKinney was upset at the time and refused to be evaluated.  However, Dr. Stopford offered the opinion that repeated sprayings, and spraying without proper decontamination (both of which regularly occurred with McKinney), increase the degree of pain and skin burns associated with being sprayed with chemical agents.

**Antonio Ward** is a 35 year old inmate who has been incarcerated in DOC facilities since 1998 and is serving a fifty year sentence for robbery with a deadly weapon.  Ward was treated by DOC mental health care providers for psychological problems during an earlier term of incarceration and has been diagnosed with depression and treated for suicide prevention.  See Doc. 421, Ex. 11 & 12; Doc. 422, Ex. 6.  Relevant here, Ward was transferred to FSP on March 24, 2004.  Two months later, when Ward refused orders to stop kicking his cell door and yelling obscenities at staff, security officers sprayed him with OC and CS.  A mental health evaluation the following day found Ward had a depressed mood

and a poor adjustment to his new setting and did not need a referral for more intensive treatment, but should see a psychiatrist.  Doc. 421, Ex. 12 at BATES 1200046.  The next day, Dr. Springer found Ward was having difficulty with security and should continue to have access  to mental health care.  Ward was seen by mental health professionals during May and June and on July 1, 2004, Ward was again sprayed with chemical agents for refusing to stop banging on his cell door and cursing at staff.  Ward refused to leave his cell for a post-use of force examination or a decontaminating shower.  An emergency medical technician advised Ward of the health consequences of his failure to take a shower or permit an exam, cautioning him that it "may cause future health problems even untimely death." Doc. 421, Ex. 11 at BATES 1100029.  Ward received disciplinary reports in November 2004 and March 2005 for causing a disturbance[37] but was not sprayed on those occasions.  He was seen as a mental health emergency on March 31, 2005.  On April 5, 2005, Ward was sprayed with OC and CS for causing a disturbance by kicking and beating on his cell door and yelling and cursing at staff.  Ward again refused a shower and post-use of force exam and received three disciplinary reports for the incident.  The next day Ward was again seen at FSP as a mental health emergency, diagnosed with dysthymic disorder and transferred to UCI the following day where he was initially put on a fifteen minute suicide watch but, upon evaluation, was deemed not to be in acute distress despite his agitated and depressed state.  Ward was returned to FSP five days later on April 11, 2005 with a note that he should

---

[37]Ward contested this assessment, claiming that he was not causing a disturbance and that security officers had falsely accused him of doing so.  Ward filed similar statements related to most of the subsequent disciplinary reports in the record.

consider mental health counseling and medication. He was seen at FSP as a mental health emergency the next day and, on April 14, 2005, three days after Ward returned to FSP and one day after Ward was treated as a mental health emergency, Ward was observed in his cell with a weapon that he apparently fashioned from a piece of metal from his foot locker. He refused orders to relinquish the weapon. A psychological specialist was brought to Ward's cell to counsel with him but Ward still refused to hand over the weapon. Security staff sprayed Ward with OC before he finally relinquished the weapon and agreed to be handcuffed so he could take a decontaminating shower and have a post-use of force examination, which revealed self-inflicted scratches on his wrist. Ward received further mental health treatment at FSP later in April and in May and June. On July 14, 2005, Ward was sprayed with OC and CS for causing a disturbance in his cell by kicking and beating on his cell door and yelling obscenities at staff. Ward refused a decontaminating shower and post-use of force exam. Mental health records from an evaluation the following day noted that Ward's moderate symptoms could continue to be managed on an outpatient basis. The counselor noted that Ward believed security officers sprayed him the previous day as reprisal for his having recently met with lawyers in the <u>Osterback</u> case. Doc. 421, Ex. 12 at BATES 1200098. Ward remained at FSP apparently without further incidents of being sprayed with chemical agents, although he did continue to receive disciplinary reports. On May 4, 2006 Ward attempted to jump off a second floor but a year later, his S-status was downgraded to S-2. By October 2007, however, Ward's mental health had again deteriorated and he was referred to UCI with a diagnosis of depression. As of June 9, 2008, Ward remained housed at UCI as an S-4 and continues to engage in behavior that results

in disciplinary reports.  Dr. Burns' review of Ward's file and her interview with him in May of 2006 revealed that he was not reporting and did not exhibit any current psychological distress or acute symptoms, even though he had stopped taking antidepressant medications several months earlier.  She did report, however, that Ward suffered anxiety and fear when sprayed with chemical agents and that he has intentionally harmed himself as a result of his anger, frustration and feelings of powerlessness.  Doc. 421, Ex. 49 at BATES 4900048.  Dr. Stopford's examination of Ward and review of his file in 2005 led Dr. Stopford to conclude that Ward had a history of asthmatic symptoms and had bronchospasms at the time Dr. Stopford examined him.  Dr. Dushoff reviewed Ward's file and found he never suffered a burn.  Doc. 427 at Tr. 25.  Dr. Hall noted that Ward's refusal to access available mental health services could itself be a sign of mental illness, but found that, in Ward's case, Ward appeared to have been competent at the time he made those decisions.  Doc. 427 at Tr. 135-36.

**Paul Echols** is a 27 year old inmate incarcerated since 2001 in DOC facilities where he is serving life sentences for carjacking and robbery with a deadly weapon. Echols has been diagnosed with adjustment disorder with anxiety and depressed mood, depressive disorder, and dysthmia.  See generally, Doc. 421, Ex. 9 & 10; Doc. 422, Ex. 4.  He was admitted to a DOC in-patient mental health facility for treatment in January 2003 after swallowing staples and eating feces.  After moving back and forth between several facilities, including UCI, Echols was transferred to FSP in March 2003 where he has remained except for a two week stay at UCI in the fall of 2003 after Echols attempted to hang himself upon learning of the death of his young daughter.  While housed at FSP, Echols has been sprayed

47

with chemical agents ten separate times for yelling and banging on his cell door.  On May 29 and 30, 2004, Echols was treated for multiple second degree burns after being sprayed with chemical agents on May 28[38] and medical staff reported areas of blistered red skin and serious drainage from his wounds for which he was prescribed twice daily treatment with silvadene ointment.[39]  However, on June 10, 2004, medical personnel told security staff there was no contraindication against the use of chemical agents and Echols was sprayed again for yelling and banging in his cell.  A mental health evaluation the following day noted that although Echols continued to experience symptoms of depression a few times per week, he remained at S-2 status, was not on any medication, and showed excellent participation in group and individual therapy sessions.  Doc. 421, Ex. 10 at BATES 1000037.  Echols' mental health deteriorated somewhat in 2007 and his mental health status was re-designated as S-3, however, the record does not show that Echols was sprayed with chemical agents anytime after December 4, 2006.  Dr. Burns interviewed Echols in May 2006 and although she did not report any particularly notable symptoms of mental illness during the interview, she noted that Echols had a history of depressive symptoms for which he was being treated.  In addition to the chemical burns, Burns found Echols experienced psychological injuries from being sprayed with chemical agents, including feelings of intense fear and helplessness and, because Echols believes that at least some of the uses of chemical agents were in retaliation

---

[38]Echols had refused a decontaminating shower, clean linens or clothing, and had refused to have his cell decontaminated.

[39]Dr. Dushoff (defendants' burns expert) testified that an infection could not develop this quickly.  Doc. 427 at Tr. 26-27.

48

for filing grievances, he now has difficulty sleeping for fear of being attacked with chemical agents without provocation.  Dr. Stopford reported that Echols' second degree burns were a direct result of exposure to chemical agents and that the extent of his burns likely increased due to his failure to receive a decontaminating shower.

**Reginald Williams** is a 49 year old inmate incarcerated in DOC facilities since the age of 19 for service of a life sentence and is currently housed at Santa Rosa Correctional Institution.  See Doc. 421, Ex. 49 (Dr. Burns' report on inmate Williams).  Williams was sprayed three times at FSP- once in 2001 and twice in 2002.  See Doc. 421, Ex. 38 at BATES 3800009.  Dr. Stopford reported that Williams developed inflammation of his cornea secondary to his exposure to chemical agents and that he is now at an increased risk of eye effects because of prior chemical injuries to his eyes.  Dr. Burns interviewed Williams and reported that he displayed some mild anxiety and difficulty with concentration and becomes fearful and anxious when security personnel come to his cell due to a fear of being sprayed with chemical agents.  However, the record does not contain Williams' inmate or mental or medical health records and therefore does not show how long Williams was housed at FSP, why Williams was sprayed, or whether Williams has received any mental health treatment while in DOC facilities.  An affidavit prepared by a DOC official states that Williams was designated as an S-1 as of May 2007 and was housed at Santa Rosa.  Doc. 421, Ex. 63 at BATES 6300002.

**Kelvin Frazier** is a 40 year old inmate who has been in DOC custody since 1985 and is serving a life sentence for murder.  See generally, Doc. 421, Ex. 17.  Frazier was moved to FSP in July of 1992 where he remained until he was moved to a CM unit at Santa Rosa

Correctional Institute in October 2002.  The record does not show that Frazier has been back to FSP since then.  Plaintiffs did not submit the DOC medical or mental health records for Kelvin Frazier.  Plaintiffs' expert, psychiatrist Dr. Kathryn Burns, reported that when she interviewed Frazier in 2005, he was not classified by DOC as having a mental illness, he did not take any psychotropic medications, and he had no history of mental illness outside of prison.  While Dr. Burns determined that Frazier suffered from occasional nightmares, fearfulness, and anxiety associated with two occasions in 2001 when Frazier was sprayed with chemical agents while at FSP, the record fails to show that Frazier was designated as S-3 at the time he was sprayed in 2001 or at any other time while in DOC custody, or, even absent such a designation, that he was suffering from symptoms of mental illness at a time he was sprayed, or that any mental health provider found him to be suffering from mental illness after he was sprayed.  Frazier's inmate file shows he was sprayed on at least one other occasion in 2002 while housed at FSP, but the records do not reveal any mental health concerns related to that incident.  Records show that as of May 2007, Frazier was housed at Santa Rosa and was designated as an S-1.  Doc. 421, Ex. 63 at BATES 6300002.

## II.  Conclusions of Law

### A.  Legal Principles

Plaintiffs bring this suit under 42 U.S.C. § 1983 seeking injunctive and declaratory relief[40] for violations of their right to be free from cruel and unusual punishment under the

---

[40]Plaintiffs settled and/or dismissed all of their claims for damages.

Eighth and Fourteenth Amendments to the United States Constitution.[41]   The Eighth Amendment, applied to the states through the Fourteenth Amendment, <u>Rhodes v. Chapman</u>, 452 U.S. 337, 344-45 (1981), "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." <u>Estelle v. Gamble</u>, 429 U.S. 97, 102 (1976) (citation omitted).  "Generally speaking," however, "prison conditions rise to the level of an Eighth Amendment violation only when they 'involve the wanton and unnecessary infliction of pain.'" <u>Chandler v. Crosby</u>, 379 F.3d 1278, 1289 (11th Cir. 2004) (quoting <u>Rhodes</u>, 452 U.S. at 347).

A two-prong analysis governs Eighth Amendment challenges to conditions of confinement.  <u>Hudson v. McMillan</u>, 503 U.S. 1, 8 (1992).  "First, under the 'objective component,' a prisoner must prove that the condition he complains of is sufficiently serious to violate the Eighth Amendment." <u>Chandler</u>, 379 F.3d at 1289 (citing <u>Hudson</u>, 503 U.S. at 8).  Minimally, the condition must be one that "'poses an unreasonable risk of serious damage to [the inmate's] future health' or safety." <u>Id.</u> (quoting <u>Helling v. McKinney</u>, 509 U.S. 25, 35 (1993)).  The risk must be of a kind that is "so grave that it violates contemporary standards of decency." <u>Helling</u>, 509 U.S. at 36.  Thus, it must be an "extreme deprivation[]", something far more than the "routine discomfort" which is "'part of the penalty that criminal offenders must pay for their offenses against society.'" <u>Hudson</u>, 503 U.S. at 9 (quoting <u>Rhodes</u>, 452 U.S. at 347).

--------

[41]In all respects, the plaintiffs have either satisfied the PLRA exhaustion requirements and/or defendants waived the requirement that they do so. <u>See</u> 42 U.S.C. § 1997e(a); Docs. 142, 253, 306, 325 (and exhibits thereto).

The second component is subjective:  "the prisoner must show that the defendant prison officials 'acted with a sufficiently culpable state of mind' with regard to the condition at issue."  Chandler, 379 F.3d at 1289 (quoting Hudson, 503 U.S. at 8).  "The proper standard is that of deliberate indifference."  Id. (quoting Wilson v. Seiter, 501 U.S. 294, 303 (1991)).  While a showing of mere negligence is not enough, a prisoner need not show that an official purposely caused him harm or knew that harm would result.  Farmer v. Brennan, 511 U.S. 825, 835 (1994).  Rather, an official's deliberate indifference is demonstrated where the official "knows of and disregards an excessive risk to inmate health or safety" caused by the denial of humane conditions.  Id. at 837.  Plaintiffs may demonstrate a causal connection between the officials and the inhumane conditions where a prison's "custom or policy results in deliberate indifference to constitutional rights."  Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003) (citation and quotation omitted).   Liability based on a custom or policy can result from either a facially unconstitutional custom or policy or from a facially constitutional custom or policy that is implemented in an unconstitutional manner.  Goebert v. Lee County, 510 F.3d 1312, 1332 (11th Cir. 2007).  To show deliberate indifference based on the latter, the violations must be flagrant, widespread and continuous such that the defendant has actual or constructive knowledge of the pattern.  Id. Thus, a policy that can be humanely and properly applied- - one that is facially constitutional- - cannot lead to liability based on a single incident of deprivation.  Marsh v. Butler County, Ala., 268 F.3d 1014, 1036-37 (11th Cir. 2001).  Rather, liability will only attach where, notwithstanding the otherwise facially constitutional policy, a pattern of unconstitutional conduct is so obvious as to put the official

on notice that the implementation of the policy results in constitutional violations. Id.[42] See

also, Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir. 1991) (finding sheriff was

deliberately indifferent where his policies for confirming suspects' identities resulted in

---

[42]Some courts have set forth other formulations of the governing standards for reviewing alleged Eighth Amendment violations where the condition of confinement involves or results in an allegedly excessive use of force.  Plaintiffs here pose an interesting question as to whether the deliberate indifference showing for a case such as this additionally requires proof of malicious and sadistic use of force.  See Doc. 431.  Defendants have not suggested that this is so (see Doc. 433) and, having reviewed the cases plaintiffs cite, the Court finds that the actions here should be measured against the test for conditions of confinement, which requires plaintiffs to show that officials were deliberately indifferent to a substantial risk of harm.  While acknowledging that the policy here is directed toward the degree of force permitted to quell a "disturbance," which is often treated as an excessive force claim (and indeed, plaintiffs pled- - and settled- - several such claims against various individual correctional officers), their challenge against the top DOC officials (the only defendants left) is directed to the prison's considered policy that inmates securely housed in their individual cells must abide by the prison rules about excessive noise or face the consequence that non-spontaneous force will be used against them to compel compliance, thus distinguishing this case from those where officers have been required to take action "in haste, under pressure, and frequently without the luxury of a second chance." Whitley v. Albers, 475 U.S. 312, 320 (1986).  Here, the facially constitutional "condition of confinement"- - defendants' use of chemical agents on inmates who refuse to follow orders to stop creating a disturbance- - is, plaintiffs claim, unconstitutional when applied to them because it fails to account for their inability, on account of mental illness, to conform their behavior to comply with the rules.  While recognizing that other formulations might exist to analyze such a claim, this seems to be a challenge that can be properly addressed under the Eleventh Circuit's traditional deliberate indifference framework for challenges to conditions of confinement. See, e.g., Goebert, 510 F.3d at 1332 (addressing under deliberate indifference standard whether facially constitutional policy that prohibited inmates from laying down during the day was unconstitutional when applied to pregnant inmate who should have been on bed rest). See also, Chandler, 379 F.3d at 1289-90 (reviewing conditions of confinement case where plaintiffs were seeking declaratory and injunctive relief under traditional two-part objective/subjective standard and requiring plaintiffs to show deliberate indifference on part of defendant prison officials); Coleman v. Wilson, 912 F.Supp. 1282, 1321-22 (E.D. Cal. 1995) (concluding that deliberate indifference, and not "malicious and sadistic," was proper standard to address challenge to prison policy of using tasers and 37mm rubber bullet launchers on mentally ill inmates because policy required deliberation through communication between various levels of staff before force could be used).

misidentification of persons who were subsequently arrested and incarcerated without cause where sheriff knew of prior instances of mistaken identity and allowed policy to continue).

If plaintiffs establish that the conditions of confinement violate the Eighth Amendment, they must each further show that the violation caused them injuries. Chandler, 379 F.3d at 1290. Finally, even where an Eighth Amendment violation is proven, plaintiffs will only be entitled to injunctive relief where the Court has a "reasonable expectation" that the violations will recur, and that policy changes implemented since litigation began will not "completely and irrevocably eradicate[ ] the effects of the alleged violations." Hall v. Board of School Comm'rs., 656 F.2d 999, 1000-01 (5th Cir. Sept. 21, 1981).[43] Thus, if plaintiffs prove an Eighth Amendment violation, defendants then bear the burden of proving that the institution will "not return to its former, unconstitutionally deficient state" "absent an injunction." LaMarca v. Turner, 995 F.2d 1526, 1541 (11th Cir. 1993) (citations omitted). Even in cases where the need for injunctive relief is demonstrated, federal courts are "ill equipped to deal with the increasingly urgent problems of prison administration and reform." Turner v. Safley, 482 U.S. 78, 84 (1987) (quotation and citation omitted). Such problems are "complex and intractable" and "not readily susceptible of resolution by decree." Id. (quotation and citation omitted). Thus, while constitutional rights must be "scrupulously observed," courts should not invoke the "name of the Constitution [as a basis to become] enmeshed in the minutiae of prison operations." Bell v. Wolfish, 441 U.S. 520, 562 (1979). Therefore, any resulting decree must go no further than "target[ing] the existing wrong." LaMarca, 995 F.2d at 1543

---

[43]Under Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981), cases decided by the Fifth Circuit prior to October 1, 1981 are binding precedent.

(citation omitted).

## B. Analysis of Plaintiffs' Claims

Plaintiffs attempt to meet the objective component of their cruel and unusual punishment claims by showing that the FSP policy as to the non-spontaneous use of chemical agents subjects them to "extreme deprivations" by spraying them with chemical agents to enforce a prison regulation that the plaintiffs had no capacity to comply with because of their mental illnesses.  To establish the subjective component, plaintiffs attempt to show that while the FSP policy may have been facially constitutional, the history of the policy's application demonstrates that officials disregarded the evidence that the policy was resulting in constitution violations because chemical agents were being used against S-3 inmates such as plaintiffs and others who had decompensated and could not follow commands to stop banging and yelling in their cells.  Several governing principles must first be established.

First, plaintiffs concede that force may appropriately be used against an inmate to enforce an order where the inmate's compliance is necessary to avoid immediate risk of injury to the inmate or to another person.

Second, credible testimony supports the conclusion that, in a prison environment where dangerous inmates are housed and where visibility into individual cells is limited (such as the CM wing at FSP), unremitting banging or yelling that an inmate refuses to stop upon order may be a "disturbance" sufficiently serious as to require that it be quelled by the non-spontaneous use of force because it may, for example, incite other inmates to join in the ruckus or the noise may overwhelm another inmate's request for help.

Third, the use of chemical agents as a means of force against a recalcitrant prisoner who refuses to obey an order generally does not, in itself, violate the Eighth Amendment. See Danley v. Allen, 540 F.3d 1298, 1307 (11th Cir. 2008) (holding in context of pretrial detainee's excessive force claim that the use of "pepper spray is an accepted non-lethal means of controlling unruly inmates" and that "[a] short burst of pepper spray is not disproportionate to the need to control an inmate who has failed to obey a jailer's orders").[44] This is true even though chemical agents, by their very nature, are "designed to disable a [person] by causing intense pain, a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx," and, occasionally, "disorientation, anxiety, and panic in the person sprayed." Id. at 1309 (citing cases).  Thus, this degree of pain is constitutional because the effects are temporary- - or at least are intended to be.

Fourth, even the temporary pain caused by the use of chemical agents may be constitutionally cognizable when the chemical agents are used unnecessarily.  Vinyard v. Wilson, 311 F.3d 1340, 1348 (11th Cir. 2002) (holding that use of pepper spray is excessive force under Fourth Amendment where crime is minor, arrestee surrenders, is secured, is not violent or threatening officer safety); Soto v. Dickey, 744 F.2d 1260, 1270 (7th Cir. 1984) (recognizing that "it is a violation of the Eighth Amendment for prison officials to use mace

_____

[44]Danley's complaint, which was before the Eleventh Circuit on review of an Order of the District Court denying defendants' motions to dismiss on grounds of qualified immunity, alleged that the chemical agent was "pepper spray." See Danley v. Allyn, 485 F.Supp.2d 1260 (N.D. Ala. 2007).  The Court therefore assumes it was OC (the generic name for which is "pepper spray"), which, according to the evidence received at trial, is the most commonly used and least dangerous chemical agent used by the DOC.

or other chemical agents in quantities greater than necessary *or for the sole purpose of punishment or the infliction of pain*") (emphasis supplied); <u>Gunn v. Sullivan</u>, No. 2:04-cv-229-FtM-99SPC, 2007 WL 80859, at *4 (M.D. Fla. Jan. 8, 2007) (holding that a jury could find unreasonable and excessive force had been used if inmate, who allegedly suffered shortness of breath just following non-spontaneous use of chemical agents, could prove that he was arbitrarily selected for punishment hours after inmates stopped yelling in their cells). <u>See also</u>, <u>Rhodes</u>, 452 U.S. at 346 ("Among 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'") (citation omitted).

Fifth, even where chemical agents are permissibly used, when the effects are longer lasting or exacerbated by prolonged exposure, inadequate decontamination, or poor ventilation- - something beyond the immediate short term effects of being sprayed with the chemical agent- - the use of chemical agents may pose an unreasonable risk to an inmate's health that is serious enough to trigger inquiry under the Eighth Amendment. <u>Danley</u>, 540 F.3d at 1311. According to the credible testimony at trial, these risks may include burns and the exacerbation or complication of many serious health conditions, including diabetes and various circulatory and respiratory conditions.

Sixth, the evidence at trial established that exposure to chemical agents - - whether used as directed or not - - may exacerbate the psychological condition of mentally ill inmates, with results including increased paranoia, feelings of anger or helplessness, and suicidal ideation, and may adversely effect the ability to treat mentally ill inmates. These psychological effects merit inquiry under the Eighth Amendment. <u>See</u> <u>LaMarca</u>, 995 F.2d at 1544 (holding that district court properly found prison officials "unnecessarily and wantonly

inflicted pain upon prisoners by failing to provide them with post-rape psychological or psychiatric counseling"); Strickler v. Waters, 989 F.2d 1375 (4th Cir. 1993) (holding that Eighth Amendment challenge can be met by proof of serious or significant physical *or emotional* injury); Jordan v. Gardner, 986 F.2d 1521 (9th Cir. 1993) (holding that inmates with history of sexual abuse met Eighth Amendment pain standard warranting injunctive relief when they were subject to "severe psychological injury and emotional pain and suffering" by prison's pat-down search policy); Northington v. Jackson, 973 F.2d 1518 (10th Cir. 1992) (holding that Eighth Amendment claim was stated by allegation that officers caused plaintiff psychological injury by holding gun to plaintiff's head and threatening to shoot); Smith v. Aldingers, 999 F.2d 109 (5th Cir. 1993) (reversing and remanding where district court failed to consider whether fear alone could be an Eighth Amendment violation). See also, Hope v. Pelzer, 536 U.S. 730, 737 (2002) (highlighting "taunting" and "humiliation" as circumstances which contributed to finding that handcuffing petitioner to hitching post "violated the basic concept underlying the Eighth Amendment, which is nothing less than the dignity of man") (quotation and citation omitted).

Seventh, DOC witnesses testified (and DOC policy provides) that except in instances where force is needed to prevent immediate harm to the inmate or another, physical force should not be used to compel compliance against an inmate who, by virtue of his S-4, S-5, or S-6 status, the DOC has determined does not have the mental capacity to follow commands. See Doc. 426 at Tr. 200-01; Doc. 427 at Tr. 186-88; Doc. 421, Ex. 41 at BATES 4100015. This is so because if the inmate cannot understand the command or cannot comply with it, the force simply produces pain, except to the extent the inmate is (in some

cases only very temporarily) incapacitated by the force used.  See Wilson v. Seiter, 501 U.S. 294, 300 (1991) (explaining that in Eighth Amendment prison cases, "the infliction of punishment" means "a deliberate act intended to chastise or deter"); Hope, 536 U.S. at 737 (holding that punitive treatment levied against a restrained prisoner was unconstitutional gratuitous infliction of wanton and unnecessary pain).  The same principle supports the DOC decision that occasionally finds inmates are to be excused from receiving disciplinary reports for their disobedience due to incompetency at the time of the infraction.  In these instances, using physical force to compel a mentally ill inmate to comply with a command that he cannot understand or follow due to incapacity "crosses the line separating necessary force from brutality."  Slakan v. Porter, 737 F.2d 368 (4th Cir. 1984) (holding prison guards' use of tear gas and other weapons against prisoner in his cell "crossed the line separating necessary force from brutality"); Stewart v. Stalder, No. 05-cv-0416-P, 2007 WL 184892, at *4 (Jan. 19, 2007) (holding plaintiff could state an Eighth Amendment violation if he could prove officials used mace to compel his compliance with an order when they had knowledge that his mental health prevented him from complying).  This conclusion is further supported by the lesson of Estelle v. Gamble, 429 U.S. 97, which teaches that the denial of medical care may be cruel and unusual punishment because physical torture or pain without penological purpose may result from the denial.  Id. at 103.  So too here because if the DOC fails to account for an inmate's decompensation, with the result that he is gassed when he cannot control his actions due to mental illness, then the force no longer has a necessary penological purpose and becomes brutality.  See also Cook v. Sheriff of Monroe Cty., Fla., 402 F.3d 1092, 1115 (11th Cir. 2005) (citation omitted) (holding that prisoners have a right

"to receive medical treatment for illness and injuries, which encompasses a right to psychiatric and mental health care").[45]

Eighth, the DOC is aware that an inmate's mental status is subject to change and that S-3 inmates housed at FSP sometimes decompensate and require transfer to an in-patient facility.   Although security staff are trained to recognize extreme symptoms of decompensation such as suicidal ideations and self-mutilation and may also recognize behaviors that are uncharacteristic for a particular inmate, some S-3 inmates manifest symptoms of mental illness which are indistinguishable to security staff (and sometimes even to mental health staff) from behaviors which appear to be willful recalcitrance.   That some inmates are deemed to have been incompetent for purposes of receiving a disciplinary report after a gassing further supports this point.

Ninth, the Florida CMA (the legislatively created monitoring body) has warned the DOC that security staff may be responding inappropriately to mentally ill inmates who may be suffering from symptoms of their illnesses that are manifested by behaviors such as yelling, lashing out, or refusing to obey orders.   The CMA has urged the DOC to consider

_____

[45]Thus, here the DOC policy that prohibits the non-spontaneous use of chemical agents against S-4, S-5, or S-6 inmates housed in in-patient facilities (except upon doctor's orders) coincides with constitutional minima.  To be clear, it has never been the DOC's legal position that it is permissible to spray S-3 inmates who have decompensated.  Rather, its position has been that if mental health staff have properly designated inmates as S-3s, then those inmates can understand the consequences of their behavior and are capable of following rules and orders.  The Osterback decision found that the overall delivery of mental health services in the DOC system met constitutional standards.  The DOC position is, essentially, that it need do no more.  This case, however, ventures into ground not covered by Osterback- - what happens when officers repeatedly use non-spontaneous force against an inmate whose mental health has slipped below the point where he can control his behavior, despite the label attached by his designation.

adopting procedures used by the Federal Bureau of Prisons which bring mental health providers to an inmate's cell for counseling in an attempt to diffuse a situation without the use of force.  The American Correctional Association, which sets correctional standards, does not mandate mental health intervention before chemical agents are used against mentally ill inmates, but many other jurisdictions employ those techniques.  See Doc. 421, Ex. 53, 76.

Tenth, DOC staff and officials, including FSP's former warden James Crosby, and others are aware of and have expressed concern about the "frequent flier" phenomenon whereby S-3 CM inmates at FSP are sprayed with chemical agents for behaviors such as yelling and banging and are thereafter deemed to have decompensated, requiring transfer to UCI's in-patient mental health treatment facility where the inmate's mental health is "restored" and he then returns to FSP where the cycle is repeated over and over again.

Based on these principles, plaintiffs could establish the objective component of an Eighth Amendment claim by showing that at the time they were ordered to cease causing a disturbance, they no longer had the capacity to comply, and the chemical agents used against them caused an "extreme deprivation."  See Hudson, 503 U.S. at 8-9.  To establish the subjective component, plaintiffs must demonstrate that the nature of their mental illnesses, the behaviors they were engaging in that caused them to be sprayed, the substantial risk of serious harm they suffered and their history of transferring between FSP and UCI are all consistent with the history of a DOC policy that has permitted such circumstances, thereby proving that the DOC officials acted with deliberate indifference as to their plight.  See Rivas, 940 F.2d at 1495.  As this is not a class action, each plaintiff must establish his own claim.

As to **Jeremiah Thomas**, the factual findings outlined above (pp. 30-36, supra) show that his psychiatric diagnoses include schizoaffective disorder bipolar-manic and antisocial personality disorder with severe borderline features, which have been marked by disturbing acts of self-mutilation and maniacal behaviors such as head banging and incessant singing. Between January 10, 2000 and July 25, 2003, Thomas was transferred between FSP and UCI nine times.  His stays at FSP were invariably short-lived, ranging from six days to 78 days (including several days spent in the FSP infirmary).  Thomas' brief stays at FSP were marked by disastrous and sometimes almost immediate episodes of confrontation with security officers which resulted in Thomas being sprayed with chemical agents on twenty different occasions, sometimes more than once in a single day, often on multiple days in a row, and usually with three separate rounds of chemicals being applied each time.  Only one of Thomas' FSP stays resulted in his transfer to UCI without his being sprayed first and that occurred when, during a six day stint at FSP, medical staff determined Thomas could not be sprayed after he tried to hang himself two days after he arrived there (though Thomas' other suicide threats or attempts at FSP did not result in similar precautions).

Each time Thomas was sprayed, he was engaged in unremitting banging or yelling in his cell which security staff deemed to be a disturbance that had to be stopped, by force if necessary.  Yet on two separate occasions, Thomas complied with officers' orders when officers brought a videocamera to the area (a technique that was apparently used while Thomas was in the FSP infirmary).  On another occasion when Thomas was "causing a disturbance" by "holding a loud conversation with himself," a correctional supervisor refused to approve the use of chemical agents and instead had Thomas escorted to a medical

holding cell because he felt chemical agents were "ineffective" when used on Thomas, who the supervisor noted had "a real mental problem" that warranted a referral to mental health for evaluation.  Doc. 421, Ex. 1 at BATES 0100079.  Indeed, disciplinary proceedings which followed several of Thomas' episodes of yelling and banging for which he was sprayed found Thomas was incompetent at the time, which is consistent with Dr. Burns' and Dr. Infante's evaluations of Thomas that found that his yelling and banging were consistent with symptoms of his severe mental illness and were predictable behaviors for which Thomas became known.  See Doc. 421, Ex. 1 at BATES 0100079 (March 3, 2000 note from Captain Kelsay that Thomas "should not be permitted to disrupt an entire wing *on a continuous basis*") (emphasis added).

This history convinces the Court that Thomas was sprayed with chemical agents at FSP for causing a disturbance in his cell by yelling or banging on occasions when he had no capacity to conform his conduct because of his mental illness, thereby demonstrating that the force used crossed the line separating permissible enforcement of prison rules from cruel and unusual punishment.  Estelle, 429 U.S. at 103.  Plaintiffs have also established that as a result of this treatment, Thomas suffered far more than the "routine discomfort" that is tolerated by society as part of the price a criminal offender must pay for his crime.  Hudson, 503 U.S. at 9.  For example, Thomas was evaluated by a nurse on September 24, 2000 after he had been sprayed twice in two days with chemical agents and she found his skin was blistering and broken from chemical burns, he smelled of urine and was acting delusional.  Yet Thomas was returned to his cell where he was sprayed the next day and the day after that as well.  By September 27, 2000, medical staff found Thomas was suffering first to third

degree burns on his back, abdomen, arms, elbows and buttocks of such severity that they considered referring Thomas to a special burn unit for treatment.[46]  Dr. Infante, who treated Thomas at UCI after his transfer from FSP, placed him in the Crisis Stabilization Unit where S-5 inmates are usually treated for periods of no more than four weeks.  Thomas remained in the CSU for over six months, and it "seemed like forever" before Dr. Infante was able to stabilize him.  Doc. 425 at Tr. 252.

Plaintiffs have further established that the actions taken by correctional staff in response to Thomas' behavior were consistent with the FSP policies in place at the time.  The undisputed evidence (including from DOC's own former mental health director, Dr. Hall) established that an inmate's mental health status is subject to change without cause or notice.  Additionally, DOC officials and staff were familiar with the problem of the "frequent flier" phenomenon which gave them notice that the mental health of inmates like Thomas was particularly fragile such that, notwithstanding his S-3 designation, he was especially susceptible to decompensating to an S-4 (or higher) designation.  Even absent the known "phenomenon" this repeated inter-facility movement created, Assistant Secretary Sapp testified that FSP officials meet daily to review the previous day's uses of force.  Given the frequency with which Thomas was sprayed with chemical agents within such short periods of time, the name "Jeremiah Thomas" had to stand out.  Moreover, the recent creation and

---

[46]It is immaterial that Thomas may have played a role in the exacerbation of his physical injuries by his failure to submit to handcuffing so he could take a decontaminating shower.  If, as the Court has found, Thomas did not have the capacity to follow orders to stop yelling or banging, neither can he be faulted for failing to follow orders to submit to handcuffing to leave his cell for a shower just after officers have sprayed him (usually repeatedly) with chemical agents.

filling of O-Dorm, which houses over 100 S-3 inmates who are at FSP awaiting transfer to UCI (and who are not subject to non-spontaneous sprayings), strongly supports the proposition that DOC policies in place before that time failed to address the mental health needs of many of the S-3 inmates at FSP. In the face of this evidence, DOC officials unreasonably continued to rely on the S-3 designation as a basis to justify using non-spontaneous chemical agents on Thomas whose known history of decompensation indisputably reveals that his S-3 designation did not accurately represent his mental health status at the times he was sprayed.

Thus, plaintiffs have demonstrated that the DOC acted with deliberate indifference to Thomas' physical and psychological health by repeatedly using chemical agents against Thomas for yelling and kicking and banging in his cell- - behaviors which were consistent with the uncontrollable manifestations of Thomas' serious mental illness- - with the result that, instead of compliance, the force used caused Thomas to suffer serious physical injuries and a further deterioration of his mental health.[47]

Like Thomas, **Michael McKinney** has a disturbing record of serious mental health issues coupled with an extraordinary disciplinary history marked by dozens of non-

---

[47] Defendants have again renewed their motion for judgment as a matter of law as to Thomas (and some of the other plaintiffs) on the ground that he lacks standing because he is not housed at FSP and has not been for many years. As discussed above, and as further noted below, defendants have stipulated that Thomas (and the others) are subject to being transferred back to FSP and indeed, the goal of Thomas' treatment at UCI is to restore his mental functioning to a level that he can be returned to an outpatient facility. Assuming Thomas continues to be a management problem warranting CM housing, FSP would be the likely choice as it is the DOC facility designated to house S-3 status CM inmates. Defendants' renewed motion is again denied as to Thomas.

spontaneous uses of chemical agents for banging and yelling in his cell at FSP and frequent transfers to UCI (see pp. 36-44, supra).  Unlike Thomas, however, whose history of mental illness is noted by some truly bizarre behaviors, McKinney's mental illness is distinguished by a near lifetime of anger and violence against others and himself.  When McKinney was only 16 years old, and already in a DOC facility, a prison psychologist accurately predicted McKinney's sad future, noting he would be difficult to handle as an inmate because of his volatile tendencies, anger and anti-social behaviors.

McKinney presents a particularly difficult case.  The apparent markings of his mental illness are seemingly indistinguishable from the recalcitrant behaviors security staff attempt to control through the use of non-spontaneous force.  On the one hand, the mental health professionals who treated McKinney at FSP regularly found him to be appropriately designated and returned him to the wing.  Even Dr. Hall, whose intervention on McKinney's behalf during his review for this case resulted in McKinney being transferred to UCI, continues to believe that McKinney's behavior did not indicate any acute impairment. Rather, testified Dr. Hall, it simply became clear that McKinney required a "more structured and intensive setting" than FSP provides.  Dr. Burns likewise found that McKinney's behavior would not likely trigger security staff to question whether he was experiencing acute symptoms of mental illness because, from security's perspective, his behavior was "bad and disruptive."   Although Dr. Burns testified that McKinney was "likely symptomatic" on occasions that he was sprayed, mental health providers at FSP failed to see that and continued to assess McKinney as being angry and poorly adjusted rather than acutely mentally ill.   McKinney's files show that unless he undertook some particularly self-

destructive action that clearly indicated a crisis (like repeatedly banging his head on a steel bunk), mental health providers continued to interpret his behaviors as anger and adjustment problems, rather than as acute and uncontrollable symptoms of serious mental illness.

On the other hand, however, a review of McKinney's incredible disciplinary history, which included frequent non-spontaneous uses of chemical agents while he was at FSP, his regular transfers between UCI and FSP, and his repeated episodes of violence toward himself and others leads the Court to conclude that DOC officials turned a blind eye for McKinney's situation to have escaped much earlier and closer attention. Although the behaviors that finally prompted Dr. Hall to intervene are no different than those other mental health providers at FSP have seen all along, McKinney's history demonstrates that DOC officials ignored the presence of an obvious danger to McKinney's well-being as evidenced by the repeated cycle of transfers between FSP and UCI, the 36 times McKinney was sprayed while at FSP and his numerous violent attempts and threats to injure himself, many of which closely followed the times McKinney was sprayed. Dr. Burns noted McKinney as an example of an inmate who "slip[ped] through the cracks" of the mental health services provided at FSP, even accounting for the additional services more recently provided. Doc. 425 at Tr. 108-09. Moreover, in addition to the temporary physical effects of the chemical agents (which were undoubtedly exacerbated by McKinney's regular refusal to participate in decontamination procedures), the record supports that McKinney suffered lasting psychological injuries from the repeated sprayings. Thus, given the severity of the picture painted by his history of incarceration at FSP, the DOC policy as applied to McKinney resulted in a failure to recognize at an earlier date that something more was needed to treat

McKinney than would be available for an inmate with an S-3 designation.[48]  On this record, the Court finds the DOC officials acted with deliberate indifference to the severe risk of harm Michael McKinney faced when officers repeatedly sprayed him with chemical agents at FSP for behaviors caused by his mental illness.

As to **Antonio Ward**, the factual findings show that although his mental health has been somewhat unstable, there is not a pattern linking the uses of chemical agents for refusing orders to stop kicking and yelling and any marked deterioration in his mental health status.  Mental health professionals who provided Ward with regular treatment during his time at FSP generally found that he was appropriately housed in an outpatient facility such as FSP and, unlike Thomas and McKinney, Ward's file does not reflect repeated cycles of decompensation that would give notice to DOC officials that his S-3 designation was not accurately capturing the instability of his mental health.  The only occasion on which Ward was sprayed that gives the Court pause is the April 5, 2005 incident, which was couched

_____

[48]As noted elsewhere in this opinion, the recent Osterback opinion determined that the general delivery of mental health services to inmates housed on CM wings within the DOC system satisfies constitutional standards.  549 F.Supp.2d 1337.  Indeed, plaintiffs were at pains to remind the Court that they were not seeking in this case to challenge the mental health classification system used by the DOC.  Nonetheless, for Michael McKinney, this system failed to account for his frequent violent episodes of decompensation that rendered him unable to conform his behavior to comply with orders to stop yelling and banging.  Indeed, McKinney's case appears to be consistent with an apparent rise in the need for prisons to develop more specialized plans for the treatment of aggressive mentally ill inmates.  See, e.g., Gates v. Gomez, 60 F.3d 525, 528 (9th Cir. 1995) (describing "Management of Aggressive Behavior" techniques used by psychiatric prison facilities to manage aggressive behavior); Gaines v. Price, No. 2:00-cv-0372, 2002 U.S. Dist. LEXIS 3435, at *2 n.1 (N.D. Tex. Mar. 1, 2002) (describing "Program for the Aggressive Mentally Ill Offender," an alternative to administrative segregation for the aggressive mentally ill offender who does not benefit from traditional programs).

between two mental health emergencies (one five days earlier and one the day after which resulted in a transfer to UCI).  However, this one incident does not persuade the Court that Ward was sprayed with chemical agents at a time that he longer had the capacity to conform his conduct, nor does it cause the Court to conclude that DOC officials were deliberately indifferent to his situation.  In addition, Ward has failed to demonstrate that he suffered psychological or physical injuries of a magnitude to warrant constitutional concern.  Although Dr. Burns found Ward suffered anxiety and fear when sprayed, it is not clear that his longer lasting symptoms are a result of these incidents.  To the extent Ward has any physical injuries, the record does not show that they were exacerbated or created by chemical agents.  Thus, Ward has not demonstrated that the sprayings at FSP establish a violation of his Eighth Amendment rights by the defendant DOC officials.

As to **Paul Echols**, the record fails to demonstrate that he was sprayed with chemical agents at a time that his mental status had decompensated to an extent that he could not control his behavior.  While the number of times Echols has been sprayed is unfortunate, the record fails to show a connection with his mental state at the time and therefore no constitutional violation has been proven.

As to **Reginald Williams**, the lack of evidence as to William's mental health status or the circumstances as to why he was sprayed with chemical agents at FSP preclude finding any constitutional violation on this record.[49]

---

[49]The Court therefore need not address defendants' renewed motion for judgment as to Williams on standing grounds.  See Doc. 433 at 36-37.

As to **Kelvin Frazier**, in their second amended complaint, plaintiffs allege that Frazier suffers from asthma, that chemical agents aggravate his condition, and that correctional officers applied chemical agents to Frazier with malicious and sadistic intent to harm him. While those allegations, if proven, might support a cause of action against correctional officers or even DOC officials, the case that was tried to this Court and the relief plaintiffs seek is limited to matters involving inmates whose mental illness allegedly prevented them from controlling their behavior to accord with prison requirements.  Frazier does not fit that category.[50]

## C.  Entitlement to Injunctive Relief

Having found that plaintiffs Jeremiah Thomas and Michael McKinney have demonstrated Eighth Amendment violations, the Court must next determine whether they are entitled to injunctive relief.  As noted above, the Court must evaluate whether policy changes implemented since this litigation began would completely and irrevocably eradicate any reasonable expectation that a violation would recur.  Hall, 656 F.2d at 1000-01. Defendants bear the burden of demonstrating that an injunction is unnecessary to protect Thomas and McKinney from further violations. LaMarca, 995 F.2d at 1541.  Defendants maintain no present intention of returning Thomas or McKinney to FSP and the testimony largely supports a conclusion that inmates housed at FSP under the policies enforced there today,[51] are not subject to the recurring cycle of sprayings and transfers.  Nonetheless, for

---

[50]Defendants' renewed motion for judgment as to Frazier is likewise moot.

[51] Many of these were enacted as recently as July 31, 2008.

several reasons, defendants have failed to carry their burden of proving that an injunction is not necessary.

First, defendants have stipulated that Thomas and McKinney (as with all the other plaintiffs) are subject to being returned to FSP. Indeed, the goal of their treatment at UCI is to restore their mental health to a state that they can manage their behavior in an out-patient facility. Because FSP is both their sending institution and the DOC's designated facility for housing S-3 CM inmates, if they are transferred, FSP is where they would likely be due to go. The return of former plaintiff Eugene Ulrath to FSP a mere sixteen days after the DOC announced it had "no present intention" to return him to FSP further underscores this point. See Doc. 253, Ex. A; Doc. 421, Ex. 22 at BATES 2200045.

Second, if Thomas or McKinney were returned to FSP and a mental health professional recognized that they needed to be transferred back to UCI, the transitional housing created on O-Dorm would prevent them from being sprayed, but the N-Dorm housing, where inmates spend a 90 day transition period upon arrival at FSP, still leaves it to the discretion of security staff to determine whether to call mental health for consultation. Although the security staff who come to N-Dorm are now trained in crisis intervention techniques, that training does not transform them into mental health professionals capable of distinguishing between behaviors that are merely recalcitrant (such as yelling because food is cold) and those that are signs of acute mental illness (such as yelling at auditory hallucinations). Importantly, the CIT trained staff do not have access to an inmate's mental health records, as would a mental health professional, and are therefore not able to review an inmate's history as a tool to assist in appropriately evaluating the situation. Moreover, Dr.

71

Hall testified that security staff are not able to perform the functions of both security and mental health services.[52]   Thus, if Thomas or McKinney did not display symptoms recognizable to security staff as acute illness, they would be subject to being sprayed with chemical agents for a refusal to stop yelling and banging in their N-Dorm cells.  If Thomas or McKinney made it through the 90 day N-Dorm transition period and returned to the CM-wing, they would be subject to the same conditions as when they were housed there before,[53] except that the post use of force mental health evaluation now in place would hopefully trigger closer scrutiny if they were sprayed on repeated days.  Thus, the Court cannot say that the policy changes at FSP with regard to mental health treatment, though salutary, would protect Thomas and McKinney from being sprayed if their mental illnesses again prevented them from complying with orders to stop yelling and banging in their cells.

Moreover, even assuming <u>arguendo</u> that these new DOC policies would sufficiently protect Thomas and McKinney from repeated Eighth Amendment violations, the history of policy changes at FSP leaves the Court with little assurance that any changes there are

_____

[52]To further illustrate this point, Dr. Burns noted that the use of force reports prepared by security staff usually summarized events, remarking only that an inmate "was yelling," to indicate that an inmate was causing a disturbance that needed to be quelled, whereas a mental health provider seeing the same inmate moments later would note, for example, that an inmate "was yelling that he was Hitler."  Doc. 425 at Tr. 177-81.  Dr. Burns explained that because security staff are not mental health professionals, they are simply not trained to listen for and document behaviors that might signal mental health decline.  <u>Id.</u>

[53]Notwithstanding the "<u>Osterback</u> training," unless an inmate is exhibiting bizarre behaviors or behaviors that are unusual for that inmate, he is presumed to be capable of conforming his conduct and will be subject to a use of force for causing a disturbance if he cannot.  Sergeant Musselman, who received the <u>Osterback</u> training, testified that he is not able to distinguish between recalcitrance and acute signs of mental illness.

permanent.  For example, even though the DOC issued at least three memos between July 20, 1999 (three days after the death of Frank Valdes) and September 8, 1999 regarding the need to videotape all uses of force, by October 26, 1999, FSP had secured an exception to that policy such that videotaping of the non-spontaneous administration of chemical agents at FSP was no longer required.  Doc. 421, Ex. 35 at BATES 3500016.  This demonstrates that even where a system-wide policy is in place, institutional exceptions can be made.  In addition, nurse Tina Battles testified that the former FSP practice of having mental health staff provide medical staff with a list of at-risk inmates was abandoned with a change of wardens.  Likewise, former warden McAndrew gave testimony as to policies regarding mental health intervention that were apparently abandoned when McAndrew left. Furthermore, during the course of this litigation, the way security historically viewed an open food flap unexpectedly changed from an incident meriting only the non-spontaneous use of force to one allowing an immediate use of force.  This policy change was effected by verbal communication among the staff.  While the Court is not questioning the bona fides of that particular decision nor the manner in which it was conveyed, it nonetheless demonstrates that the policies are fluid.[54]  Finally, DOC has not stated that the recent policy changes are permanent.

For these reasons, the Court finds defendants have failed to carry their burden of demonstrating that an injunction need not issue.  Defendants are to be provided with an

---

[54]The Court is also mindful that some of the recent positive changes with regard to mental health treatment of inmates were apparently only undertaken in response to the <u>Osterback</u> litigation (and perhaps this litigation).

opportunity to frame appropriate terms of an injunction in favor of Jeremiah Thomas and Michael McKinney to which these two plaintiffs shall be afforded a chance to respond before the Court rules on the terms. <u>See</u> 18 U.S.C. § 3626(a)(1).

### III. Conclusion

This case has shown that there is disagreement among both correctional and mental health professionals concerning the difficult issue of how mentally ill inmates can properly be disciplined. There are those who think that DOC's policies in this regard (even as recently reformed) are unenlightened; others view them as acceptable. However, the Court is keenly aware that it is not the Court's function to determine correctional best practices. Rather, the only question presented here is whether the inmates who brought this lawsuit and proceeded to trial have demonstrated that the repeated chemical sprayings they received pursuant to the DOC's policies at Florida State Prison violated the Eighth Amendment. Based on the law and the evidence, the Court concludes that the DOC's policies as applied to Jeremiah Thomas and Michael McKinney resulted in violations of their Eighth Amendment rights. The DOC officials must therefore be enjoined from doing so again. Plaintiffs Antonio Ward, Paul Echols, Reginald Williams and Kelvin Frazier have not proven an Eighth Amendment violation. Accordingly, it is hereby

**ORDERED**:

1. Judgment will be entered in favor of defendants Walter McNeil and Randall Bryant and against plaintiffs Antonio Ward, Paul Echols, Reginald Williams and Kelvin Frazier.

2.     Judgment will be entered in favor of plaintiffs Jeremiah Thomas and Michael McKinney and against defendants Walter McNeil and Randall Bryant.

3.     The Clerk is directed to reserve entry of judgment until further Order to follow once the terms of an injunction are settled.

4.     The parties are directed to confer for the purposes of attempting to reach an agreement on the proposed terms of an injunction.  No later than **February 10, 2009** defendants shall submit their proposal, indicating whether it is one to which plaintiffs have agreed.  In the event the parties are unable to agree to terms, plaintiffs shall be given until **February 24, 2009** to submit their objections to defendants' proposal.[55]  Absent extraordinary circumstances, no extensions of these deadlines will be given.

**DONE AND ORDERED** at Jacksonville, Florida this 9th day of January, 2009.

TIMOTHY J. CORRIGAN
United States District Judge

s.
Copies:

counsel of record

---

[55]Any party may request a hearing on this issue.