# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

MAXIME THOMAS on behalf
of the estate of Jeremiah Thomas,
MICHAEL MCKINNEY,
Plaintiffs,                                        Civil Action No. 3:04-cv-917-J-32TJC-JRK

v.

EDWIN G. BUSS, Secretary of the Florida Department
of Corrections, in his official capacity, et. al.
Defendants.
_____

## PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND MEMORANDUM OF LAW IN SUPPORT

As the prevailing parties in this civil rights action, Plaintiffs Jeremiah Thomas and

Michael McKinney (collectively "Plaintiffs"), by and through undersigned counsel, move

this Court pursuant to 42 U.S.C. §1988, Rule 54, Federal Rules of Civil Procedure, and Local

Rule 3.01 to enter an Order awarding Plaintiffs reasonable attorneys' fees in the amount of

$2,486,942.33, an amount fully supported herein.  Plaintiffs make this Motion after

significant consideration and reductions of hundreds of thousands of dollars of compensable

time, all reimbursable expenses, and taxable costs.  See Summary of Fees and Costs Request,

Ex 1.  In support of this motion, Plaintiffs set forth the following grounds demonstrating their

entitlement to attorneys' fees.

## MEMORANDUM OF LAW

### I.      INTRODUCTION

After years of shocking abuse, Jeremiah Thomas and Michael McKinney, both seriously mentally ill inmates, established in this litigation that the Florida Department of Corrections (FDOC) violates the Constitution when it uses chemical agents to compel a known mentally ill inmate to comply with a command that he cannot understand or follow due to incapacity. The District Court and the Eleventh Circuit found that Thomas and McKinney were each gassed repeatedly without mental health consultation while demonstrating unambiguous symptoms of their mental illness and of decompensation. They repeatedly suffered the pain, panic, and anxiety that Defendants intended the chemical agents to cause. This Court entered injunctive relief to protect Thomas and McKinney from being unconstitutionally gassed again. The Eleventh Circuit agreed that this injunctive relief was necessary to prevent Defendants from repeatedly violating Plaintiffs' constitutional rights. Thomas was not gassed between the entry of the injunction and the date of his death.[1] McKinney has not been gassed since the entry of the injunction. Moreover, the injunctive relief issued by the District Court represents an excellent and significant result following years of litigation, establishing the principle that mentally ill inmates should not be subject to the planned use of force when they are unable to conform their behavior to institutional standards. See Declarations of Margaret Winter (Ex. 2 at ¶7), John Boston (Ex. 3 at ¶¶6-16), and William Sheppard (Ex. 4 at ¶¶12-13).

While not a class action, this litigation has resulted in a major reduction in the use of chemical agents against mentally ill inmates at Florida State Prison (FSP). Pursuant to their policy of allowing the use of chemical agents against known mentally ill inmates without an

---

[1] Mr. Thomas died on May 16, 2010 while in DOC custody. This Court granted a timely Motion to Substitute Maxime Thomas, Jeremiah Thomas' father, on February 22, 2011. Docs. 458, 476.

assessment by mental health staff, Defendants used chemical agents non-spontaneously at FSP over 1,958 times in the four years prior to the filing of this litigation. In contrast, Defendants used chemical agents at FSP non-spontaneously only nine (9) times in the six months prior to trial. Trial Transcript IV at 169-170.

This was a case of first impression. Ex. 3 at ¶7. Litigating novel Eighth Amendment issues demands an extraordinary commitment of personnel, time, and resources. Counsel broke new ground to achieve relief for Plaintiffs McKinney and Thomas, who were at constant risk of being abused with chemical agents when they were decompensating. The intensity, nature, and the sheer number of complaints against FDOC required frequent and often time-sensitive client contact with FSP inmates, including those who had been transferred to Union Correctional Institution (UCI). The litigation also required extensive review of documents, including proactive use of the public records laws throughout, to obtain information about current use of force. It was also necessary to creatively utilize resources and contacts to establish relationships with key witnesses, including former FDOC employees. The time and resources that counsel put into developing this litigation, defending against Defendants' several Motions for Summary Judgment, preparing for trial, and defending this Court's judgment on appeal has resulted in the protection of Plaintiffs Thomas and McKinney and is a clear shift in practice, if not policy, regarding the planned use of chemical agents against inmates who are known to be mentally ill.

## II. OVERVIEW OF LITIGATION

## A.  PLAINTIFFS THOMAS AND MCKINNEY

Plaintiff McKinney has a history of severe mental illness.  During his tenure in FDOC he has been repeatedly transferred between FSP and the UCI inpatient care unit often as a result of being gassed at FSP.  Defendants commonly referred to individuals who were repeatedly transferred like this as "frequent fliers."  Prior to and even during the instant litigation, FSP officers gassed him over 29 times (often repeatedly on the same day or on consecutive days) when he was showing clear signs of decompensation.  The officers acted pursuant to Defendants' policy that allows the use of chemical agents against known mentally ill inmates without any prior contemporaneous mental health evaluation.  See Doc. 434 at 36 – 44 for a detailed discussion of McKinney's background.

Plaintiff Jeremiah Thomas had a long and marked history of severe mental illness during his incarceration in FDOC.  Thomas' symptoms and signs of mental illness were unambiguous and he often decompensated suddenly and without warning.  He was repeatedly transferred between FSP and the inpatient unit at UCI, and was known to be a "frequent flier."  Despite FDOC's knowledge of his mental illness, Thomas was gassed over 20 times at FSP, including repeatedly during the same day and on consecutive days.  Thomas was gassed even though medical staff contemporaneously noted that he was showing signs of decompensation and that his skin was burned and blistered from the chemical agents.  See Doc. 434 at 30 – 36 for a detailed discussion of Thomas' background.

## B.  PROCEDURAL HISTORY OF THE CASE

Achieving and defending injunctive relief has been hard-won in what this Court characterized as "a hard case."  Doc. 434.  It is the culmination of over ten years of advocacy.

Plaintiffs' counsel have brought the issue of abuse of mentally ill inmates with chemical agents to the attention of Defendants in this and other fora. The first attempt to address the issue was in <u>Osterback v. Crosby</u>,[2] a class action filed in March of 1999 that challenged the conditions of confinement of mentally ill inmates in Close Management, the severely restrictive isolation in which Thomas and McKinney were housed when repeatedly gassed. Counsel attempted to resolve chemical agents abuse in <u>Osterback</u> in June 2001, but FDOC was not willing to address the issue. <u>See</u> Declaration of Randall Berg, Jr., (Ex. 5 at ¶8). Instead, during the pendency of the <u>Osterback</u> injunction between 2000 and 2004, the planned use of chemical agents against inmates at FSP, including inmates Thomas and McKinney, increased over 157%. In fact, all of the repeated uses of chemical agents against Plaintiff Thomas, and many of those against Plaintiff McKinney, that gave rise to the successful claims in this matter against FDOC occurred in 2000 and 2003, while the <u>Osterback</u> injunction was in effect. Defendants' refusal to even discuss the issue resulted in continued abuse of mentally ill inmates with chemical agents.

Plaintiffs' counsel next attempted to prevent FDOC from abusing mentally ill and other inmates system-wide with the planned use of chemical agents in <u>Brown v. Crosby</u>.[3] <u>Brown</u> was filed in September 2003 as a class action seeking only declaratory and injunctive relief. Defendants again flatly refused to address the increasing abuse of mentally ill inmates and ultimately successfully opposed Plaintiffs' motion for class certification.

---

[2] Case No. 3:04-cv-210-J-25MCR (FLMD).

[3] <u>Brown v. Crosby</u>, et. al., Case No. 2:03-cv-526-FtM-29DNF (FLMD).

In addition to <u>Osterback</u> and <u>Brown</u>, the Correctional Medical Authority (CMA)[4] expressed in its reports the same serious concerns Plaintiffs ultimately raised and proved in the instant litigation.  In its 2002/2003 report, the CMA found that chemical agents were being inappropriately used on inmates in confinement settings resulting in serious medical consequences including chemical burns, and the exacerbation of mental health symptoms, which in one instance led to an inmate's suicide.  This concern was reiterated in the CMA's 2003/2004 report, but the FDOC ignored it.  The CMA also issued a 2005/2006 report advising FDOC that mentally ill inmates suffer symptoms that result in behaviors such as yelling incessantly or refusing to obey orders and may have difficulty following "the strict rules of a prison setting."  The CMA cautioned that security staff may respond inappropriately in ways that "aggravate the prisoner's conduct."  The CMA suggested that the FDOC improve the situation by considering adopting confrontation avoidance techniques including requiring mental health consultation before the planned use of chemical agents. FDOC again ignored these recommendations.

The abuse of severely mentally ill inmates with chemical agents was particularly striking at FSP given the institution's history of abuse and change in its mission.  As a result of the <u>Osterback</u> litigation, FDOC chose to designate FSP as an institution that would house a majority of mentally ill inmates in Close Management (CM) or long-term isolation units even though FSP has a notorious history of officer brutality against inmates, including the beating

---

[4] The CMA was created in 1986 by the Florida legislature as an independent agency to monitor the delivery of health care services in Florida's prisons.  It was given survey authority as part of the resolution in <u>Celestino and Costello v. Singletary</u>, 147 F.R.D. 258 (M.D. Fla. 1993) (known as the Costello litigation), class action litigation that challenged the lack of mental health and medical care throughout the FDOC.

death of inmate Frank Valdez in 1999.  Despite this pattern, FDOC failed to prevent the abuse of Plaintiffs at FSP, going so far in their indifference in the months and years after Valdez's death and the subsequent designation of FSP as the CM institution for mentally ill inmates to remove the requirement that planned uses of chemical agents be videotaped.

FDOC's refusal to attempt to resolve the known problem of abuse of mentally ill inmates with chemical agents is particularly significant since this is an issue that ought to have been resolvable without litigation.[5]  FDOC policy requires that officers ask medical staff whether an inmate has a medical contraindication to the use of chemical agents prior to using them against him; why would FDOC be so resistant to implementing a similar safeguard for inmates with severe mental health conditions, especially given their knowledge that mentally ill inmates can decompensate suddenly and without warning?

In response to FDOC's continued abuse of mentally ill inmates at FSP and continued refusal to change its policies and practices, Plaintiffs filed the instant litigation on September 20, 2004.  Plaintiffs' intention was to establish a landmark legal principle that would protect Plaintiffs from further abuse with chemical agents as punishment for demonstrating symptoms of their known mental illness.  The strength of Plaintiffs' commitment was mirrored by Defendants' commitment to defending their policies and practices regarding use of chemical agents and led to seven more years of intense litigation and of suffering for the Plaintiffs, as McKinney was gassed many times during the instant case.

---

[5] Plaintiffs' counsel spent approximately 700 hours in attempting to resolve this issue through mediation and settlement conferences.

In its initial Complaint, damages claims were alleged against 27 Defendants resulting from Defendants' use of chemical agents against Plaintiffs. Plaintiffs were all mentally ill inmates in the custody of FDOC who had been subjected to non-spontaneous uses of chemical agents while housed at FSP by officers pursuant to Defendants' policies. At the time chemical agents were used against them, Plaintiffs were housed alone in small cells with solid steel doors. Plaintiffs were repeatedly transferred in and out of inpatient care after being gassed with chemical agents at FSP. When they returned to FSP, they were often gassed again within days or hours, often leading to decompensation.

Defendants responded to Plaintiffs' complaint by refusing to waive service (and in some cases challenging service made), which resulted in months spent tracking down individual Defendants.[6] Defendants also unsuccessfully moved to stay the litigation based on the pendency of the Brown v. Crosby litigation.

Plaintiffs filed their Second Amended Complaint seeking injunctive relief, declaratory relief, and damages on February 14, 2006 after the Brown v. Crosby litigation was voluntarily dismissed. Defendants unsuccessfully moved to dismiss Plaintiffs' Second Amended Complaint. When that Motion was denied, they unsuccessfully moved for reconsideration of their Motion to Dismiss. One Defendant filed an unsuccessful Motion for Qualified Immunity and took an interlocutory appeal to the Eleventh Circuit Court of Appeals, which was also unsuccessful.

---

[6] Much of this time has been discounted as part of the exercise of billing judgment; additional time spent locating Defendants was done by volunteers and not charged.

On June 29, 2006, the parties engaged in mediation. Plaintiffs' expert Chase Riveland, then-FDOC Secretary James McDonough, and counsel for the parties attended the mediation, held in Tallahassee for the convenience of the Secretary, with mediator Terrance Schmidt. This mediation was unsuccessful.

Plaintiffs diligently pursued discovery while continuously attempting to amicably resolve the case. Counsel reviewed extensive document production, took many depositions of officers, witnesses, and Defendants' experts, and defended the multiple depositions of Plaintiffs and their experts. Plaintiffs were also compelled to respond to one Defendant's ultimately unsuccessful Motion to Disqualify Holland & Knight as Co-Counsel.

After the close of discovery, Defendants filed eight Motions for Summary Judgment. Plaintiffs filed an extensive response. Defendants filed Motions to Strike Plaintiffs' Exhibits and also filed Replies to their Motions for Summary Judgment, to which Plaintiffs responded. After a hearing on November 1, 2007, this Court denied Defendants' Motions.

The parties attended a second court-ordered mediation regarding injunctive relief with the Honorable Harvey E. Schlesinger on January 10, 2008. Secretary McDonough was again in attendance, but he had just publicly announced his retirement from his position as FDOC Secretary the evening prior to the mediation and the parties were unable to reach a resolution. The parties attended a third  mediation during January 2008 where the damages claims were discussed. The parties filed stipulations of dismissal of all Plaintiffs' damages claims which the Court granted on May 28, 2008.

The parties finally tried Plaintiffs' claims for declaratory and injunctive relief in September 2008. During the five-day bench trial, Plaintiffs presented the testimony of

twelve witnesses, live and by deposition, including three experts. On January 9, 2009, this Court issued a 75-page findings of fact and conclusions of law in Plaintiffs' favor. Doc. 434. On March 9, 2009, this Court issued a final judgment that incorporated the findings of fact and conclusions of law and held that "the [Florida] DOC's [Department of Corrections] policies [on chemical sprayings] as applied to [plaintiffs] Jeremiah Thomas and Michael McKinney resulted in violations of their Eighth Amendment rights." Doc. 443 <u>citing</u> Doc. 434 at 74. The Court found that Defendants "acted with deliberate indifference to the severe risk of harm to plaintiffs Thomas and McKinney when DOC officers repeatedly sprayed plaintiffs with chemical agents for behaviors which were caused by their mental illnesses and over which they had no control" (Doc. 443 at 1) and requested that Defendants advise the Court of proposed terms for injunctive relief. Doc. 434. Defendants refused to comply with this Court's request. Doc. 439. Instead, Defendants filed a Motion to Amend this Court's Findings of Fact and Conclusions of Law, arguing that the Court's findings and conclusions were erroneous. Doc. 436. Plaintiffs opposed (Doc. 436) and the Court denied Defendants' Motion (Doc. 440).

The Court ultimately issued the following injunctive relief:

In the event that plaintiffs Jeremiah Thomas or Michael McKinney are placed in the Florida State Prison (FSP) Close Management (CM) wing, defendants Walter McNeil, as Secretary of the Florida Department of Corrections, and Randall Bryant, as Warden of the Florida State Prison, in their official capacities, are enjoined from allowing the non-spontaneous application of chemical agents to plaintiffs Thomas or McKinney without first consulting with DOC's trained mental health staff so that a mental health professional can determine whether the application of the chemical agents is dangerous to the inmate's wellbeing, likely to exacerbate the current crisis or whether, on account of mental illness, the inmate is currently unable to conform his conduct to comply with the directives being given to him

> by correctional staff. Once contacted, the mental health professional
> will use his or her professional judgment to determine whether the
> non-spontaneous use of chemical agents is contraindicated for that
> inmate at that time (similar to the prior consultations which now
> occur with medical staff before non-spontaneous application of
> chemical agents is permitted). If, after consultation, the mental
> health professional deems the use of chemical agents to be
> contraindicated, chemical agents may not be employed at that time.

Id. at 4-7. The injunction went into effect immediately. Defendants appealed to the Eleventh Circuit, which did not stay the application of the injunction. While the Appeal was pending, and just prior to oral argument, Plaintiff Thomas died while in FDOC custody on May 16, 2010. Defendants filed a Suggestion of Death with the Appellate Court and with this Court. Doc. 457. Plaintiffs filed a timely Motion to Substitute Maxime Thomas, Jeremiah Thomas' father, with the District Court. Doc. 458.

The Eleventh Circuit affirmed this Court's judgment on August 20, 2010. Defendants moved for reconsideration, which the Eleventh Circuit denied on October 25, 2010. Plaintiffs' counsel forwarded a proposal for resolution of the issue of attorneys' fees in satisfaction of Local Rule 3.01(g) to Defendants' counsel on December 9, 2010, but Defendants have not responded substantively. This Court granted Plaintiffs' Motion to Substitute on February 22, 2011, and set a schedule for resolution of the pending matters .[7] Doc. 476.

## C.     PLAINTIFFS' LITIGATION TEAM

The lawyers in this case were not only competent, but expert in performing the tasks assigned. The success of this litigation was brought about in large part by the combination of

---

[7] On January 26, 2011, the Eleventh Circuit issued an Order granting Plaintiffs' motion to transfer application for appellate attorneys' fees to the District Court. Doc. 474.

public interest attorneys with expertise in prison litigation at Florida Institutional Legal Services (FILS) and Florida Justice Institute (FJI) working together with the Holland & Knight private practitioners, who have extensive experience in complex litigation.

FILS is a non-profit, 501(c)(3) corporation that has been providing civil legal assistance to indigent people in state custody for over 30 years.  See Declaration of Christopher Jones (Ex. 6).  FILS specializes in complex litigation challenging unconstitutional institutional conditions and practices.  The FILS attorneys all had experience representing mentally ill and other prisoners in complex civil litigation.

FJI is a not-for-profit, public interest law firm which was established to in part challenge unconstitutional conditions of confinement in Florida's prisons and jails.  See Ex. 3.  FJI normally maintains a docket of approximately forty active civil rights cases, most of which are brought in federal courts for prisoners.  Id.  FJI also started and directs the Volunteer Lawyers' Project for the U.S. District Court for the Southern District of Florida (VLP) pursuant to an Administrative Order.  Id.  The FJI attorneys all had extensive experience litigating a range of civil rights cases.

FJI and FILS developed and initiated the instant litigation during its initial stages as the result of our co-counseling in Osterback and Brown, two class actions concerned with FDOC's mistreatment of mentally ill inmates.  Ex. 3 at ¶8.  As the litigation progressed, FJI and FILS requested Holland & Knight's Community Services Team's assistance.  Id. at ¶9.

One of Holland & Knight's most experienced trial lawyers, George E. "Buddy" Schulz, Jr., participated in investigation and analysis of the facts and issues and agreed to dedicate the firm's significant resources and experience as lead counsel to this litigation.  See

Declaration of George E. "Buddy" Schulz, Ex's. 7 at ¶3 and 7-A. Having this fine law firm and experienced trial and appellate lawyer as lead counsel in Jacksonville significantly benefitted this litigation. Mr. Schulz enlisted Melinda Higby, an experienced litigation paralegal (Ex. 7-C), and Leon Fresco (Ex. 7-D), a Chesterfield Smith Fellow, to participate in the litigation. The Holland & Knight team worked tirelessly with FILS and FJI as well as with experts, consultants, witnesses, law students and other colleagues to successfully prosecute this litigation to establish Plaintiffs' constitutional rights. Ex. 7 at ¶4. Each attorney and paralegal played a discrete role in contributing to Plaintiffs' success.

Lisa Shirley served as co-counsel when the instant case was filed in September 2004 through her departure from FILS in 2006. See Ex. 6-B. In 2000, Ms. Shirley joined FILS with a National Association for Public Interest Law (NAPIL) Fellowship to focus on guard brutality. She became a staff attorney with FILS in 2002 and continued her work challenging the use of force against vulnerable inmates. Ms. Shirley was instrumental in developing the foundation for the litigation, in discovery, and in working with experts. Ex. 6 at ¶ 10. For example, she took the photographs of Plaintiffs that were key evidence in this matter.

Cassandra Capobianco served as co-counsel for the entire length of the case. See Ex. 6 at ¶6. Ms. Capobianco joined FILS in 2002 with a NAPIL fellowship to focus issues related to mentally ill inmates. Ex. 6-C. She became a staff attorney with FILS in 2004. Kristen Lentz also served as co-counsel for the entire length of the case. See Ex. 6 at ¶7. In 2003, Ms. Lentz joined FILS with an Equal Justice Works fellowship with a focus on treatment issues related to institutionalized people. Ex. 6-D. She became a staff attorney in

2005 and became managing attorney in 2007. Ms. Lentz took a more active role in the litigation after attorney Shirley left FILS.

Ms. Capobianco and Ms. Lentz were primarily responsible for working with the individual Plaintiffs throughout the litigation. Ex. 7 at ¶9. FILS had developed a unique relationship with inmates, had coordinated the contact between Plaintiffs' legal team and the inmate Plaintiffs and witnesses, and had, throughout the years of litigation, maintained responsibility for interviewing inmate Plaintiffs and witnesses. Exs. 2 at ¶8, 6 at ¶9, and 7 at ¶9. So they, with periodic necessary assistance from others, took primary responsibility for the inmate Plaintiffs and witnesses, as well as the many thousands of pages of records associated with them. Id. Ms. Capobianco and Ms. Lentz also drafted discovery requests, including requests for production and interrogatories. Ex. 7 at ¶12. With the assistance of Ms. Higby of Holland & Knight, they were responsible for managing discovery requests and responses, ensuring discovery was complete, and initiating steps to compel when necessary. Ms. Capobianco, Ms. Lentz and FILS attorney Kara Coggins (Ex. 6-E) were responsible for witnesses related to medical and mental health issues throughout the litigation. Ex. 7 at ¶20.

Randall Berg is the Executive Director of the Florida Justice Institute, Inc.. Ex. 5-A. Mr. Berg has held that position since establishing FJI in 1978. He took an active role throughout the litigation, with a focus on preparing and examining the correctional expert witnesses for both Plaintiffs as well as for the FDOC. Ex. 5.

Peter Siegel was a Senior Staff Attorney at FJI for 24 years until his retirement from

the practice of law on December 31, 2006. Ex. 5-B. Mr. Siegel practiced law for 41 years. He was instrumental in the initial development this litigation and was involved in drafting pleadings, interviewing clients at the outset, and participating in discovery. Ex. 5 at ¶13.

Joshua Glickman has been a Staff Attorney at FJI for over three years. Ex. 5-C. He started work on this lawsuit while in law school after working with the Vera Institute of Justice on a national prison commission. Mr. Glickman participated in many aspects of the litigation. Ex. 5 at ¶15. At trial, Messrs. Berg and Glickman took responsibility for security witnesses and experts' direct and cross examinations.

Lead counsel Mr. Schulz has nearly 40 years of experience leading teams of lawyers, paralegals, experts and consultants in the trial of numerous cases against governments, Fortune 500 companies, and other substantial adversaries. Ex. 7-A. Mr. Schulz had the overall responsibility to oversee and coordinate this litigation. Ex. 7 at ¶22. He was responsible for managing all aspects and phases of the litigation, for developing the overall litigation plan and strategy, for identifying experts to undertake each component, for assigning and supervising most tasks, and for coordinating the work of the litigation team. At trial, Mr. Schulz took primary responsibility for the opening statement and for introducing Plaintiffs' case theories, facts and exhibits through adverse witness, George Sapp. Id. at ¶10.

Leon Fresco joined Holland & Knight in 2005 as a Chesterfield Smith Fellow. Ex. 7-B. Prior to this, he clerked for the Honorable Daniel Hurley in the Southern District of Florida. Mr. Fresco was primarily responsible for toxicity and effect of chemical agent issues in discovery and at trial. Ex. 7 at ¶17. Holland & Knight, and particularly Mr. Fresco, with assistance from others, took responsibility throughout this litigation for legal analysis

and post-trial findings of fact and conclusions of law.  Id. at ¶21.  Given the extensive nature

of these tasks and oftentimes the limited time available, the legal team contributed to these

submissions as necessary.  On appeal, due to the departure of Mr. Fresco from Holland &

Knight, Laurie Webb Daniel,[8] (Ex. 7-E), who leads Holland & Knight's appellate practice,

took primary responsibility for Plaintiffs'/Appellees' briefs.  Ex. 7 at ¶21.  Mr. Schulz, with

significant and substantial assistance in preparation from others, participated in oral argument

before the Eleventh Circuit.  Id.

        The role of each lawyer representing Plaintiffs was focused primarily on those areas

where their experience was essential to the performance of the task, including preparing and

presenting trial and argument to this Court; briefing complex and novel legal issues involving

this groundbreaking area of law and the Prison Litigation Reform Act (PLRA);  litigating,

negotiating, and analyzing voluminous discovery, including technical and medical records;

mediating the issues in this case; communicating with mentally ill clients and witnesses;

navigating labyrinthine protocols; utilizing the public records law to keep abreast of current

developments in FDOC policy and practice; and consulting with experts in mental health,

security, and toxicology.  Mr. Schulz drew on each practitioner's strengths in making well-

considered task allocation decisions throughout the litigation that promoted efficiency and

reduced costs by eliminating the necessity for all members of the legal team to participate in

the same task.  Ex.'s. 2 at ¶8 and 7 at ¶8.  Mr. Schulz's litigation management ensured as

much as possible that there would be no unnecessary duplication of effort.  Id.; Ex. 4 at ¶11.

---

[8] Marlysha Myrthil, another Chesterfield Smith Fellow, also assisted substantially with the Appeal.   Plaintiffs
have eliminated all of Ms. Myrthil's time in this matter in the exercise of billing judgment. Ex. 7 at ¶26.

### III.    FEE ENTITLEMENT - PLAINTIFFS ARE THE PREVAILING PARTY

Plaintiffs are the prevailing parties under 42 U.S.C. § 1988 and are entitled to an award of attorneys' fees.  In order to be considered a prevailing party under §1988, the claimant must achieve a "judicially sanctioned change in the legal relationship of the parties."  Buckhannon Board & Home Care, Inc. v. West Virginia Department of Health & Human Services, 532 U.S. 598, 605 (2001).  The Eleventh Circuit holds that in the absence of a judicially sanctioned settlement agreement, there must be a "situation where a party has been awarded by the court at least some relief on the merits of his claim."  Smalbein v. City of Daytona Beach, 353 F. 3d 901, 904-05 (11th Cir. 2003).

Moreover, a person who obtains an injunction should ordinarily be entitled to prevailing party status as a matter of course.  See Virdi v. Dekalb County Sch. Dist., 216 Fed. Appx. 867, 871 (11th Cir. 2007).  A plaintiff must establish that he is at risk of injury in the absence of injunctive relief in order to satisfy jurisdictional standing requirements and be awarded an injunction.  Id.  In other words, a plaintiff seeking injunctive relief must establish that he will benefit from the injunction before such relief can be awarded.

### A.    MCKINNEY AND THOMAS ARE PREVAILING PARTIES BECAUSE THEY SUCCEEDED ON THEIR CLAIMS AND BENEFITED FROM THE INJUNCTION

Plaintiffs Thomas and McKinney each brought claims against Defendants McDonough and Bryant for injunctive and declaratory relief seeking protection from again being harmed with chemical agents while unable to control his behavior because of mental illness.  Doc. 142 at ¶¶ 123, 124, 298, 299, 397-399.  This Court issued an Order containing declaratory and injunctive relief that achieved this purpose in favor of Plaintiffs McKinney and Thomas on

March 9, 2009.  <u>See</u> Doc. 443 (incorporating by reference Doc. 434); Exs. 2 at ¶8 and 3 at ¶13.

The Eleventh Circuit affirmed this Court's Order on August 20, 2010.  Neither McKinney nor

Thomas has been gassed since the entry of this Court's Order.  It is only as a direct result of this

Court's Order that they have been protected from additional abuse with chemical agents.

Prior to this Court's Order, McKinney was moved from FSP to UCI's inpatient unit

after Defendants' own mental health expert recommended that he required inpatient care.

McKinney has remained at UCI for approximately four (4) years.  Thomas was transferred to

UCI after being gassed at FSP twice in 2003.  He remained there until his May 16, 2010 death.

Defendants Buss and Singer served at least eight filings arguing that Plaintiffs lacked standing

for injunctive relief because they were housed at UCI.  Docs. 153, 185, 195, 253, 306, 391, 410,

and 436.  This Court made consistent and extensive findings throughout this litigation, and most

importantly in its Final Order, supporting its conclusion that this Court had a "reasonable

expectation" that the violations of Plaintiffs' rights will recur in the absence of injunctive relief.

Docs. 434 at 35-36, 60, 65, 71, 72, and 73.  The Court found that the length of McKinney's and

Thomas' inpatient stays were anomalous given that stays of just a few months are typical for

FDOC inmates, after which the inmates were returned to their originating institutions (for

McKinney and Thomas, FSP).  Doc. 434 at 36.  FDOC's *stipulated* intention of McKinney and

Thomas' treatment at UCI was that they be returned to FSP.  Doc. 434 at 60.  And, FDOC

stipulated that they could be returned to FSP at anytime.

Defendants also presented this argument in their appeal to the Eleventh Circuit.  In

denying Defendants' appeal, the Eleventh Circuit held *inter alia* that future harm was not

speculative or unlikely, but rather that "DOC's historical treatment of McKinney gives rise to

an inference of future irreparable injury justifying the entry of injunctive relief."[9] Thomas v. Bryant, 614 F.3d 1288, 1319 (11th Cir. 2010). Plaintiffs submit that McKinney and Thomas were not returned to FSP only because of this litigation and Order. If FDOC had chosen to return Thomas or McKinney to FSP, where both would almost certainly have decompensated and been subject to the use of chemical agents, they would have been protected by the safeguards in this Court's injunction. This remains true today for Plaintiff McKinney.

### B. THOMAS IS A PREVAILING PARTY REGARDLESS OF DEATH POST-JUDGMENT

Plaintiff Thomas' death on May 16, 2010 does not change his prevailing party status. The Eleventh Circuit stated, "Thomas may still be a "prevailing party" entitled to attorneys' fees for the costs of the district court litigation notwithstanding his untimely death." Thomas v. Bryant, 614 F.3d at 1295. The Appeals Court reasoned that "[w]hen plaintiffs clearly succeeded in obtaining the relief sought before the district court and an intervening event rendered the case moot on appeal, plaintiffs are still 'prevailing parties' for the purposes of attorney's fees for the district court litigation." Diffenderfer v. Gomez-Colon, 587 F.3d 445, 454 (1st Cir. 2009). Plaintiff Thomas is a prevailing party. See supra at pp. 16-18. He benefited from this Court's injunction for over one year prior to his death in DOC custody. This Court can therefore award fees to Thomas. Thomas v. Bryant, 614 F.3d at 1295.

### IV. METHOD OF FEE COMPUTATION

### A. PLRA

---

[9] While the Eleventh Circuit's analysis was specific to McKinney because of Thomas' death during the pendency of the appeal, the District Court also made these findings regarding Plaintiff Thomas. Doc. 434.

Under the PLRA, fees must be "directly and reasonably incurred in proving an actual violation of the plaintiff's rights" and "proportionately related to the court ordered relief for the violation." 42 U.S.C. §1997(e)(d)(1).

        **1.**        **All requested time entries were directly and reasonably incurred in proving the violations of plaintiffs' rights.**

The District Court in <u>Laube v. Allen</u> recognized that the PLRA standard regarding fees is "not a paragon of clarity." 506 F. Supp. 2d 969, 978 (M.D. Ala. 2007) <u>citing</u> <u>Cody v. Hilliard</u>, 304 F. 3d 767, 776 (8th Cir. 2002). Because the standard relies on interpretation, the Court must use its discretion to analyze Plaintiffs' fee petition. The need for the exercise of discretion is particularly significant in the instant case, which has been lengthy and complex. Plaintiffs submit that the entries for which they have requested fees were all directly and reasonably incurred in proving the violations of Plaintiffs' rights.

Each task that counsel completed, even with specific regard to Plaintiffs whose cases settled or were ultimately unsuccessful, assisted in understanding and challenging the policies and practices of FDOC regarding use of chemical agents against mentally ill inmates. All of the Plaintiffs' and witnesses' records, deposition testimony, and other evidence (for example, photographs of Plaintiffs Butler and Massie and video of witness Jasmin Hunter) were invaluable to the development of the litigation, at summary judgment, and at trial. Similarly, all of counsel's work regarding Defendants, even those sued in their individual capacities and ultimately dismissed, proved essential to establishing Plaintiff Thomas' and McKinney's claims. Plaintiffs submitted deposition testimony of several of these dismissed Defendants as testimony in their case in chief, and this Court cited some of this testimony in its Final Order.

Further, in determining whether the hours billed on a matter are reasonable, the Court may consider Defendants' resistance in the case and whether it contributed to the effort required by Plaintiff's counsel.  Riverside v. Rivera, 477 U.S. 561, 580, n.11 (1986).  Defendants cannot "litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response."  Id.  Courts have been sensitive to the expenses associated with public interest plaintiffs forced to employ large numbers of lawyers to work extensive hours to defeat defendants who mount "a Stalingrad defense, resisting . . . [plaintiff] at every turn."  Lipsett v. Blanco, 975 F. 2d 934, 939 (1st Cir. 1992).  Courts should not penalize plaintiffs' counsel through reductions in hours spent meeting such a defense.  Rodriguez-Hernandez v. Miranda-Velez, 132 F. 3d 848, 860 (1st Cir. 1998).  Here, Defendants mounted such a vehement defense and Plaintiffs should be compensated for all the time spent responding to it.

### 2. Plaintiffs' Fee Request is Proportionally Related to the Court Ordered Relief

The proportionality requirement is equivalent to the analysis of "degree of success," which governs non-prison attorneys' fees proceedings.  Dannenberg v. Valadez, 338 F.3d 1070, 1075-76 (9th Cir. 2003).  Many civil rights cases will present multiple claims for relief involving "a common core of facts" or that are "based on related legal theories."  Hensley v. Eckhardt, 461 U.S. 424 (1983).  Hensley recognizes that "[m]uch of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis.  Such a lawsuit cannot be viewed as a series of discrete claims.  Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation."  Id., see also Dowdell v. City of Apopka, 698 F.2d 1181, 1187-88 (1983) ("In fixing the fee, the

district court should be mindful that in complex civil rights litigation ... issues are overlapping and intertwined.... [T]he court must consider the relationship of the claims that resulted in judgment with the claims that were rejected and the contribution, if any, made to success by the investigation and prosecution of the entire case").

"Where all theories derive from a common core of operative facts, the focus should be on the significance of overall results as a function of total reasonable hours." Norman v. Housing Authority of the City of Montgomery, 836 F. 3d 1292, 1302 (11th Cir. 1988).  In analyzing the significance of the relief, a court should recognize that the vindication of a constitutional right is particularly important.  Id.  Moreover, fully compensatory fees should be recovered when a Plaintiff obtains an "excellent result."  Hensley, 461 U.S. at 435.

Plaintiffs McKinney and Thomas achieved precisely the kind of targeted judicial intervention that they sought.  The Court ordered relief that has resulted in their not being subjected to the use of chemical agents since the date of the Order.  Additionally, this litigation resulted in the drastic reduction of the non-spontaneous use of chemical agents at FSP and established important precedent that will undoubtedly protect other mentally ill inmates.  Ex's 2 at ¶7, 3 at ¶¶6-16 and 4 at ¶¶12-13.  According to Mr. William Sheppard, "the significance of the achievement of the litigation is difficult to overstate," in that it requires the involvement of mental health staff in security decisions.  Ex. 4 at ¶13.  The significance of the result must be evaluated in the context of the decades of significant effort involved with attempting to persuade FDOC to treat mentally ill inmates humanely and to reform its policies and practices of using chemical agents against severely mentally ill inmates.  Ex. 4 at ¶¶7, 12-13.  Given this history and the entrenchment of FDOC in

continuing to use force in the face of extensive knowledge that these inmates were not able to conform their behavior to orders because of their mental illness, the results obtained in this litigation are not just excellent, but remarkable. Exs. 2 at ¶7, 3 at ¶¶6-16, and 4 at ¶¶12-13.

Although other Plaintiffs either settled or were not ultimately successful at trial, their claims were almost entirely entwined with those of Plaintiffs McKinney and Thomas. The claims in this case flowed from a common set of facts related to FDOC's policies and practices regarding chemical agents use against mentally ill inmates. The claims shared a common legal theory. The relationship between counsel's work to prosecute each and every one of Plaintiffs' claims and the contribution of that work to the ultimate outcome in the case is overlapping and intertwined. Much of the evidence obtained in prosecuting the claims that were settled or ultimately unsuccessful was used in the litigation and relied upon by this Court in ruling on the claims that were ultimately successful at trial and on appeal.

Counsel litigated this issue-driven case as a whole, making it impractical and unnecessary to eliminate particular hours based on the lack of success or settlement of particular claims. We recognize, however, that not every hour spent on these claims is compensable. We therefore propose a reduction in our fee demand, which we submit compensates Defendants for any time spent solely on settled or unsuccessful claims.[10]

B.    LODESTAR

Because Plaintiffs have prevailed pursuant to 42 U.S.C. §1988, this Court now must determine: (1) first, the number of hours reasonably expended on the litigation; and (2)

---

[10] The Supreme Court and the Eleventh Circuit agree that, when making a reduction, "[i]t is improper to make the reduction based on a simple ratio of successful issues to issues raised. <u>Norman</u>, 836 F. 3d at 1302 <u>quoting</u> <u>Hensley</u>, 461 U.S. at 435, n. 11.

second, the prevailing market rate for work performed by similarly situated attorneys in similar cases in the relevant legal community. This analysis provides the Court with the lodestar figure. See, e.g., Norman, 836 F.2d at 1299; see also Lattimore v. Oman Construction, 868 F.2d 437, 438, n. 1 (11th Cir. 1989). Some of the Johnson factors remain relevant to the lodestar. 836 F. 3d at 1299, 1302. A discussion of these factors follows.

### 1.     Hours Reasonably Expended

The "hours claimed or spent on a case. . .are a necessary ingredient to be considered," Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717 (5th Cir. 1974). Indeed, they are viewed as "the most useful starting point for determining the amount of a reasonable fee." Hensley v. Eckerhart, 461 U.S. at 433 (1983). "Hours reasonably expended" means "billable hours — that is, work that would be paid for by a reasonable client of means seriously intent on vindicating the rights in issue." Perkins v. Mobile Housing Board, 847 F.2d 735, 738 (11th Cir. 1988); Norman, 836 F. 3d at 1301. "[T]he measure of reasonable hours is determined by the profession's judgment of the time that may be conscionably billed and not the least time in which it might theoretically have been done." Norman, 836 F. 3d at 1306.

Moreover, a district court may not reduce a fee award without identifying the hours disallowed and explaining why an award for these hours would be improper. *See* Carmichael v. Birmingham Saw Works, 814 F.2d 590, 592 (11th Cir. 1987); *see also* Norman, 836 F. 3d at 1304. Hours "may not be deducted unless the court determines that the profession generally would not bill at all for the type of activity or for the quantity of time devoted to the activities." Perkins, 847 F.2d at 738; *see also* Norman, at 836 F. 3d at 1306. "Sworn testimony that, in fact, it took the time claimed is evidence of considerable weight on the

issue of the time required in the usual case and therefore, it must appear that the time claimed is obviously and convincingly excessive under the circumstances." Perkins, 847 F.2d at 738. Here, Plaintiffs have attached the sworn testimony of Ms. Winter, Mr. Sheppard, Mr. Berg Mr. Jones, and Mr. Schulz, whose declaration incorporates by reference Plaintiffs' Exhibits 1, 8, and 9, (Ex's 1, 2, 4-9) that all attest to the legitimacy of the time claimed.

Norman also noted that a "well prepared fee petition also will include a summary, grouping the time entries by the nature of the activity or the stage of the case." 836 F. 3d at 1303. In order to assist Defendants and the Court in analyzing this fee petition we have attached here as Exhibit 8 such a grouping of time entries by the nature of the activity and the stage of the case for each of the principal timekeepers on this case, as well as Plaintiffs' Consolidated Time Sheets, as Exhibit 9.[11]

### 2.    Billing Judgment

A benchmark for determining the reasonableness of hours expended on the litigation is the consideration of billing judgment. See Hensley, 461 U.S. at 435 (counsel has an obligation to make a "good faith effort to exclude from a fee request hours that are excessive, redundant or otherwise unnecessary."). In determining the number of attorney hours for which the Plaintiffs seek compensation, Plaintiffs have carefully reviewed the actual time entries contemporaneously recorded and have exercised sound billing judgment. Ex. 5 at ¶¶17-20, 6 at ¶¶11, 12, 20, and 7 at ¶¶23-33. In exercising sound billing judgment, Plaintiffs

---

[11] Most of the categories in Exs. 8 and 9 are self-explanatory; however, some may require clarification. "Document review" is review of pleadings and other documents, not discovery document review, which is generally categorized as "Discovery". Additionally, where there were entries that included both research and writing (tasks which the attorneys often undertook simultaneously), these are usually categorized as "drafting." For ease of review, all correspondence and meetings among co-counsel are in one general category. "Hearings" include all Court appearances except for trial. All of these activities are compensable.

have not sought compensation for a significant amount of work done on this case, thereby reducing the fee request by hundreds of thousands of dollars. Exs. 1, 2 at ¶10 and 7 at ¶¶23-33. Plaintiffs have also proposed a percent reduction to account for any lumping or duplications in our time records and any time spent solely litigating settled and unsuccessful claims. Id.

### 3.    Time Entries

The Supreme Court noted in Hensley, 461 U.S. at 437 n.12, that the attorney "is not required to record in great detail how each minute of his time was expended," but the attorney "at least . . . should identify the general subject matter of his time expenditure." Courts have recognized that it is not necessary to know the exact amount of time of precise activity so long as the time records provide fairly definite information regarding various general activities. See, e.g., FMC Corp. v. Varonos, 892 F.2d 1308, 1317 (7th Cir. 1990).

However, in American Civil Liberties Union of Georgia v. Barnes, the Eleventh Circuit criticized what was the then routine practice of "lump(ing) together all the tasks performed by an attorney on a given day without breaking out the time spent on each task." 168 F.3d 423, 429 (1999). Plaintiffs acknowledge that some of their time entries may not meet the exacting standard articulated in Barnes. Rather than attempting to go back and retroactively assign time to each task for those timekeepers who "lump" their time, a practice permitted by Barnes, Plaintiffs instead suggest that in this case, which unlike Barnes involves voluminous fee documentation appropriate to a multi-year case such as this, "an hour by hour review is simply impractical and a waste of judicial resources." Loranger v. Stierheim, 10 F.3d 776 (11th Cir. 1994). We respectfully suggest that this Court should follow the

Eleventh Circuit's guidance in <u>Loranger</u> and apply the percentage fee reduction Plaintiffs have suggested *infra* at pp. 33-35 to compensate defendants for the problem of lumping in Plaintiffs' time entries.

### 4. Multiple Attorneys

"There is nothing inherently unreasonable about a client having multiple attorneys, and they may all be compensated if they are not unreasonably doing the same work and are being compensated for the distinct contribution of each lawyer." <u>Norman</u>, 836 F. 3d at 1302. Each of the attorneys representing Plaintiffs in this matter was essential. Without the contributions of each, Plaintiffs simply could not have achieved all that they did in this action. Use of multiple attorneys in the instant case is "'understandable and not a ground for reducing the hours claimed' because [t]he use of a team of attorneys who divide up the work is common for both plaintiff and defense work.'" <u>Johnson v. University College</u>, 706 F.2d 1205, 1208 (11th Cir. 1983). Multiple attorneys are especially justified where the case is complex, such as this lawsuit.

Plaintiffs staffed this case in a prudent and appropriate manner. Exs. 2 at ¶8-10 and 4 at ¶11. While Defendants may suggest that the staffing of this case was excessive, the far greater miscarriage would have been to compromise on the staffing of this case, such that Plaintiffs constitutional rights were not protected. Communication between counsel for the purpose of coordinating efforts and strategizing was crucial to this case. In complex litigation, such time is compensable. *See* <u>Berberena v. Coler</u>, 753 F.2d 629, 633 (7th Cir. 1985). In this case, it was necessary to maintain routine communication among co-counsel

through meetings, conference calls, and e-mails.  Ex. 7 at ¶8.  Such communications were

conducted in an economic manner, and promoted the efficient preparation of this cause.  Id.

Each attorney and paralegal made his own separate and distinct contribution to this

case.  See supra at pp. 11-16; Ex. 7.  Although some counsel spent time performing similar

tasks, each attorney uniquely contributed to the results.  We have, however, proposed a minor

reduction that accounts for any duplication of effort.

### 5.    Appropriate Compensation

### i.    Travel Time

Plaintiffs incurred significant travel time developing this case.  Travel time is fully

recoverable when necessary for the litigation.  See Barnes, 168 F.3d at 433.  While Holland

& Knight's involvement as lead counsel reduced travel time during discovery and other

phases of the litigation, travel was essential in this case.  Ex. 5 at ¶9.  At some points in the

litigation, FDOC's housing decisions for Plaintiffs resulted in Plaintiffs being housed nearly

as far apart as possible across the state.  While Plaintiffs' counsel reduced travel time by

often conducting legal calls with Plaintiffs and witnesses, some in-person contact was

required for depositions, as well as for meetings throughout the case.  Plaintiffs' counsel took

depositions of former-employee witnesses out of state.  Defendants took multiple depositions

of Plaintiffs' experts, requiring trips to defend them.  Additionally, the sheer volume of

discovery materials produced by Defendants required that some counsel travel.  Generally,

the Jacksonville offices of Holland & Knight served as a base from which counsel worked

throughout the litigation and FILS and FJI attorneys travelled there for meetings, mediations,

and to prepare for hearings and trial.  These meetings served to make the litigation more

efficient.  Without travel, the results in this case could not have been achieved.  Plaintiffs should therefore be compensated for all of the travel time they have submitted.

### ii.  Paralegal Time

Paralegal time is compensable.  <u>Missouri v. Jenkins</u>, 491 U.S. 274, 285-289 ("the 'reasonable attorney's fee' provided for by statute should compensate the work of paralegals.").  Paralegal time is compensable if the prevailing practice in a given community is to bill these items separately at market rates.  <u>See</u> <u>id.</u> at 285.  It is common practice in Jacksonville to bill separately for paralegal time.  Ms. Higby contributed greatly to Plaintiffs' success.  Her time should be compensated.

### 6.  Hours for which Compensation is Sought

Plaintiffs' hours, after exercising billing judgment, are outlined in Ex's. 1, 8, and 9.

### 7.  Johnson Factors that Particularly Support Hours Claimed

### i.  The Complexity and Difficulty of the Question

The extraordinary burdens imposed upon prisoners in federal civil rights litigation and the complexities of the PLRA, 18 U.S.C. § 3626, 42 U.S.C. § 1997, rendered this lawsuit a massive and complex undertaking.   The resistance by Defendants to making practical, reasonable changes to their policies and practices; the severe mental illness of our clients; the volume of discovery; and the burdens imposed by the PLRA made this lawsuit an extraordinarily complex case.  Ex's. 3 at ¶6-16, 4 at ¶¶12-13, and 7 at ¶5.

### ii.     Results Obtained

Plaintiffs' counsel achieved excellent results in this lawsuit, which compels a finding that Plaintiffs' counsel should be compensated for all hours reasonably expended.  *See* Norman, at 1302.  See generally *supra*.

### iii.     Undesirability of the Case

Mr. Sheppard notes in describing the fee limitations in the PLRA that "[t]he value of the work and accomplishments of this case are worth far more than this Court will ever be able to award under the current state of the law."  Ex. 4 at ¶11.  These limitations are so harsh that they render complex prison litigation economically unfeasible.  Id.  This case also required the commitment of substantial resources, both in terms of personnel and expenses.  Particularly, Plaintiffs' counsel undertook this case notwithstanding their inability to recover substantial expenditures for their expert witnesses who were indispensable to the prosecution of our clients' claims.   The three experts were paid a total of $135,492.61.  Ex. 7 at ¶15.

## B.     Hourly Rate

### 1.     Market Rate

An attorney's or paralegal's "reasonable hourly rate" is based on "the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience and reputation."  Norman v, 836 F.2d at 1299; *see also* Martin v. University of S. Ala., 911 F.2d 604, 609-10 (11th Cir. 1990) (the basis for reasonable hourly rates under § 1988 is the "going rate" in the community).  The Middle District recently held Holland & Knight's market rates to be reasonable hourly rates. [12]   Durden v. Citicorp Trust Bank, 2011

---

[12]The Supreme court has made clear that lodestar calculations are based upon the prevailing market rates in the

WL 337363 (M.D. Fla.). The best evidence of the rates customarily charged in "similar" litigation is the normal non-contingent hourly billing rates of the attorneys representing plaintiffs. See Blum v. Stenson, 465 U.S. 886, 896, n. 11 (1984) (rate typically charged in private non-contingent representation "[a]ffords relevant comparison."). The Jacksonville billing rates of Plaintiffs' counsel and paralegal are *infra* at p. 32 and in Exhibits 8 and 9.

### b.     PLRA Rate Cap

The PLRA, 42 U.S.C. § 1997e(d) imposes a harsh restriction on attorney's fees in actions brought by prisoners when the fees are authorized under 42 U.S.C. § 1988. Section 1997e(d)(3) of the PLRA limits the hourly rates for attorney's fees in cases involving prison conditions to 150% of the hourly rate established under the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A. See 42 U.S.C. § 1997e(d)(3); Martin v. Hadix, 527 U.S. 343 (1999); Laube v. Allen, 506 F. Supp. 2d 969 (M.D. Ala. 2007). The hourly rate established under § 3006A is the amount authorized by the Judicial Conference, not the amount actually appropriated by Congress. Webb v. Ada Cnty., 285 F.3d 829, 839 (9th Cir. 2002); Riker v. Gibbons, 2010 WL 4366012 *8 (D. Nev.) (awarding an hourly rate $208.50 in FY 2010 when the CJA authorized rate was $139.00 per hour). In its 2011 Congressional Budget Summary prepared by the Administrative Office of the Courts, the Judicial Conference noted that the statutorily authorized rate is $141 per hour.[13] 150% of $141.00 is $211.50.

---

relevant community regardless of whether plaintiff is represented by private or nonprofit counsel. *See* Blum v. Stenson, 465 U.S. 886, 895 (1994). Thus, there is no differentiation between the rates sought for private and nonprofit counsel; all rates are based upon "rates actually billed and paid in similar lawsuits." Norman, 836 F. 3d at 1299.

[13] Fiscal Year 2011 Congressional Budget Summary, pgs. ii, 7, 39 at:
http://ftp.resource.org/courts.gov/ao/US_Judiciary_2011_Budget_Justifications_Summary.pdf .

Courts have the discretion to determine the market rates for compensating legal assistants, so long as the rates are less than those paid to counsel. Report of the Proceedings of the Judicial Conference of the United States, Mar. 4, 2004, pg 15 at http://www.uscourts.gov/judconf/marc04proc.pdf; Perez v. Cate, 632 F.3d 553 (9th Cir. 2011) (holding paralegal time may be billed at market rate up to the rate capped by the PLRA); Laube, 506 F. Supp. 2d at 989. Ms. Higby is normally billed at the market rate of $180 per hour. Given her exceptional skills and experience, this rate is a reasonable hourly rate. Ex. 7 at ¶29. As this rate is less than the PLRA rate for attorneys, $180 per hour is the appropriate PLRA rate.

## V.   THE ATTORNEY/PARALEGAL FEE REQUEST

Plaintiffs' attorney/paralegal fee request is:[14]

| TIMEKEEPER | HOURS | MARKET RATE | MARKET VALUE | PLRA RATE | PLRA VALUE |
|---|---|---|---|---|---|
| Capobianco, Cassandra | 1804.05 | $320.00 | $   577,296.00 | $211.50 | $   381,556.58 |
| Coggins, Kara | 153.21 | $255.00 | $     39,068.55 | $211.50 | $     32,403.92 |
| Lentz, Kristen | 460.40 | $300.00 | $   138,120.00 | $211.50 | $     97,374.60 |
| Shirley, Lisa | 297.50 | $365.00 | $   108,587.50 | $211.50 | $     62,921.25 |
| **Sub-Total** | **2715.16** | | **$   863,072.05** | | **$   574,256.34** |
| Berg, Randall | 549.35 | $480.00 | $   263,688.00 | $211.50 | $   116,187.53 |
| Glickman, Joshua | 348.90 | $255.00 | $     88,969.50 | $211.50 | $     73,792.35 |
| Siegel, Peter | 71.49 | $480.00 | $     34,315.20 | $211.50 | $     15,120.14 |
| **Sub-Total** | **969.74** | | **$   386,972.70** | | **$   205,100.01** |
| Agliata, Michael | 588.20 | $320.00 | $   188,224.00 | $211.50 | $   124,404.30 |
| Daniel, Laurie | 242.70 | $480.00 | $   116,496.00 | $211.50 | $     51,331.05 |
| Fresco, Leon | 1593.70 | $300.00 | $   478,110.00 | $211.50 | $   337,067.55 |
| Higby, Melinda | 707.40 | $180.00 | $   127,332.00 | $180.00 | $   127,332.00 |

---

[14] See Exs. 1 and 8.

| | | | | | |
|---|---|---|---|---|---|
| Schulz, George | 5414.05 | $480.00 | $2,598,744.00 | $211.50 | $1,145,071.58 |
| **Sub-Total** | **8546.05** | | **$3,508,906.00** | | **$1,785,206.48** |
| **TOTAL** | **12230.95** | | **$4,758,950.75** | | **$2,564,562.83** |
| | | | | | |
| **3% reduction for lumping, duplication, etc.** | 367.00 | $351.25 | $    128,908.75 | $211.50 | $     77,620.50 |
| | | | | | |
| **GRAND TOTAL AFTER 3% REDUCTION** | **11863.95** | | **$4,630,042.00** | | **$2,486,942.33** |

Our goal in exercising billing judgment and putting together this Petition has been to "outfair" Defendants in compiling a reasonable fee demand based on the work that this complex litigation required.  We have spent approximately 370 hours analyzing our billing records, exercising billing judgment, compiling these records for attachment to this Petition, and drafting the Petition.  We are not seeking compensation for over 220 hours of that time.[15] Our hope is that we will be able to avoid costly fees litigation; however, we are not waiving our ability to seek fees going forward if we are forced to litigate this matter to conclusion.

In the exercise of sound billing judgment, Plaintiffs eliminated in its entirety the work of 39 timekeepers who worked on this case and the following categories of time for a total reduction of 1,822.68 hours or $361,475.32 under the PLRA rate:

- All time pre-filing, which comes to over 1000 hours, despite the fact that much of the foundational work for this case occurred prior to the filing of the

---

[15] Fees-on-fees are clearly compensable.  <u>Jackson v. State Bd. of Pardons and Paroles</u>, 331 F.3d 790 (11th Cir. 2003).

Complaint, and that pre-filing work is compensable.[16]  Ex. 6 at ¶15.

- All time spent by attorneys at each deposition <u>except</u> for two attorneys;

- All time spent by attorneys at trial <u>except</u> for two attorneys from each organization per day (charging one fulltime and the other a maximum of 8 hours) and one fulltime paralegal;

- Over 200 hours spent drafting the response to Defendants' appeal; and

- 50% of Mr. Schulz's time spent preparing to argue the appeal.

<u>See</u> Exs. 1 and 7 at ¶¶23-33.  Moreover, as fully discussed herein, we have proposed an additional total 3% cut ($77,620.50) to our overall time to account for any deficiencies in our time records and time spent litigating unsuccessful claims.  <u>Id.</u>  While we have reduced our fees alone in total by **$439,095.82** under the PLRA rate, we have waived or omitted a total of **$931,138.37** in fees, costs, and litigation expenses.  <u>Id.</u>  This has resulted in a total fee demand of **$2,486,942.33**, with **$574,256.34** to FILS, **$205,100.01** to FJI, and **$1,785,206.48** to Holland & Knight.  <u>Id.</u>  We are seeking compensation for only the reasonable and necessary work of the lawyers and paralegal who did the principal work on this case.

## VI.    LITIGATION EXPENSES

In an effort to be as reasonable as possible, Plaintiffs are waiving <u>all</u> litigation expenses and taxable costs in this case.  The total litigation expenses are $234,012.55, with compensable expenses equaling $98,519.94.  <u>See</u> Exs. 1 and 7 at ¶¶23-33.

---

[16] <u>Webb v. Board of Education</u>, 471 U.S. 234, 243 (1985) ("services performed before a lawsuit is formally commenced are compensable).

## CONCLUSION

In sum, Plaintiffs, as the prevailing party, seek a PLRA fee award under 42 U.S.C.

§1988 of the following:[17]

| | |
|---|---|
| **Attorney/Paralegal Fees:** | **$3,184,068.15** |
| **Less Omitted Fees:** | **$  258,030.00** |
| **Less Billing Judgment Adjustments:** | **($  361,475.32)** |
| **Less 3% Loranger Adjustments:** | **($    77,620.50)** |
| <u>**TOTAL FEES:**</u> | **$2,486,942.33** |

Respectfully Submitted,
<u>*s/ Stephen Hanlon*</u>

Stephen Hanlon, Esq.
Florida Bar No. 209430
George E. Schulz, Jr., Esq.
Florida Bar No. 169507
Holland & Knight LLP
50 North Laura Street, Suite 3900
Jacksonville, Florida 32202
Telephone: (904) 353-2000
Facsimile: (904)358-1872

Cassandra Capobianco, Esq.
Christopher M. Jones, Esq.
Kristen Cooley Lentz, Esq.
Florida Institutional Legal Services
12921 SW 1st Road, Ste 107, #346
Newberry, FL 32669
Telephone: (352) 375-2494
Facsimile: (352) 331-5202

Randall C. Berg, Jr., Esq.
Joshua A. Glickman, Esq.
Florida Justice Institute, Inc.

---

[17] <u>See</u> Exs. 1 and 7 at ¶¶23-33.

3750 Miami Tower
100 S.E. Second Street
Miami, Florida 33131-2309
Telephone: (305) 358-2081
Facsimile: (305) 358-0910

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 29, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*s/ Cassandra Capobianco*

Cassandra Capobianco
Florida Bar No. 614734